Christina M. Martin, OSB #084117
CMartin@pacificlegal.org
Lead Counsel
Pacific Legal Foundation
4440 PGA Blvd. #307
Palm Beach Gardens, Florida 33410-6541
(509) 480-9709

Daniel M. Ortner, Cal. SB #329866*
DOrtner@pacificlegal.org
Ethan W. Blevins, Wash. SB #48219*
EBlevins@pacificlegal.org
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814-4605
(916) 419-7111
*Attorneys for Plaintiff*
*Pro Hac Vice Pending*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## [PORTLAND DIVISION]

| | |
|---|---|
| TOTAL REAL ESTATE GROUP, LLC, an Oregon limited liability company, | Case No.: _____ |
| Plaintiff, | |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| STEVE STRODE, in his official capacity as the Oregon Real Estate Commissioner; ELLEN ROSENBLUM, in her official capacity as Attorney General for the State of Oregon's Department of Justice, | |
| Defendants. | |

Complaint             1

**INTRODUCTION**

1.      Selling or buying a home is more than dollars and cents. Homeowners develop an intimate attachment to the homes where their lives have played out, watching children grow, nurturing relationships with neighbors, and experiencing the tragedies and triumphs of everyday life. Likewise, homebuyers look not just for the best deal, but also for a space they can call their own for years to come.

2.      Understandably, buyers and sellers often wish to express these personal feelings about the homes in which they have lived or hope to live. Buyers can do this by writing what real estate brokers[1] call a "love letter," a personal note to a seller explaining why they love the home they are hoping to make their own. Such letters might describe the buyer's captivation with the view of the sunset out a living room window, their excitement about nearby hiking trails, or their plans for using a reading nook on the second floor. Sellers often find value in such letters because they want the home they have loved to continue to be loved and cared for in return. A seller also derives more pragmatic value from such letters because they indicate a buyer's commitment to closing a deal.

3.      The State of Oregon, however, has banned such letters, rendering this financially and emotionally significant decision into an impersonal process little different from purchasing groceries at the self-checkout machine.

4.      In June 2021, the Oregon Legislature passed H.B. 2550, a gag rule that forbids sellers' agents from passing along to a seller "any communications other than customary

---

[1] In Oregon, a broker is any individual who holds an active real estate license. ORS 696.010. Oregon law also refers to brokers as buyers or sellers agents in their specific representative capacity. This complaint uses the term broker generally, and agent only when referring specifically to a broker's role as a buyer's agent or seller's agent.

documents in a real estate transaction, including photographs, provided by a buyer." The purpose of this gag rule is to prevent the exchange of love letters, though it reaches other communications as well. The Legislature believes the gag rule is justified "to help a seller avoid selecting a buyer based on the buyer's race, color, religion, sex, sexual orientation, national origin, marital status or familial status as prohibited by the Fair Housing Act (42 U.S.C. 3601, *et seq.*)."

5.      This censorship is based on mere speculation that sellers might sometimes rely on information in these letters to discriminate based on a protected class. Indeed, when bill sponsor Mark Meek testified about the bill, he asked rhetorically whether such letters lead to discrimination. His answer was "maybe not." The National Association of Realtors (NAR) has similarly confirmed that it knows of no Fair Housing claim arising from a love letter.[2]

6.      Guesswork is not adequate grounds for suppressing truthful speech. Nor can the Legislature broadly prohibit expression because a small portion of it might theoretically prompt some people to violate the law. State and federal law already prohibit discrimination in housing.

7.      Oregon's ban violates the First Amendment rights of brokers and their clients. While the First Amendment protects speech generally, speech regarding something as significant as a home purchase warrants careful protection. This is not simply speech about buying a widget or article of clothing from Walmart. The home has long held a special place in "our culture and our law." *City of Ladue v. Gilleo*, 512 U.S. 43, 58 (1994). Speech related to this fundamental institution deserves the same solemn regard.

---

[2] Oregon Bans Love Letters, Realtor Magazine (July 9, 2021), https://magazine.realtor/daily-news/2021/07/09/oregon-bans-buyer-love-letters ("we are not aware of instances in which these letters have led to lawsuits or legal action elsewhere in the country").

## JURISDICTION AND VENUE

8.      This action arises under the First Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment. This Court has jurisdiction through 42 U.S.C. § 1983 and 28 U.S.C. § 1331. Declaratory relief is authorized by the Declaratory Judgment Act, 28 U.S.C. § 1331.

9.      Under *Ex Parte Young*, 209 U.S. 123 (1908), actions against state officials seeking prospective injunctive relief are not barred by sovereign immunity.

10.      As explained below, H.B. 2550, codified at Section 696.805, of the Oregon Revised Statutes, bars real estate brokers representing sellers from transmitting to the seller any communications that are not a customary part of a real estate transaction. Plaintiff Total Real Estate Group, LLC (TREG) has a number of licensed Oregon real estate brokers who are professionally affiliated with TREG and who represent homebuyers and sellers in Oregon. Beginning in January 2022, TREG's real estate brokers will have to adjust their communications to sellers in order to comply with H.B. 2550. Thus, a present and concrete controversy exists between the parties.

11.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2). Plaintiff TREG has its principal place of business in this District and enforcement of the challenged law will take place here.

## PARTIES

12.      Total Real Estate Group, LLC is a boutique real estate firm with its principal place of business in Bend, Oregon, and an office in Portland. The licensed designated principal broker affiliated with TREG supervises the professional real estate activity of about twenty licensed brokers throughout Oregon. TREG focuses on the purchase and sale of residential housing

13.     Defendant Steve Strode is sued in his official capacity as the Oregon Real Estate Commissioner. He is responsible for enforcing the provisions of the sections of the Oregon code dealing with Real Estate and Escrow Activity (ORS 696) which includes the love letter ban.

14.     Defendant Ellen Rosenblum is sued in her official capacity as Attorney General for the State of Oregon's Department of Justice. The Department of Justice is responsible for enforcing the love letter ban.

## GENERAL ALLEGATIONS

<u>Oregon's love letter ban</u>

15.     On September 25, 2021, Oregon Governor Kate Brown signed into law House Bill 2550, the first of its kind in the nation, referred to here as the "love letter ban."

16.     The love letter ban, slated to take effect in January 2022, amends Section 696.805 of the Oregon Revised Statutes, which lists various legal duties for real estate brokers representing someone selling their home. House Bill 2055 adds the following obligation to that list: "In order to help a seller avoid selecting a buyer based on the buyer's race, color, religion, sex, sexual orientation, national origin, marital status or familial status as prohibited by the Fair Housing Act (42 U.S.C. 3601, *et seq*.), a seller's agent shall reject any communication other than customary documents in a real estate transaction, including photographs, provided by a buyer."

17.     The law is designed to bar what the real estate industry often calls "love letters." In discussing the love letter ban, Oregon's Real Estate Commissioner Steve Strode described them as "notes, letters, and pictures that buyers may submit along with their offers to purchase in order

to create an emotional connection between sellers and buyers—especially when significant competition exists on a given property."[3]

18.     Such letters might explain why a potential buyer likes the home or community, whether the buyer intends to occupy the home, or why the buyer will be reliable in closing on the home.

19.     The law extends broadly to prohibit all such communications, even those that contain no facts that might indicate a protected class status. The law even extends beyond just love letters, requiring a seller's agent to "reject" "any communication" that is not "customary," including verbal communications.

20.     The love letter ban, by only allowing "customary" documents, appears to also prohibit cover letters written by the buyer's broker on the buyer's behalf. If a love letter written by the buyer is not included with an offer, TREG brokers representing buyers will usually draft their own cover letter to include with an offer. The cover letter might explain any number of pertinent details about a buyer that have no relation to protected class status. These may include the reason why the buyer is planning on a lower down payment, the buyer's rationale for moving to the area, such as having secured a good job, or something the buyer liked about the neighborhood, such as a nearby park or bike path. These cover letters can convey to the seller and the seller's broker that the buyer is motivated and able to follow through on the purchase.

21.     The law does not, however, bar a buyer from sending a love letter directly to a seller. Nor does it prohibit a seller from inquiring about protected class status or seeking such information from other sources.

_____

[3] https://www.oregon.gov/rea/newsroom/Pages/2021_OREN-J/New-Legislation-Related-to-Your -License.aspx.

22.    While neither statute nor formal rule defines "customary," Real Estate Commissioner Steve Strode issued a public statement regarding the Commission's interpretation of the term: "First, regarding customary documents, the Agency interprets that to mean disclosure forms, sales agreements, counter offer(s), addenda, and reports. Love letters would not be considered customary documents."[4] Mr. Strode has indicated that he does not expect any rulemaking regarding the love letter ban.

23.    Violations of the love letter ban would be subject to investigation and a disciplinary proceeding by Commissioner Strode or his agents. Violations may be punished by public reprimand, the denial of a renewal of a real estate license or the suspension and revocation of a license. There is also the possibility of civil penalties under ORS 696.585.

The law's impact on buyers, sellers, and TREG's brokers

24.    The inability to use communications that are not "customary" will hurt homebuyers, sellers, and real estate brokers throughout Oregon.

25.    TREG's real estate brokers have found that love letters provide benefits to both buyers and sellers, and their agents. A significant portion of TREG's real estate transactions include a love letter from a buyer. Brokers will also regularly include information similar to that contained in a love letter in cover letters that they prepare to transmit to a seller's agent. In addition, seller's agents will frequently ask for information similar to that contained in love letters and will convey that information to the seller along with their own recommendations and insights.

26.    Love letters can help underdog buyers gain a competitive edge. A seller will sometimes forego the highest offer on the basis of a persuasive love letter. In one of many

---

[4] https://www.oregon.gov/rea/newsroom/Pages/2021_OREN-J/New-Legislation-Related-to-Your-License.aspx.

experiences with love letters, a TREG real estate broker, in purchasing her own first home in Bend, Oregon, competed with multiple investors who had placed higher offers. The broker and her husband submitted a letter explaining their connection to Bend, and that they were looking to buy their first home and put down roots in the area. The seller was excited to help them buy their first home and settle down in Bend and took their offer over higher investor offers

27.    Sellers also benefit from love letters. In TREG's experience, sellers typically ask for information about the buyers. Sellers that TREG brokers have represented have often found great value in learning details such as what the buyer likes about the property, whether the buyer is buying to occupy, or whether this is the buyer's first home purchase. Often, a seller may want to have a sense of whether a buyer is shopping around, has the means to follow through, owns anything in the immediate vicinity, or why they selected the seller's property over other similar neighboring properties. If the home has sentimental or historic significance, as many do, a seller may also have a special interest in a buyer's desire to care for and preserve it, something that can only be conveyed by a love letter or similarly prohibited communication.

28. The ban on love letters may especially hinder the ability of sellers who want to sell to a buyer who intends to occupy a home. The investor market for single family rental housing is growing and is projected to continue to grow dramatically.[5] But many sellers prefer to have their home bought by someone who will actually live there. Love letters allow a buyer who intends to occupy a home to convey this important information to the seller..

29.    TREG itself also benefits from love letters. When a smaller real estate firm like TREG represents owner-occupant buyers, love letters offer an important means for TREG to

---

[5] Patrick Clark, Blackstone Bets $6 Billion on Shifting Path to Suburban Homes, Bloomberg (June 22, 2021), https://www.bloomberg.com/news/articles/2021-06-22/blackstone-makes-6-billion-bet-on-u-s-suburban-home-rentals,

compete with large investment firms and institutional buyers that may be able to outspend TREG's clients. It is often this personalized approach that gives TREG a competitive edge in a hot real estate market, particularly in states like Oregon and locations like central Oregon, where broker to broker communications and relationships are paramount.

30.    TREG brokers also benefit from love letters and cover letters when representing sellers for similar reasons—they provide useful information which helps the broker assess the strength and reliability of the offer. If no love letter or cover letter is included in an offer, a TREG broker will typically call the buyer's agent to learn more about the buyer's circumstances. Moreover, sellers often ask TREG brokers about the buyer.

31.    Love letters allow a buyer to inform a seller of his intentions for the property. This is particularly valuable when a seller has lived in a home and has an emotional attachment to the property and to the community. Sellers may, for instance, care about their neighbors and want to make sure that the property is purchased by someone who will live in that neighborhood rather than someone who will use the property for short-term rentals, or a seller may hope to preserve how her family has traditionally used the property—such as maintaining a family farm for agricultural use.

32.    Furthermore, love letters allow a buyer to express unique reasons why a property might be a good fit. For instance, a buyer can explain that she already has family or friends in the neighborhood. A buyer can also describe how a location is convenient to access employment, or other facilities such as local hospitals. Perhaps a buyer wants to express his love of dogs and the major benefit close access to a dog park gives him. Or perhaps a prospective buyer enjoys gardening and wants to tell the seller that the sun hits the backyard just right to allow the buyer to

Complaint                                        9

grow prize winning tomatoes. A buyer may also simply be enamored with the view, the architectural styles, or any number of other physical properties.

33.    Love letters also help a seller gauge the interest and commitment of a buyer. If a buyer expresses a strong interest in closing a deal on a particular property, then a seller may prefer that offer over one with slightly better terms or financing but that may take longer to close or may involve drawn-out negotiations. If a buyer does not send a love letter or show particular interest in a property, then this may show a level of indifference or nonchalance that is undesirable for a seller.

34.    The list of reasons that a buyer may wish to write a love letter or that a seller may find the information in such a letter to be helpful and persuasive is nearly endless. However, for those sellers who are not interested in or do not desire to received love letters, there is nothing to preclude them from directing their brokers to refuse them.

35.    Oregon law forbids, or at the very least substantially burdens, this valuable exchange of truthful and non-misleading information These benefits to sellers, buyers, and real estate brokers will be lost thanks to Oregon's love letter ban.

36.    Love letters also touch upon TREG brokers' ethical obligations and fiduciary duties to their clients. TREG's brokers are members of the NAR and its Oregon affiliate, the Oregon Association of Realtors (OAR), and TREG's brokers follow the Code of Ethics and Standards of Practice published by NAR. The Code requires TREG's brokers to avoid "concealment of pertinent facts relating to the property or the transaction." Pertinent facts encompass the entirety of a written offer, including letters and photos accompanying the offer. Hence, if a TREG broker's seller asks for information about a buyer that does not pertain to a protected class, and the broker is in possession of a love letter that contains such details, the broker has an ethical obligation to

disclose it. Likewise, other factual disclosures pertinent to a transaction that are not "customary" are prohibited by the law. The love letter ban prohibits brokers from acting on this ethical responsibility.

37.    Similarly, TREG's brokers must comply with legal obligations that conflict with the love letter ban. When representing sellers, TREG's brokers have an affirmative duty to "disclose material facts known by the seller's agent" and to avoid "action that is adverse or detrimental to a seller's interest in a transaction." A love letter may contain material facts, particularly where a seller has asked about information regarding the buyer contained in such a letter. Rejecting non-customary communications, as H.B. 2550 requires, may also be detrimental to a seller's interests if the letter contains information that the broker believes that the seller would find valuable in deciding to whom to sell property.

38.    TREG brokers are also concerned that the love letter ban may extend so far as to bar the use of pre-approval letters. A pre-approval letter is a communication from a lender confirming that the buyer has been approved for financing. Including a pre-approval letter is standard practice among TREG brokers and the brokers with whom they work. Pre-approval for financing (or lack of pre-approval) is a material fact that TREG brokers feel ethically obligated to disclose to sellers. Yet such letters are not included in the list of "customary" documents provided by the Real Estate Commissioner.

39.    Thanks to the love letter ban, TREG brokers plan to alter their business practices and their speech when the law takes effect in 2022. Beginning January 1, 2022, TREG brokers representing sellers will communicate only the boilerplate Oregon Real Estate Forms published and provided by Oregon Real Estate Forms, LLC, or forms that are substantially similar All other communications from buyers, verbal or written, will be rejected, including love letters and cover

letters. This is a substantial change in TREG's business practices, which would typically allow for love letters and other less formal communications that TREG brokers believe in their professional judgment would be useful to a seller.

<u>The lack of evidence that love letters cause harm</u>

40.    While the love letter ban harms homebuyers, sellers, and brokers, it does little to nothing to further the state's interest in preventing discrimination.

41.    The purpose of the love letter ban is to help sellers avoid discrimination based on a protected class. Yet nothing in the legislative record indicates that sellers frequently or ever rely on information discovered in a love letter as a basis for discriminating against someone based on a protected class. The Legislature could not point to a single Fair Housing claim arising from a love letter, and the NAR is unaware of any such claims arising from this standard practice.

42.    In public testimony, the bill's sponsor, House Representative Mark Meek, expressed concerns that the standard practice of using love letters "perpetuates systemic issues of bias in real estate transactions." He said the law was meant to address unsubstantiated "implicit biases that we're not even aware of." While Mr. Meek pointed to racial disparities in home ownership, he admitted that he did not know whether love letters contributed to this trend.

43.    In TREG's experience, the overwhelming majority of love letters and cover letters prohibited by the love letter ban contain no details that might hint at protected status, making discrimination, implicit or otherwise, impossible. Such letters rarely contain pictures that might reveal protected class status, either. For example, many of the photographs are merely pictures of the buyer's pets. TREG brokers have never experienced a seller client discriminating based on details in a love letter or cover letter.

44.     If a TREG broker were ever to be concerned that a love letter drafted by a client could raise the specter of discrimination, the broker would address that concern with the client and recommend amending the letter. Likewise, TREG brokers would not draft cover letters that could create a risk of discrimination.

45.     TREG is concerned that the love letter ban, if anything, increases the likelihood of discrimination because it allows buyers to send love letters to sellers without the intermediary of a broker to protect against that risk. Likewise, the love letter ban may make it more likely that problematic communications simply occur over the phone rather than in writing, making it more difficult to police against possible discriminatory conduct on the part of sellers.

### COUNT I (First Amendment to the United States Constitution)

46.     Plaintiffs incorporate all preceding paragraphs.

47.     Oregon cannot ban truthful speech on the suspicion that someone somewhere might misuse it. "It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976).

48.     First Amendment protections extend to speech connected to a commercial transaction. Indeed, the public's interest in the "free flow of commercial information . . . may be as keen, if not keener by far, than [their] interest in the day's most urgent political debate." *Id.* at 763. This is particularly so with regard to something so central to one's life as a home.

49.     Under the First Amendment, laws regulating commercial speech must be narrowly tailored to achieving an important government interest. *See Central Hudson Gas and Electric Corp. v. Public Service Commission, 447 U.S. 557 (1980); Ballen v. City of Redmond*, 466 F.3d 736, 742 (9th Cir. 2006).

Complaint                                                13

50.    The lover letter ban is not narrowly tailored for several reasons:

51.    The love letter ban rests on mere conjecture that sellers might discriminate against a protected class should they have access to love letters. *See Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 392 (2000) ("We have never accepted mere conjecture as adequate to carry a First Amendment burden . . . ."). Accordingly, there is no evidence that the ban actually furthers the state's interest in preventing discrimination.

52.    The love letter ban is underinclusive, in that it does not prohibit a buyer from sending a love letter directly to a seller. *See Metro Lights, LLC v. City of Los Angeles*, 551 F.3d 898, 904–06 (9th Cir. 2009) (holding that there must exist "a logical connection between the interest a law limiting commercial speech advances and the exceptions a law makes to its own application").

53.    The love letter ban is significantly overinclusive because it bans expression that does not mention or otherwise implicate a protected class. *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 948 (9th Cir. 2011) (en banc) ("The Plaintiffs have identified several obvious examples of prohibited speech that do not cause the types of problems that motivated the ordinance.").

54.    The love letter ban is more extensive than necessary because obvious, less-restrictive alternatives exist, namely longstanding laws prohibiting discrimination in housing. *See id.* at 949 ("The city has various other laws at its disposal that would allow it to achieve its stated interests while burdening little or no speech.").

55.    Because the love letter ban fails intermediate scrutiny, it would also fail strict scrutiny if love letters were not considered to be commercial speech.

Complaint                                    14

56.     Thus, the love letter ban violates the Free Speech Clause of the First Amendment to the United States Constitution, incorporated against the states by the Fourteenth Amendment.

57.     TREG has standing to bring this First Amendment claim because TREG has its own First Amendment right to convey information from buyers or lenders to sellers and to draft cover letters. TREG also has third party standing to bring this First Amendment claim on behalf of their clients whose speech rights to send and receive love letters are restricted by the love letter ban.

## PRAYER FOR RELIEF

WHEREFORE, TREG prays for relief as follows:

1.      For a declaration that H.B. 2550, codified as ORS 696.805(7), violates the First Amendment on its face;

2.      For a preliminary and permanent injunction against enforcement of H.B. 2550 by Defendants, their agents, representatives, and employees;

3.      For an award, pursuant to 42 U.S.C. 1988(b), of reasonable attorney fees, expenses, and costs; and

4.      For nominal damages and such other relief as the Court deems just and proper.

DATED: November 18, 2021.

Respectfully submitted,

s/Christina M. Martin
CHRISTINA M. MARTIN
Local Counsel, OSB #084117
*Attorney for Plaintiff*