Christina M. Martin, OSB #084117
CMartin@pacificlegal.org
Lead Counsel
Pacific Legal Foundation
4440 PGA Blvd #307
Palm Beach Gardens Florida 33410-6541
509 480-9709

Daniel M. Ortner, Cal. SB #329866*
DOrtner@pacificlegal.org
Ethan W. Blevins, Wash. SB #48219*
EBlevins@pacificlegal.org
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814-4605
(916) 419-7111
*pro hac vice pending
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## [PORTLAND DIVISION]

| | |
|---|---|
| TOTAL REAL ESTATE GROUP, LLC, an Oregon limited liability company, | Case No.: 3:21-cv-1677 |
| Plaintiff, | |
| v. | **MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| STEVE STRODE, in his official capacity as the Oregon Real Estate Commissioner; ELLEN ROSENBLUM, in her official capacity as Attorney General for the State of Oregon's Department of Justice, | |
| Defendants. | |

Memorandum ISO MPI

# TABLE OF CONTENTS

Page(s)

I.  INTRODUCTION ............................................................................................... 1

II.  STATEMENT OF FACTS ................................................................................. 3

    A.  Oregon's Love Letter Ban .......................................................................... 3

    B.  The Benefits of Love Letters ...................................................................... 6

    C.  The Harm to Plaintiff .................................................................................. 9

III.  STANDARD OF REVIEW .............................................................................. 11

IV.  LIKELIHOOD OF SUCCESS ON THE MERITS .......................................... 12

    A.  Plaintiff Have Standing ............................................................................ 12

        1.  Total Real Estate Group and Its Brokers Have Direct Standing to Raise a First Amendment Challenge ................................... 12

        2.  Total Real Estate Group and Its Brokers Have Third-Party Standing to Raise a First Amendment Challenge ................................... 13

    B.  The Love Letter Ban Cannot Withstand First Amendment Scrutiny ................. 16

        1.  The Love Letter Bill Is Content-Based ........................................ 16

        2.  The Love Letter Ban Fails Intermediate Scrutiny ................................ 18

    C.  Regulated Speech Is Not Misleading and Does Not Propose Unlawful Activity ........................................................................................ 19

    D.  The State's Interest Does Not Insulate the Love Letter Ban from Careful Constitutional Scrutiny ............................................................. 20

    E.  The Love Letter Ban Fails to Directly Advance the Government's Interest ........ 21

        1.  The Love Letter Ban Is Based on Mere Conjectures with No Real Findings or Evidence that the Ban Will in Fact Be Solving a Real Problem ........................................................................... 21

        2.  The Love Letter's Underinclusive Nature Undermines the State's Interest ........................................................................ 23

        3.  The Love Letter Ban Is More Extensive Than Necessary to Fulfil the Government's Objective ......................................................... 24

        4.  The Government Bears the Burden of Showing Why Alternatives Measures Could Not Succeed ................................................ 28

V.  Plaintiff Will Suffer Irreparable Harm Without a Preliminary Injunction ....................... 29

VI.  The Balance of Harms and Public Interest Weigh in Plaintiff's Favor ............................ 30

VII.  No Security Should Be Required ..................................................................... 31

## TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) ................................................20

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) .............................................11

*Americans for Prosperity v. Bonta*, 141 S. Ct. 2373 (2021) ...........................................................28

*April in Paris v. Becerra*, 494 F. Supp. 3d 756 (E.D. Cal. 2020) ..................................................30

*Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335 (2020) ....................................17

*Bates v. State Bar of Arizona*, 433 U.S. 350 (1977) .......................................................................20

*Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786 (2011) ....................................................23

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016) ...............................................................28

*Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644 (9th Cir. 2021) ..........................................................11

*California Pharmacists Ass'n v. Maxwell-Jolly*,
    563 F.3d 847 (9th Cir. 2009) .....................................................................................................30

*Calvillo Manriquez v. Devos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018) ..........................................30

*Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989) ...........................................14

*Carey v. Population Services Int'l*, 431 U.S. 678 (1977) ...............................................................15

*City of Cincinnati v. Discovery Network*, 507 U.S. 410 (1993) ......................................................24

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994) ...............................................................................2, 23

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
    657 F.3d 936 (9th Cir. 2011) (en banc) ............................................................................... 24-26

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878 (9th Cir. 2003) .............31

*Craig v. Boren*, 429 U.S. 190 (1976) ..............................................................................................15

*Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848 (9th Cir. 2017) .....................................11

*Doe v. Bolton*, 410 U.S. 179 (1973) ................................................................................................15

*Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014) ...........................................................................11, 31

*F.C.C. v. Pacifica Found.*, 438 U.S. 726 (1978) ..........................................................13

*Gibson Bowles, Inc. v. Montgomery*, 625 P.2d 670 (Or. 1981)................................. 29-30

*Hunt v. City of Los Angeles*, 638 F.3d 703 (9th Cir. 2011) ........................................18

*IMDB.com Inc. v. Becerra*, 962 F.3d 1111 (9th Cir. 2020)...................................19, 26

*June Med. Servs. L. L. C. v. Russo*, 140 S. Ct. 2103 (2020) ................................... 15-16

*Klein v. City of San Clemente*, 584 F.3d 1196 (9th Cir. 2009) ................................ 29-30

*Landwatch v. Connaughton*, 905 F. Supp. 2d 1192 (D. Or. 2012) ................................31

*Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001).................................................12

*Linmark Assocs., Inc. v. Willingboro Twp.*, 431 U.S. 85 (1977) .......................... *passim*

*Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011 (9th Cir. 2009) ...........30

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001)...................................................21

*McCullen v. Coakley*, 573 U.S. 464 (2014) ...................................................................28

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012)......................................................31

*Metro Lights, LLC v. City of Los Angeles*, 551 F.3d 898 (9th Cir. 2009) .....................23

*Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221 (10th Cir. 2005) .......................29

*Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367 (1969) ...................................................13

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015)....................................................16

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781 (1988)................18

*Robertson v. Jones*, 280 Or. 507, 571 P.2d 905 (1977) ..................................................2

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ..................................................30

*Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995) .......................................................21

*Sammartano v. First Jud. Dist. Ct., in & for Cty. of Carson City*,
   303 F.3d 959 (9th Cir. 2002) ....................................................................................31

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ...................................................13, 16

*Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ......................................21

*U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715 (1990)......................................................15

Memorandum ISO MPI                          iv

*United States v. Eichman*, 496 U.S. 310 (1990) ........................................................17

*United States v. Playboy*, 529 U.S. 803 (2000) .......................................................21

*Valle Del Sol v. Whiting*, 709 F.3d 808 (9th Cir. 2013)........................................ *passim*

*People of State of Calif. ex rel. Van de Kamp v. Tahoe Regional Planning Agency*,
    766 F.2d 1319 (9th Cir. 1985) ...........................................................31

*Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980)..................13

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976).........................................................................12

*Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988).........................14

*Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015) .........................................23

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ..................................11

*Zepeda v. I.N.S.*, 753 F.2d 719 (9th Cir. 1983).............................................. 30-31

## Statutes

Fair Housing Act (42 U.S.C. 3601, *et seq.*) .................................................4, 26

ORS 18.395...............................................................................................2

ORS 18.960...............................................................................................2

ORS 307.286.............................................................................................2

ORS 659A.421 (2021) ............................................................................9, 26

ORS 696.010.............................................................................................3

ORS 696.174 (2021) ................................................................................27

ORS 696.805 (2021) ...........................................................................10, 21

## Miscellaneous

Patrick Clark, *Blackstone Bets $6 Billion on Shifting Path to Suburban Homes*,
    Bloomberg (June 22, 2021), https://www.bloomberg.com/news/articles/2021-
    06-22/blackstone-makes-6-bill ion-bet-on-u-s-suburban-home-rentals. ...................7

H.B. 2550, 2021 Or. Legis. Serv. ch. 359 (West)...................................................4, 26

*Hearing on H.B. 2550 Before the H. Comm. On Housing*, 81st Leg. Assemb.,
    Reg. Sess. (Or. 2021) (statement of Rep. Mark Meek),
    https://olis.oregonlegislature.gov/liz/mediaplayer/?clientID=4879615486&eve
    ntID=20210210 91 ............................................................................................... 5, 17-18, 22, 26

Nat'l Ass'n of Realtors, *Code of Ethics & Arbitration Manual* pt. 4, app. 2 (2021),
    https://www.nar.realtor/code-of-ethics-and-arbitration-manual/part-4-
    appendix-ii-%E2%80%94-appropriate-interpretation-of-
    %E2%80%9Cpertinent-facts%E2%80%9D-as-used-in-article-2-of-the.Reg.
    Sess. (Or. 2021) (statement of Rep. Mark Meek) ..................................................... 9

Nat'l Ass'n of Realtors, *2021 Code of Ethics & Standards of Practice* art. 2,
    https://www.nar.realtor/about-nar/governing-documents/code-of-ethics/2021-
    code-of-ethics-standards-of-practice .......................................................................... 9

Miller, Jen A., *When a House is So Much More*, New York Times (Aug. 3, 2018),
    https://www.nytimes.com/2018/08/03/realestate/when-a-house-is-so-much-
    more.html. .................................................................................................................... 2

N.Y.U Furman Center 10–12 (2018),
    https://furmancenter.org/files/Supply_Skepticism_-_Final.pdf ............................... 27

Or. Real Estate Agency, *Law and Rule Required Course 2022-2023*, Or. Real
    Estate Agency (Aug. 4, 2021),
    https://www.oregon.gov/rea/Educators/PostLicense/Documents/LARRC-22-
    23-Outline-Final ......................................................................................................... 27

Restatement (Second) of Contracts § 360 (1981) .......................................................... 2

Strode, Steve, *New Legislation Related to Your License*, Or. Real Estate Agency
    (Sept. 2021), https://www.oregon.gov/rea/newsroom/ Pages/2021_OREN-
    J/New-Legislation-Related-to-Your-License.aspx ............................................... 4, 17

*Suburban Homes*, Bloomberg (June 22, 2021),
    https://www.bloomberg.com/news/articles/2021-06-22/blackstone-makes-6-bill ............... 16

## I.    INTRODUCTION

Selling or buying a home is more than dollars and cents. Homeowners develop an intimate attachment to the homes where their lives have played out, watching children grow, nurturing relationships with neighbors, and experiencing the tragedies and triumphs of everyday life. Likewise, homebuyers look not just for the best deal, but also for a space they can call their own for years to come.

Understandably, buyers and sellers often wish to express these personal feelings about the homes in which they have lived or hope to live. Buyers can do this by writing what real estate brokers call a "love letter," a personal note to a seller explaining why they love the home they are hoping to make their own. Such letters might describe the buyer's captivation with the view of the sunset out a living room window, their excitement about nearby hiking trails, or their plans for using a reading nook on the second floor. Sellers often find value in such letters because they want the home they have loved to continue to be loved and cared for in return. A seller also derives more pragmatic value from such letters because they indicate a buyer's commitment to closing a deal.

But rather than respecting these First Amendment freedoms, Oregon has taken the extraordinary step of banning or significantly burdening the communication of lawful and truthful speech about the home. Oregon's new law bars seller's agents from transmitting any personalized communications from the buyer or buyer's agent to the seller.

At its core the love letter ban is based on a faulty premise. Oregon appears to think that the consideration of any factors pertaining to the sale of a home other than the dollars and cents of an offer is irrelevant at best and discriminatory at worst. This isn't so. Selling a home is not just "an exchange of money for a product, it is also an undertaking suffused with hopes and dreams and, at

least in the case of the seller, the memories and experiences rooted in that physical space."[1] Demanding that human beings ignore all of these feelings, desires, and expectations is both impracticable and contrary to human nature. As Dr. Scott Huettel, a neuroeconomist at Duke University, explained, "You can't just be dispassionate about value and cut off all the memories and evidence that have accumulated."[2]

The law has long recognized that real property is not fungible like a widget or article of clothing from Walmart. As the Oregon Supreme Court has noted, "every piece of land, and especially a home, is in some sense unique." *Robertson v. Jones*, 280 Or. 507, 511, 571 P.2d 905, 907 (1977).[3] This is why the United States Supreme Court has recognized that "[a] special respect for individual liberty in the home has long been part of our culture and our law." *City of Ladue v. Gilleo*, 512 U.S. 43, 58 (1994). The Court spoke about laws that "constrain a person's ability to *speak* there." *Id.* But the same reasoning should apply to laws that constrain the ability to freely speak *about* the home.

For Plaintiff, Total Real Estate Group, LLC, facilitating personal communication between buyer and seller is crucial. If Oregon's ban is allowed to go into effect on January 1, 2022, Plaintiff

---

[1] Jen A. Miller, *When a House is So Much More*, New York Times (Aug. 3, 2018), https://www.nytimes.com/2018/08/03/realestate/when-a-house-is-so-much-more.html.

[2] *Id.*

[3] For this reason the remedy of specific performance has long been available as an equitable remedy for real property transactions. *Id.*; Restatement (Second) of Contracts § 360 (1981) ("Contracts for the sale of land have traditionally been accorded a special place in the law of specific performance. A specific tract of land has long been regarded as unique and impossible of duplication by the use of any amount of money."). Similarly, homes have long received special protections in matters of property taxation, foreclosure, and the resolution of bankruptcy proceedings. *See* ORS 307.286 (homestead exemption for property taxes); ORS 18.960 (setting out a 180-day period for the redemption of a home sold in a foreclosure proceeding); ORS 18.395 (homestead exemption in bankruptcy).

Total Real Estate Group, LLC, and its affiliated brokers will be required to severely curtail their communications on behalf of clients and will lose the personal touch that gives them a competitive advantage. And the buyers and sellers that Plaintiff works with will likewise be unable to convey crucial information about their property. Because the love letter ban will have a strong chilling effect on all of this valuable and important speech and cannot be justified, a preliminary injunction is justified.

## II.    STATEMENT OF FACTS

Total Real Estate Group, LLC, (TREG) is a boutique real estate firm that has a number of licensed Oregon real estate brokers[4] who are professionally affiliated with TREG and who represent homebuyers and sellers in Oregon. Complaint ¶ 12. TREG has its principal place of business in Bend, Oregon with an office in Portland. *Id.* The licensed designated principal broker affiliated with TREG supervises the professional real estate activity of about twenty licensed brokers throughout Oregon and focuses on the purchase and sale of residential housing. *Id.*

### A.    Oregon's Love Letter Ban

In September 2021, Governor Kate Brown signed into law House Bill 2550, henceforth referred to as the "love letter ban." Complaint ¶ 15. The love letter ban amends Section 696.805 of the Oregon Revised Statutes, which enumerates the duties and obligations owed by an agent representing a seller in a real estate transaction. Complaint ¶ 16. House Bill 2550 adds a new obligation to Section 696.805, namely that sellers' agents must reject any communication aside from customary documents provided by a buyer, including photographs, "[i]n order to help a seller

---

[4] In Oregon, a broker is any individual who holds an active real estate license. ORS 696.010. Oregon law also refers to brokers as buyer's or seller's agents in their specific representative capacity. This memorandum uses the term broker generally, and agent only when referring specifically to a broker's role as a buyer's agent or seller's agent.

avoid selecting a buyer based on the buyer's race, color, religion, sex, sexual orientation, national origin, marital status or familial status as prohibited by the Fair Housing Act (42 U.S.C. 3601, et seq.)." H.B. 2550, 2021 Or. Legis. Serv. ch. 359 (West). *Id.*

The law targets "love letters," which Oregon's Real Estate Commissioner, Defendant Steve Strode, has described as "notes, letters, and pictures that buyers may submit along with their offers to purchase in order to create an emotional connection between sellers and buyers—especially when significant competition exists on a given property." Complaint ¶ 17; Steve Strode, *New Legislation Related to Your License*, Or. Real Estate Agency (Sept. 2021), https://www.oregon.gov/rea/newsroom/ Pages/2021_OREN-J/New-Legislation-Related-to-Your-License.aspx. Love letters can provide valuable information to sellers, such as the use for which the buyer desires the property, the reason the buyer likes the home or neighborhood, or the buyer's willingness to close on the deal.

The love letter ban broadly prohibits all love letters, even those that contain no facts that could indicate a buyer's protected class status. It also extends beyond love letters to "any communication" that is "not customary." H.B. 2550, 2021 Or. Legis. Serv. ch. 359 (West). Complaint ¶ 19. For example, it appears to ban cover letters written by buyer's agents which do not implicate protected class status but which can also provide useful information to a seller, such as the buyer's rationale for moving into the area or the buyer's attraction to the home or neighborhood, and can demonstrate the buyer's ability and willingness to follow through on the purchase. Complaint ¶ 20.

The term "customary" is not defined by either rule or statute, but Defendant Strode has stated that the Oregon Real Estate Agency interprets the term "customary documents" to mean "disclosure forms, sales agreements, counter offer(s), addenda, and reports. Love letters would not

be considered customary documents." Strode, *supra*. The Agency does not currently anticipate any additional rulemaking, as it views the legislative intent to be clear. *Id.*

Although the love letter ban's purpose is to prevent discrimination based on protected class status in real estate transactions, it does little, at best, to further this interest. There is nothing in the legislative record indicating that sellers ever rely on information from love letters as a method for discrimination. The Oregon Legislature was unable to identify even one claim under the Fair Housing Act arising from love letters and the National Association of Realtors is also unaware of any claims arising from their use. House Representative Mark Meek, the bill's sponsor, claimed in public testimony that the use of love letters perpetuates systemic biases in the real estate transactions and that the law was intended to address implicit biases in this area. The existence of such biases is unsubstantiated, however, and although Mr. Meek noted the existence of racial disparities in home ownership, he admitted in the same testimony that he did not know whether love letters contributed to this trend. *Hearing on H.B. 2550 Before the H. Comm. On Housing*, 81st Leg. Assemb., Reg. Sess. (Or. 2021) (statement of Rep. Mark Meek).[5]

Additionally, while the love letter ban prevents seller's agents from sending communications that are not "customary" from the buyer to the seller, the ban does not prevent a buyer from contacting a seller directly, nor does it prevent the seller from inquiring about protected class status or from seeking information about that status through channels other than a real estate broker.

Those who violate the love letter ban are subject to an investigation and disciplinary proceeding by Defendant Strode and his agents, and could face public reprimand, the denial of a

---

[5] https://olis.oregonlegislature.gov/liz/mediaplayer/?clientID=4879615486&eventID=2021021091 (8:55-10:05).

renewal of their real estate license, or the revocation of their license. They could also suffer civil penalties. Complaint ¶ 23.

### B.    The Benefits of Love Letters

Meanwhile, many of TREG's brokers have found that love letters are highly beneficial to buyers, sellers, and brokers alike, and a significant portion of their transactions include one. Complaint ¶ 25. Brokers also regularly include information similar to that found in a love letter in personalized cover letters. *Id.*

Love letters can benefit less-wealthy or underdog buyers by helping them gain a competitive edge, with sellers sometimes foregoing higher offers because of a persuasive love letter. Complaint ¶ 26. One of TREG's brokers, when purchasing her own first home, was able to beat out several investors who had placed higher offers because of her love letter emphasizing her desire to settle in the area for the long term. *Id.*; Smith Decl. ¶ 2.

Furthermore, love letters allow a buyer to express unique reasons why a property might be a good fit. Complaint ¶ 18. For instance, a buyer can explain that she already has family or friends in the neighborhood. Complaint ¶ 31. A buyer can also describe how a location is convenient to access employment, or other facilities such as local hospitals. *Id.* Perhaps a buyer wants to express how he is a dog lover and close access to a dog park will be a major benefit. Or perhaps a prospective buyer enjoys gardening and wants to tell the seller that the sun hits the backyard just right to allow the buyer to grow prize-winning tomatoes. *Id.* A buyer may also simply be enamored with the view, the architectural styles, or any number of other physical properties. *Id.*

Meanwhile, sellers benefit by gaining the opportunity to learn more about potential buyers. Complaint ¶ 27. TREG's brokers have often found that their clients derive value from learning information about the buyers, such as why the buyer likes the property, whether this purchase is

the buyer's first, and whether the buyer intends to occupy the home. In particular, love letters allow a buyer to let a seller know his intentions for the property. This is particularly valuable when a seller has lived in a home and has an emotional attachment to the property and to the community. Sellers may, for instance, care about their neighbors and want to make sure that the property is purchased by someone who will live in that neighborhood rather than someone who will use the property for short-term rentals. *Id.* Additionally, if the home has high sentimental or historic value, a seller may want to know of a buyer's interest in the home's preservation and continued use. For example, a seller may be hoping to preserve how her family has traditionally used the property— such as maintaining a family farm for agricultural use. *Id.*

Love letters can also give a seller an important sense of the degree to which a buyer is committed to that property or whether that buyer is merely browsing. Complaint ¶ 32 If a buyer expresses a strong interest in closing a deal on a particular property, then a seller may prefer that offer over one with slightly better terms or financing but that may take longer to close or may involve drawn out negotiations. If a buyer does not send a love letter or show particular interest in a property, then this may show a level of indifference or nonchalance that is undesirable for a seller. Additionally, if the home has high sentimental or historic value, a seller may want to know of a buyer's interest in the home's preservation. *Id.* This information can often be gleaned only from a love letter or another communication forbidden by the ban. *Id.*

The ban on love letters may especially hinder the ability of sellers who want to sell to a buyer who intends to occupy a home. Complaint ¶ 28. The investor market for single family rental housing is growing and is projected to continue to grow dramatically.[6] But many sellers prefer to

---

[6] Patrick Clark, *Blackstone Bets $6 Billion on Shifting Path to Suburban Homes*, Bloomberg (June 22, 2021), https://www.bloomberg.com/news/articles/2021-06-22/blackstone-makes-6-billion-bet-on-u-s-suburban-home-rentals.

have their home bought by someone who will actually live there. Love letters allow a buyer who intends to occupy a home to convey this important information to the seller.

TREG and other small real estate firms also benefit from love letters, as the letters enable them to compete with larger firms. Complaint ¶ 29. Larger firms which are oriented toward investment can easily outspend TREG's clients, who are often seeking to purchase homes in order to live in them. The personal approach afforded by the love letters enables smaller firms like TREG to contend with larger firms in a highly competitive market. The love letters also provide similar benefits for brokers to those that they provide for sellers, as they help brokers assess the strength of offers and the buyer's reasons for desiring the property. Complaint ¶ 30. In fact, these details are often requested by sellers, so the love letters play a key role in the services TREG's brokers offer their clients. *Id.*

The list of reasons that a buyer may wish to write a love letter or that a seller may find the information in such a letter to be helpful and persuasive is nearly endless. Oregon law forbids, or at the very least substantially burdens, this valuable exchange of truthful and non-misleading information. Complaint ¶ 34. Unless this Court enjoins enforcement of the love letter ban, the benefits that love letters provide to buyers, sellers, and smaller real estate firms will be lost.

On the other hand, in TREG's experience assisting clients with real estate transactions, it has found that the overwhelming majority of the communications prohibited by the love letter ban do not contain any details providing so much as a hint at protected class status and that those communications rarely contain pictures that might reveal that status (for instance, they frequently contain pictures of pets). Complaint ¶ 43. Never, in TREG's experience, has a seller client discriminated based on details from such a communication. *Id.*

TREG takes its responsibility not to discriminate in real estate transactions, as required by Oregon law, extremely seriously. Or. Rev. Stat. § 659A.421 (2021). Complaint ¶ 44. If a TREG broker were ever to be concerned that a love letter could create the risk of discrimination, that broker would address that concern and recommend the amendment of the letter. *Id.* Similarly, a TREG broker would never draft a cover letter that could risk discrimination. *Id.*

In fact, TREG is concerned that the love letter ban increases the likelihood of discrimination because it may encourage buyers to send love letters directly to sellers without a broker to help ensure that anti-discrimination laws are adhered to. Complaint ¶ 45. The ban also increases the risk that discriminatory communications will occur orally, by telephone, rather than in writing, making it more difficult to police this kind of prohibited conduct when it occurs. *Id.*

### C.    The Harm to Plaintiff

In addition to destroying the benefits love letters afford to all parties in a real estate transaction, the ban also makes it harder for TREG to fulfil its ethical and fiduciary duties to its clients. Complaint ¶ 36. Because TREG is a member of the NAR, TREG and its affiliated brokers must adhere to the NAR's Code of Ethics and Standards of Practice, which requires TREG's affiliated brokers to avoid "concealment of pertinent facts relating to the property or the transaction."[7] These "pertinent facts" comprise all written offers, including letters and photographs accompanying them.[8] A TREG broker would therefore have an ethical obligation disclose information gleaned from a love letter that does not pertain to a protected class, but the ban

---

[7] Nat'l Ass'n of Realtors, *2021 Code of Ethics & Standards of Practice* art. 2, https://www.nar.realtor/about-nar/governing-documents/code-of-ethics/2021-code-of-ethics-standards-of-practice.

[8] Nat'l Ass'n of Realtors, *Code of Ethics & Arbitration Manual* pt. 4, app. 2 (2021), https://www.nar.realtor/code-of-ethics-and-arbitration-manual/part-4-appendix-ii-%E2%80%94-appropriate-interpretation-of-%E2%80%9Cpertinent-facts%E2%80%9D-as-used-in-article-2-of-the.

prohibits this. The ban also prohibits other factual disclosures that are not "customary." In short, the ban gives TREG's brokers a choice between violating their fiduciary duties to their clients and breaking the law.

The love letter ban makes it similarly difficult for TREG's brokers to fulfil the affirmative duties that they owe their clients and other parties in a transaction under Oregon law. Complaint ¶ 37. TREG brokers representing sellers in a transaction have an affirmative duty to "present all written offers, written notices and other written communications to and from the parties," to "disclose material facts known by the seller's agent," and to not take "action that is adverse or detrimental to the seller's interest in a transaction." Or. Rev. Stat. § 696.805 (2021). A love letter is a written communication and may contain material facts, particularly if the seller has requested information about the buyer contained in the letter. Withholding love letters and similar communications from the buyer, as the love letter ban demands, may also constitute an action that is detrimental to the seller's interest if the letter contains information that the buyer believes would be of value to the seller.

Furthermore, TREG's brokers have serious concerns that the ban also prohibits pre-approval letters, communications from lenders sent by a buyer's agent confirming a buyer's approval for financing. Complaint ¶ 38. Providing pre-approval letters is standard practice among TREG's brokers and other brokers with whom TREG works. Pre-approval for financing, or lack thereof, is a material fact that TREG brokers feel ethically bound to disclose to sellers, but pre-approval letters are not included in Defendant Strode's list of "customary" documents.

TREG and its brokers feel that they have no choice but to alter their speech and their well-established business practices when the love letter ban takes effect January 1, 2022. Complaint ¶ 39. When that happens, all communications from buyers that are not standard real estate forms

will be withheld, a marked change to TREG's practices, which utilize love letters and other informal communications that TREG's brokers firmly believe help to their clients. As a result, Plaintiff TREG now asks this Court to issue a preliminary injunction and enjoin the enforcement of the love letter ban.

## III.    STANDARD OF REVIEW

A court shall issue a preliminary injunction if plaintiffs show that: (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm without injunctive relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017). Additionally, a preliminary injunction may be appropriate if plaintiffs raise serious questions going to the merits and the balance of hardships tilts sharply towards him or her, as long as they are likely to suffer irreparable harm without the injunction and the balance of equities tips in their favor. *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 652 n.6 (9th Cir. 2021); *Disney Enterprises*, 869 F.3d at 856; *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). In the First Amendment context, plaintiffs have an initial burden of making a colorable claim that their rights have been infringed or are threatened with infringement, with the burden shifting to the government to justify the restriction after plaintiffs make that claim. *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014).

## IV.    LIKELIHOOD OF SUCCESS ON THE MERITS

### A.    Plaintiff Have Standing

TREG has standing to bring a First Amendment challenge against Oregon's love letter ban. The law directly burdens and chills the First Amendment rights of TREG and its brokers. In

addition, the law burdens the First Amendment rights of TREG's clients, and TREG has standing to advocate for its client's First Amendment rights.

### 1.    Total Real Estate Group and Its Brokers Have Direct Standing to Raise a First Amendment Challenge

Oregon's law prohibits a seller's agent from accepting any "non-customary" documents that come from the buyer. According to Steve Strode, the Oregon Real Estate Commissioner, this includes anything other than "disclosure forms, sales agreements, counter offer(s), addenda, and reports." This prohibition therefore includes a wide variety of communications that come directly from TREG's brokers. In particular, a buyer's agent will frequently convey relevant information about her client in her own voice as part of a cover letter. In this way, a broker engages in her own advocacy on behalf of her clients in the hopes of helping to secure a deal. And a seller's agent will often convey this information to her client mingled with her own professional or personal insights as to whether an offer is the best choice. Smith Decl. ¶ 4. Oregon directly prohibits these types of candid communications from TREG's brokers and therefore directly infringes on their First Amendment rights. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548 (2001) (allowing attorneys to challenge a policy which did not allow attorneys to receive legal services funds if they were arguing that a statute was unconstitutional on behalf of their clients and emphasizing that an attorney "works under canons of professional responsibility that mandate his exercise of independent judgment on behalf of the client.").

Moreover, even when a broker passes along a client's love letter without any further comment, the broker's First Amendment rights are still implicated. The First Amendment protects both the "source" and the "recipients" of that speech. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) (consumers had standing to challenge

a restriction banning pharmacists from advertising the prices of prescription drugs because they had a right to "receive information" and "freedom of speech 'necessarily protects the right to receive'"). That includes intermediaries who transmit rather than produce speech. If such intermediates lacked standing, then the government could disrupt the free flow of information with impunity by going after intermediaries rather than speakers or listeners.

Hence in *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 559 (2011), the Supreme Court held that a law that barred pharmacies from transmitting prescriber-identifying information violated the First Amendment even though the pharmacies merely transmitted this data. Similarly, broadcasting companies are frequently entitled to sue and raise First Amendment arguments even when they do not actually produce the content they are broadcasting. *F.C.C. v. Pacifica Found.*, 438 U.S. 726 (1978); *Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367, 369 (1969). It should be no different for a broker who transmits a letter between buyer and seller.

### 2. Total Real Estate Group and Its Brokers Have Third-Party Standing to Raise a First Amendment Challenge

TREG and its brokers are also entitled to raise the First Amendment rights of their clients to send and receive love letters. In the First Amendment context, the Supreme Court has explained that "[g]iven a case or controversy, a litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court." *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 634 (1980).

There is indisputably a case or controversy here. If Oregon's new law is allowed to go into effect, Plaintiff has alleged that it will suffer several discreet injuries, including a loss of revenue and impaired client relationships. Complaint ¶¶ 29-30; Smith Decl. ¶ 7. And the love letter ban

"substantially abridges" the First Amendment rights of a buyer to transmit relevant information concerning the purchase of a home to a seller and the rights of the seller to receive this information.[9] *See Linmark Assocs., Inc. v. Willingboro Twp.*, 431 U.S. 85, 92 (1977), ("Persons desiring to sell their homes are just as interested in communicating that fact as are sellers of other goods and services" and "[s]imilarly, would-be purchasers of realty are no less interested in receiving information about available property than are purchasers of other commodities in receiving like information about those commodities."). Accordingly, TREG is entitled to raise the First Amendment rights of its clients. *See Virginia v. Am. Booksellers Ass'n, Inc*., 484 U.S. 383, 393 (1988) (ruling that a bookstore could raise a First Amendment argument because they "alleged an infringement of the First Amendment rights of bookbuyers").

Even putting aside the more permissive First Amendment standard for third-party standing, TREG has standing to advocate for its clients' rights. In determining whether third-party standing exists courts consider three factors: "the relationship of the litigant to the person whose rights are being asserted; the ability of the person to advance his own rights; and the impact of the litigation on third-party interests." *Id.* All three factors need not be present before third-party standing is found. *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 623 n.3 (1989) (noting that "[t]he second of these three factors counsels against review here," but finding that there was

---

[9] The State may argue that the love letter ban does not "substantially abridge" First Amendment freedoms because individual buyers can go directly to sellers. But as outlined in the declaration of Cheri Smith this is simply not a viable option in most circumstances especially given the speed and volatility of the housing market and the difficulty of contacting a seller directly. Smith Decl. ¶ 13. Oregon has blocked the most natural and effective way that these letters are transmitted and this imposes a substantial burden. If the State argues otherwise, then it is effectively conceding that its law is pitifully underinclusive and ineffective and cannot survive any type of scrutiny.

standing after concluding that "the first and third factors, however, clearly weigh in petitioner's favor"). Here, however, all three factors support third-party standing.

First, a broker acts as the agent of a buyer or a seller, which is a close fiduciary relationship. In such situations, the speech of the agent is seen as effectively synonymous with the person they are representing. The relationship is akin, for instance, to the attorney-client relationship which has previously been recognized as creating third-party standing. *See U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720 (1990) (attorney had right to bring a due process claim on behalf of his clients against a restriction on the fees that attorneys could charge). Courts have even allowed third-party standing outside the context of a traditional fiduciary role, where, for instance, a business sues on behalf of its customers *See also Craig v. Boren*, 429 U.S. 190, 192 (1976) (convenience store raising rights of young men to challenge sex-based restriction on beer sales); *Doe v. Bolton*, 410 U.S. 179, 188 (1973) (abortion provider raising the rights of pregnant women to access an abortion); *Carey v. Population Services Int'l*, 431 U.S. 678 (1977) (distributors of contraceptives raising rights of prospective purchasers to challenge restrictions on sales of contraceptives).

Second, it will be difficult for any particular buyer or seller assert their First Amendment rights in this context since individuals are likely to buy or sell their properties far faster than the duration of a lawsuit, so a buyer or seller's claims may easily become moot. Similarly, buyers and sellers may have little incentive to engage in costly and extended litigation over a one-time transaction that typically is over quickly. Under such circumstances, "'the obvious claimant' and 'the least awkward challenger' is the party upon whom the challenged statute imposes 'legal duties and disabilities.'" *June Med. Servs. L. L. C. v. Russo*, 140 S. Ct. 2103, 2119 (2020) (quoting *Craig*, 429 U.S. at 196–197).

And third, this litigation will further the interests of TREG's clients by allowing love letters to be sent and received. The Supreme Court has "generally permitted plaintiffs to assert third-party rights in cases where the "'enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights.'" *June Med. Servs. L. L. C.*, 140 S. Ct. at 2118–19. That is precisely the case here. Accordingly, this is a paradigmatic case for allowing third-party standing.

### B.    The Love Letter Ban Cannot Withstand First Amendment Scrutiny

#### 1.    The Love Letter Bill Is Content-Based

The love letter ban is a content-based regulation of speech.[10] Because First Amendment tests vary depending on whether a law is content-based or content-neutral, the "crucial first step" in analyzing a free speech claim is to "consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163, 165 (2015) (quoting *Sorrell*, 564 U.S. at 556). The term "content-based" has a "commonsense meaning:" a content-based law is one that applies to particular speech "because of the topic discussed or the idea or message conveyed." *Reed*, 576 U.S. at 163. For instance, in *Reed*, a sign code was content-based on its face because it applied different rules depending on whether the sign conveyed a political, ideological, or directional message.

A law will also be considered content-based if the law's intent is to target certain speech content "because of disagreement with the message the speech conveys" even if it is not content-based on its face. *Id.* at 164. Hence, a law with "no explicit content-based limitation on the scope

---

[10] Even though Plaintiff assumes for purposes of this preliminary injunction motion that love letters are commercial speech, the fact that the love letter ban is content-based still matters because review under *Central Hudson* is generally more rigorous than review of content-neutral time, place, or manner restrictions.

of prohibited conduct" may still be content-based if "the Government's asserted *interest* is related to the suppression of free expression." *United States v. Eichman*, 496 U.S. 310, 315 (1990). In addition, a law is considered content-based if it "favors some speakers over others" in a manner that "reflects a content preference." *Barr v. Am. Ass'n of Political Consultants, Inc*., 140 S. Ct. 2335, 2347 (2020).

The love letter ban is content-based in all three respects: it draws distinctions between content on its face, the state's interest is related to suppressing certain speech content, and it favors some speakers over others in a manner that reflects a content preference. On its face, the law allows a seller's agent to transmit those documents deemed "customary," while prohibiting all others. While this may appear to appear to restrict speech regardless of what that speech says, the definition of "customary" depends upon the content of the speech in the communications provided by the buyer's agent. The Real Estate Commission defines "customary documents" as "disclosure forms, sales agreements, counteroffer(s), addenda, and reports." Strode, *supra*. If the written content in a document does not fit within the definition of these customary documents, then it is prohibited. The law therefore draws distinctions based on the message that the communications by a buyer's agent conveys.

Even if the law were neutral on its face, the state's asserted interests are to suppress certain speech content. Real Estate Commissioner Steve Strode called HB 2550 the "Love Letter Bill," specifically designed to prohibit "notes, letters, and pictures that buyers may submit along with their offers to purchase in order to create an emotional connection between sellers and buyers." *Id.* And more specifically, the state is concerned about content in these letters that may tip off a seller to protected class status that could in turn lead to discrimination. *Hearing on H.B. 2550 Before the H. Comm. On Housing*, 81st Leg. Assemb., Reg. Sess. (Or. 2021) (statement of Rep. Mark Meek)

Memorandum ISO MPI                    17

(3:57–5:43) ("[M]any times [the letter] will tell [the seller] about [how] [the buyer] grew up in the area, ... [they] want to raise their family there, [or they] go to church right down the street").[11] This law is clearly designed to suppress speech because of the message that speech conveys.

Finally, the law also discriminates based on speaker identity in a manner that reflects content preferences. Brokers are restricted from communicating, while a buyer may go directly to a seller. For all of these reasons the love letter ban is content-based.

### 2.    The Love Letter Ban Fails Intermediate Scrutiny

Intermediate scrutiny for commercial speech restrictions looks to four factors: (1) whether the restricted speech is misleading or related to unlawful activity; (2) whether the government's interest is substantial; (3) whether the speech restriction directly advances that interest; and (4) whether the speech restriction is not more extensive than necessary.[12] *Valle Del Sol v. Whiting*, 709 F.3d 808, 816 (9th Cir. 2013). If the speech is not misleading or related to unlawful activity under the first factor, then the government bears the burden of showing that it satisfies the remaining three factors.

---

[11]  https://olis.oregonlegislature.gov/liz/mediaplayer/?clientID=4879615486&eventID=2021021091.

[12] For the purpose of this motion for preliminary injunction Plaintiff will assume that love letters are commercial speech and that *Central Hudson* applies. However, Plaintiff intends to preserve the argument that love letters are not commercial speech. The letters are not a traditional form of advertisement. *Hunt v. City of Los Angeles*, 638 F.3d 703, 715 (9th Cir. 2011). And although these letters accompany a proposal for a commercial transaction, their contents go far beyond a request for a sale and touch on highly personal details such as a prospective buyer's hobbies, interests, employment, and social relations. Indeed, it can be said that the commercial aspects of these letters are "inextricably intertwined with otherwise fully protected speech." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796 (1988). If these letters are not considered commercial speech then Oregon's content- and speaker-based speech restriction plainly fails strict scrutiny.

Memorandum ISO MPI                    18

Love letters and other documents prohibited by the love letter ban are not inherently misleading, nor do they propose an unlawful transaction. Hence, the state must show that its interest is important, that the love letter ban directly advances that interest, and that the ban is not more extensive than necessary.

While there is no doubt that preventing discrimination is an important interest in the abstract, the state is unlikely to succeed in showing that the ban directly advances its interests because there simply is no evidence that love letters contribute to discrimination, and—even if they did—the law is severely underinclusive.

Similarly, the state cannot show that the ban is no more extensive than necessary because the ban restricts far more speech than just love letters that mention protected class status, and there are obvious less-restrictive means to deal with discrimination—namely to enforce existing anti-discrimination laws.

### C.    Regulated Speech Is Not Misleading and Does Not Propose Unlawful Activity

As a threshold matter, courts applying *Central* Hudson ask whether the speech being regulated proposes an unlawful transaction or is deceitful. *Valle Del Sol*, 709 F.3d at 821. If so, the speech does not merit First Amendment protection. This threshold inquiry looks to "the content of the affected speech," not whether the speech might be used to facilitate unlawful activity. *Id.*; *IMDB.com Inc. v. Becerra*, 962 F.3d 1111, 1123 (9th Cir. 2020) (rejecting a rule that "would require this court to permit the restriction not only of speech that proposes an illegal activity but also facially inoffensive speech that a third-party might use to facilitate its own illegal conduct."). The question asked when examining the speech content is simply whether "the affected speech propose[s] an illegal transaction." *Valle Del Sol*, 709 F.3d at 822.

By contrast, the Supreme Court has explained that speech "bans that target truthful, nonmisleading commercial messages" are viewed with great suspicion and are subject to "the rigorous review that the First Amendment generally demands." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 502–03 (1996). That is the case with Oregon's love letter ban.

Oregon argues that love letters may occasionally be misleading or facilitate unlawful discrimination and therefore they must be banned or severely curtailed. But the key question under *Central Hudson* is whether the speech in question is "inherently misleading." *Bates v. State Bar of Arizona*, 433 U.S. 350, 372 (1977).

Love letters play a crucial role in the homebuying process by facilitating communication between buyers and sellers on intangible but vital considerations that go into the purchase and sale of a home. *See Supra Section II B.* These letters can convey a wide variety of useful and truthful information from a buyer to seller.

## D.    The State's Interest Does Not Insulate the Love Letter Ban from Careful Constitutional Scrutiny

The love letter ban is intended to prevent housing discrimination. There is no question this is an important interest.

However, no matter how important the interest, speech restrictions must be carefully scrutinized to ensure that speech is not unnecessarily restricted. Hence, in *Linmark*, the Supreme Court recognized that a township's goal of "promoting stable, racially integrated housing" was an important one, but concluded that "the First Amendment disabled the State from achieving its goal by restricting the free flow of truthful information" by prohibiting "for sale" signs in yards. 431 U.S. at 95. The City had failed to provide evidence that the display of these signs had resulted in racially discriminatory sales. Moreover, the restriction was especially suspect because it "**may bear**

on one of the most important decisions [residents] have a right to make: where to live and raise their families.*" Id.* at 96. The Court rejected Willingboro's "highly paternalistic approach" and emphasized that the First Amendment forbade the township from "suppressing information" in order to prevent "the dangers of its misuse." *Id.* at 97.

In this case likewise, the love letter ban "bear[s] on one of the most important decisions [residents] have a right to make: where to live and raise their families." And accordingly, Oregon's "highly paternalistic approach" of "suppressing information" in order to prevent "dangers of its misuse" is deeply suspect even if its stated goal is to prevent discrimination in housing.

**E.    The Love Letter Ban Fails to Directly Advance the Government's Interest**

**1.    The Love Letter Ban Is Based on Mere Conjectures with No Real Findings or Evidence that the Ban Will in Fact Be Solving a Real Problem**

A speech restriction does not directly advance the government's interests if the restriction only swipes at speculative harms. "The First Amendment requires a more careful assessment and characterization of an evil" before restricting speech. *United States v. Playboy*, 529 U.S. 803, 819 (2000). When government restricts speech to "prevent anticipated harms, it must do more than simply 'posit the existence of the disease to be cured.'" *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994). Even under intermediate scrutiny, the state's fear must find substance in evidence that "the harms it recites are real" rather than "*mere* speculation and conjecture." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (quoting *Greater New Orleans Broadcasting v. United States*, 527 U.S. 173, 188 (1999)). This demand for concrete evidence is not satisfied by "anecdotal evidence and educated guesses." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 490 (1995). For example, in *Linmark*, the government forbade "for sale" signs in yards out

of fear that such signs exacerbated "white flight" from the township, thus undermining racial integration. 431 U.S. 85. The Court held, however, that the government had "failed to establish that this ordinance is needed to assure that Willingboro remains an integrated community." *Id.* at 95. The government lacked evidence regarding two key premises: that "for sale" signs were a "major cause" of white people selling off property and moving away, and that banning such signs would "reduce public awareness of realty signs and thereby decrease public concern over selling." *Id.* at 95–96.

The unfounded assumptions behind Oregon's love letter ban resemble the flaws in the "for sale" sign ordinance in *Linmark*. Like in *Linmark*, the Legislature failed to develop any record or make legislative findings that love letters are a "major cause" of housing discrimination. Likewise, there is no legislative record or finding indicating that banning love letters will "thereby decrease" incidents of housing discrimination. Indeed, the bill's sponsor as much as conceded in public testimony that he does not know whether love letters actually contribute to discrimination. *Hearing on H.B. 2550 Before the H. Comm. On Housing*, 81st Leg. Assemb., Reg. Sess. (Or. 2021) (statement of Rep. Mark Meek).[13] The government has thus failed to show that "the harms it recites are real." The presumption of harm implicit in the State's aggressive approach to speech regulation clashes with the fundamental notion that speech restrictions "should be the government's tool of last resort." *Valle Del Sol*, 709 F.3d at 826.

**2.      The Love Letter's Underinclusive Nature Undermines the State's Interest**

---

[13]  https://olis.oregonlegislature.gov/liz/mediaplayer/?clientID=4879615486&eventID=20210210
91 (8:55–10:05)

A law's underinclusive scope bears on the direct advancement inquiry. *Valle Del Sol*, 709 F.3d at 824. An underinclusive reach significantly "diminish[es] the credibility of the government's rationale for restricting speech in the first place." *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994).

A law is underinclusive if it does not extend to equally harmful activity "when judged against [the law's] asserted justification." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 802 (2011). A law need not "address all aspects of a problem in one fell swoop," but First Amendment problems arise if it "regulates one aspect of a problem while declining to regulate a different aspect of the problem that affects its stated interest in a comparable way." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 451 (2015). This Circuit has held that exceptions that carve out some speech from the reach of a law "must relate to the interest the government seeks to advance." *Metro Lights, LLC v. City of Los Angeles*, 551 F.3d 898, 906 (9th Cir. 2009).

Here, the love letter ban is underinclusive in at least two respects: it does not stop a buyer from writing a love letter directly to the seller; and the law also does not prohibit the seller's agent from conveying information about the buyer to the seller if that information did not come from the buyer, such as if the seller's agent personally knows the buyer or researches about the buyer on social media.

If the state is correct in its unfounded assertion that love letters promote housing discrimination, then direct buyer-seller communications pose at least as great a threat to the state's interests as a love letter conveyed through the seller's agent. Indeed, these direct buyer-seller communications are *more* likely to create a risk of housing discrimination than the communications prohibited by the lover letter ban. When brokers trained in how to avoid housing discrimination act as an intermediary between buyers and sellers, a buyer's broker can flag

problematic communications and either encourage a buyer to rewrite a letter or decline to disclose a protected status, and a seller's broker can notify the seller that relying on a protected status revealed in a letter or other communication would be unlawful and guide the seller toward compliance. Ambrose Decl. ¶ 7. The love letter ban drives buyers away from these safeguards toward communications that are more likely to endanger the state's purported interests.

### 3.    The Love Letter Ban Is More Extensive Than Necessary to Fulfil the Government's Objective

The love letter ban is more extensive than necessary because there are obvious less restrictive alternatives to a total ban on love letters and other communications that are "not customary" that the government could have pursued.

A law cannot survive intermediate scrutiny, "if there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech." *City of Cincinnati v. Discovery Network*, 507 U.S. 410, 417 n.13 (1993). In short, "the availability of obvious less-restrictive alternatives renders a speech restriction overinclusive." *Valle Del Sol Inc.*, 709 F.3d at 826. *See also Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 949 (9th Cir. 2011) (en banc) ("The city has various other laws at its disposal that would allow it to achieve its stated interests while burdening little or no speech."). For example, in *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, a city ordinance banned street soliciting in order to promote traffic safety and reduce congestion. 657 F.3d at 941-42. The court invalidated the ordinance under intermediate scrutiny because the city could have achieved its goals by focusing on the underlying conduct instead of speech that might lead to the conduct, holding that "[t]he City need only enforce laws against jaywalking, stopping in traffic along a red-painted curb, and stopping a car so as to obstruct the normal movement of traffic." *Id.* at 949. Under intermediate

scrutiny, a court "cannot ignore the existence of … readily available alternatives" such as focusing on underlying conduct. *Id.* at 950.

In this case, the love letter ban is far more extensive than necessary. It broadly prohibits all love letters, not just those that implicate protected class status. In fact, it extends beyond love letters to all communications that are not "customary." Because the love letter ban is overinclusive, it is not narrowly tailored, and its enforcement should be enjoined. *See Comite de Jornaleros de Redondo Beach*, 657 F.3d at 948 (citing *Watchtower Bible and Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 168 (2002)).

The state may attempt to argue that the love letter ban is not more extensive than necessary because it allows buyers to communicate directly with sellers. But the love letter ban makes it significantly more difficult for  communication to occur. In *Linmark*, the Supreme Court rejected the argument that a ban on for sale signs could be justified because the status of a home could be conveyed in other ways such as "leaflets, sound trucks, demonstrations, or the like." The Court noted that "in practice realty is not marketed through" these means and that other alternatives might "involve more cost and less autonomy," be "less likely to reach" the intended audience, or "be less effective media for communicating the message." *Id.* at 93. As a result, "the alternatives … [were] far from satisfactory." *Id.* The same is true with the love letter ban: it would be highly unusual for a buyer represented by a broker to reach out directly to a seller, and such a communication would be far less likely to reach and be read by the seller before a real estate transaction is consummated. Smith Decl. ¶ 13. Moreover, there is no other way for a broker to engage in protected speech on behalf of her client.

There are obvious alternatives to such a wide-ranging prohibition that would be less burdensome on protected speech which the government has failed to utilize. The most obvious of

these alternatives is to enforce the existing anti-discrimination law that applies to real estate transactions. *See IMDB.com Inc.*, 962 F.3d at 1123 ("Rather than restrict truthful speech, the typical 'method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it.'") (quoting *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001)). The government's stated interest in imposing the love letter ban is to "help a seller avoid selecting a buyer based on the buyer's race, color, religion, sex, sexual orientation, national origin, marital status or familial status as prohibited by the Fair Housing Act (42 U.S.C. 3601 et seq.)." H.B. 2550, 2021 Or. Legis. Serv. ch. 359 (West). Fortunately, Oregon already bans discrimination in the selling of houses and applies this prohibition to both sellers and real estate brokers. Or. Rev. Stat. § 659A.421 (2021). Just like enforcing traffic regulations was a less burdensome means of satisfying the government's interests than barring driver solicitation in *Comite de Jornaleros*, enforcing this already-existing prohibition against discriminatory conduct in the real estate market would be a far less burdensome method of preventing discrimination without also banning a wide range of protected speech. *See Comite de Jornaleros*, 657 F.3d at 949–51.

Another alternative that would burden less speech would be to narrowly target letters that actually refer to protected class status. The government could have passed a law that would have required seller's agents to withhold letters that refer to protected class status and only give the sellers information unrelated to that class from those letters. It could also simply have required seller's agents to redact any letters they might receive to remove any references to a protected class. In fact, the bill as it was originally introduced proposed this very solution. H.B. 2550, 81st

Leg. Ass., Reg. Sess. (Or. 2021).[14] Instead, HB 2550 bans all love letters and non-customary communications, whether they refer to a protected class or not.

Another alternative that would be less burdensome than banning protected speech would be to implement training for real estate brokers to help them recognize, avoid, and prevent discrimination. Anti-bias training would also be a less burdensome way to reduce the influence of implicit bias on the real estate market than banning all love letters. Oregon already requires real estate brokers to take a course, approved by the Real Estate Board, which discusses these very issues. Or. Rev. Stat. § 696.174 (2021); Or. Real Estate Agency, *Law and Rule Required Course 2022-2023*, Or. Real Estate Agency (Aug. 4, 2021).[15] This training teaches brokers about the requirements of state and federal fair housing laws and how to recognize prohibited transactions and implicit bias without burdening protected speech. Or. Real Estate Agency, *supra*. Anti-discrimination and anti-bias training is much less burdensome than the love letter ban's broad prohibition on non-customary documents while still enabling the government to combat discrimination and implicit bias in the real estate market.

The government could also implement a number of additional alternatives if it wishes to reduce racial disparities in the housing market. There are several measures that the state could use that would make housing more affordable to marginalized communities while also refraining from banning protected speech. For example, the government could implement upzoning measures to allow for new development capacity. A higher development capacity would increase the supply of housing, making it more affordable, and could help reduce racial disparities. Vicki Been et al.,

---

[14] Although Plaintiff TREG does not necessarily suggest that such a solution would be constitutional either, it would at least burden far less speech than the current ban, which bans every single love letter or other communication.
[15] https://www.oregon.gov/rea/Educators/PostLicense/Documents/LARRC-22-23-Outline-Final.pdf.

*Supply Skepticism: Housing Supply and Affordability*, N.Y.U Furman Center 10–12 (2018), https://furmancenter.org/files/Supply_Skepticism_-_Final.pdf. The government could also make efforts to simplify housing permits, eliminate barriers to urban growth, and help first-time buyers secure more favorable terms. There are many ways in which the government could have attempted to combat racial disparities in home ownership that would not burden speech.

"The point is not that [Oregon] must enact all or even any of the proposed measures discussed above. The point is instead that the [state] has available to it a variety of approaches that appear capable of serving its interests, without" restricting speech. *McCullen v. Coakley*, 573 U.S. 464, 493–94 (2014). For this reason, the ban is more extensive than necessary, and does not pass muster under intermediate scrutiny.

### 4. The Government Bears the Burden of Showing Why Alternatives Measures Could Not Succeed

Restrictions on speech must be a last resort rather than the first recourse. To ensure that this is the case, the State "must show that it 'seriously undertook to address the problem with less intrusive tools readily available to it'" and that "imposing lesser burdens . . . 'would fail to achieve the government's interests, not simply that the chosen route was easier.'" *McCullen*, 573 U.S.at 494–95. Of course it may be "easier" to bar love letters altogether, "[b]ut that is not enough to satisfy the First Amendment." *Id.* at 495; *see also Americans for Prosperity v. Bonta*, 141 S. Ct. 2373, 2387 (2021) ("ease of administration" is not an appropriate rationale for restricting speech). Instead, this burden must be satisfied "by describing the efforts it had made to address the government interests at stake by substantially less-restrictive methods or by showing that it seriously considered and reasonably rejected." alternatives. *Bruni v. City of Pittsburgh*, 824 F.3d 353, 371 (3d Cir. 2016) (citing *McCullen*). The State of Oregon cannot show that it "seriously

undertook to address the problem with the less intrusive tools readily available to it," when there is no evidence of even a single enforcement action brought under existing fair housing laws for the improper transmission or use of a love letter. And the State similarly can point to no serious consideration of the variety of less-restrictive alternatives discussed above.

## V.    PLAINTIFF WILL SUFFER IRREPARABLE HARM WITHOUT A PRELIMINARY INJUNCTION

The "loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury." *Klein v. City of San Clemente,* 584 F.3d 1196, 1207–08 (9th Cir. 2009) (citing *Elrod v. Burns,* 427 U.S. 347, 373 (1976). This standard applies with full force to commercial speech restrictions. *Valle Del Sol Inc.*, 709 F.3d at 828 (upholding a finding of irreparable harm against an ordinance that prohibited in-street employment solicitation because a First Amendment injury "unquestionably constitutes irreparable harm"). *See also Pac. Frontier v. Pleasant Grove City,* 414 F.3d 1221, 1235 (10th Cir. 2005) ("We therefore assume that plaintiffs have suffered irreparable injury when a government deprives plaintiffs of their commercial speech rights").

Presuming irreparable harm is particularly appropriate in this case as if Oregon's love letter ban is allowed to go into effect, Plaintiff and its brokers will be required to significantly curtail their speech on behalf of clients  Ambrose Decl. ¶¶ 13-15.  It also places them between the Scylla of violating the love letter ban and the Charybdis of violating the fiduciary and ethical duties of obedience, diligence, and full disclosure that they owe to their clients. Ambrose Decl. ¶ 7; Smith Decl. ¶ 9. *See Gibson Bowles, Inc. v. Montgomery*, 625 P.2d 670, 673 (Or. 1981) ("A real estate broker has a duty of full disclosure of information to his principal. This includes informing the principal of all facts the principal should know in transacting his business.")

Whatever they choose, Plaintiff's brokers face the risk of the loss of commissions, financial penalties, and even the loss of their professional licenses. *Gibson Bowles, Inc.*, 625 P.2d at 673 (explaining that the breach of the fiduciary duty of full disclosure "is an equitable defense which constitutes a complete defense to an action for a commission by a real estate broker." Moreover, the type of speech contained in love letters is extremely time sensitive and so the presumption of irreparable harm applies with particular force where "the element of timeliness may be important." *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1021 (9th Cir. 2009).[16]

## VI.    THE BALANCE OF HARMS AND PUBLIC INTEREST WEIGH IN PLAINTIFF'S FAVOR

The irreparable harms that Plaintiff will suffer without a preliminary injunction outweigh any harm that the preliminary injunction would cause Defendants. The law "clearly favors granting preliminary injunctions to a plaintiff … who is likely to succeed on the merits of [its] First Amendment claim," *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009), because the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *see also Zepeda v. I.N.S.*, 753 F.2d

---

[16] Plaintiff's injuries are also irreparable because it cannot seek monetary relief due to Defendants' sovereign immunity. *See California Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009), *vacated on other grounds sub nom. Douglas v. Indep. Living Ctr. of S. California, Inc.*, 565 U.S. 606 (2012) ("We are persuaded that because the Hospital Plaintiffs and their members will be unable to recover damages against the Department even if they are successful on the merits of their case, they will suffer irreparable harm if the requested injunction is not granted.")*. See also April in Paris v. Becerra*, 494 F. Supp. 3d 756, 770 (E.D. Cal. 2020) ("Where . . . sovereign immunity bars a financial recovery, monetary injury may be irreparable."); *Calvillo Manriquez v. Devos*, 345 F. Supp. 3d 1077, 1106 (N.D. Cal. 2018) ("Where sovereign immunity bars certain types of damages, those damages can constitute irreparable harm."). Any financial injury suffered as a direct consequence of the love letter ban will therefore not be recoverable.

719, 727 (9th Cir. 1983) ("[T]he INS cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations.").

Moreover, "the public interest favors the exercise of First Amendment rights," *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014), and accordingly the 9th Circuit has "consistently recognized the significant public interest in upholding First Amendment principles" through the issuance of a preliminary injunction. *Sammartano v. First Jud. Dist. Ct., in & for Cty. of Carson City*, 303 F.3d 959, 974 (9th Cir. 2002). Indeed, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). In contrast, given the absence of evidence that love letters are contributing to racial discrimination and the fact that existing anti-discrimination laws fully cover unlawful discrimination in the real estate market, the public will not suffer an injury if the love letter ban is enjoined.

## VII.   NO SECURITY SHOULD BE REQUIRED

No bond should be required in this case. "Federal courts have consistently waived the bond requirement in public interest . . . litigation, or required only a nominal bond." *Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1198 (D. Or. 2012) (citing *People of State of Calif. ex rel. Van de Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319 (9th Cir. 1985)). Moreover, Plaintiff has established a strong likelihood of success on the merits given Defendants' explicit violation of First Amendment freedoms, and this "tips in favor of a minimal bond or no bond at all." *Van De Kamp*, 766 F.2d at 1326. Finally, "the bond amount may be zero if there is no evidence the party will suffer damages from the injunction," and that is the case here. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003). There is therefore no need for a bond or other security.

Dated: November 18, 2021

s/ Christina M. Martin
Local Counsel, OSB #084117
