ELLEN F. ROSENBLUM
Attorney General
BRIAN SIMMONDS MARSHALL  #196129
Senior Assistant Attorney General
ALEX JONES #213898
Assistant Attorney General
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Brian.S.Marshall@doj.state.or.us
        Alex.Jones@doj.state.or.us
Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| TOTAL REAL ESTATE GROUP, LLC, an Oregon limited liability company,<br><br>       Plaintiff,<br><br>   v.<br><br>STEVE STRODE, in his official capacity as the Oregon Real Estate Commissioner; ELLEN ROSENBLUM, in her official capacity as Attorney General for the State of Oregon's Department of Justice,<br><br>       Defendants. | Case No.  3:21-cv-01677-HZ<br><br>DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION |

Page i -    DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
BM2/jl9/

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND ................................................................................................. 2

        A.      Race Discrimination in Housing in Oregon ............................................ 2

                1.      In Oregon's early history, the State excluded non-white citizens
                        and violated their property rights. .............................................. 3

                2.      State policies and organized efforts of the real estate industry
                        encouraged race discrimination and residential segregation in
                        Oregon well into the 20th Century ............................................. 3

                3.      The effects of past discrimination, reinforced by ongoing private
                        discrimination, persist in housing disparates and residential
                        segregation. ................................................................................. 4

        B.      "Love Letters" and Residential Real Estate Sales ................................. 5

        C.      House Bill 2550 ...................................................................................... 8

        D.      This Litigation ........................................................................................ 9

III.    LEGAL STANDARDS ....................................................................................... 9

IV.     STATUTORY INTERPRETATION ................................................................ 10

V.      ARGUMENT .................................................................................................... 12

        A.      TREG is Unlikely to Succeed on the Merits of its First Amendment Claim ........ 12

                1.      HB 2550 does not violate the First Amendment rights of real estate
                        brokers ........................................................................................ 13

                        a.      HB 2550 restricts real estate brokers' conduct, not their
                                speech. ............................................................................ 13

                        b.      HB 2550 survives rational basis review ......................... 16

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

2.    TREG is unlikely to succeed on its clients' First Amendment
      claims. ........................................................................................... 17

      a.    TREG lacks standing to assert the rights of its clients. ................ 17

      b.    Even if TREG may assert its clients' First Amendment
            rights, HB 2550 satisfies intermediate scrutiny. .......................... 19

            i.    Letters in support of real estate buyers' offers are
                  commercial speech. .......................................................... 20

            ii.   The State has a compelling interest in preventing
                  housing discrimination. .................................................... 23

            iii.  HB 2550 advances the State's interest in preventing
                  discrimination. ................................................................. 23

            iv.   HB 2550 is well-targeted to preventing
                  discrimination. ................................................................. 29

B.    The Balance of Equities Favors the State. ............................................... 33

      1.    TREG has not suffered an injury. ............................................... 33

      2.    The public interest disfavors an injunction. ............................... 34

VI.   **CONCLUSION** ...................................................................................... **35**

Page iii -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
BM2/jl9/

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

# TABLE OF AUTHORITIES

## Cases

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) .................................... 10

*Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107 (9th Cir. 2021)................................................. 20

*Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401 (9th Cir. 1991)................................................................................................................................ 33

*Bd. of Trs. of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195 (9th Cir. 2019)......... 26

*Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989)...................................................... 22

*Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989) ........................................ 19

*Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980) 19, 23, 29

*City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993) ........................................... 29

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002)............................................... 27

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986)..................................................... 27

*Coral Constr. Co. v. King County*, 941 F.2d 910 (9th Cir. 1991) ................................................ 26

*Craig v. Boren*, 429 U.S. 190 (1976).......................................................................................... 19

*Dent v. West Virginia*, 129 U.S. 114 (1889) ............................................................................... 13

*F.C.C. v. League of Women Voters of Cal.*, 468 U.S. 364 (1984)................................................ 15

*F.C.C. v. Pacifica Found.*, 438 U.S. 726 (1978) ........................................................................ 14

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157 (9th Cir. 2008).................................................................................................................................... 29

*Fla. Bar v. Went For It, Inc.*, 515 U.S. 618 (1995)...................................................................... 13

*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949)........................................................ 15

*Goldfarb v. Va. State Bar*, 421 U.S. 773 (1975)......................................................................... 13

*Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173 (1999)......................... 29

*Greater Phila. Chamber of Commerce v. City of Philadelphia*, 949 F.3d 116 (3d Cir. 2020) ..................................................................................................................................... 27

*Hong Kong Supermarket v. Kizer*, 830 F.2d 1078 (9th Cir. 1987)........................................ 17, 19

*Hunt v. City of Los Angeles*, 638 F.3d 703 (9th Cir. 2011) .................................................. 20, 22

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*Italian Colors Rest. v. Becerra*, 878 F.3d 1165 (9th Cir. 2018) .................................................. 29

*Jancik v. HUD*, 44 F.3d 553 (7th Cir. 1995)............................................................................... 29

*Jarlstrom v. Aldridge*, 366 F. Supp. 3d 1205 (D. Or. 2018)...................................................... 13

*Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509 (7th Cir. 2014).............................................. 20

*June Med. Servs. L. L. C. v. Russo*, 140 S. Ct. 2103 (2020) ..................................................... 19

*King v. Governor of the State of N.J.*, 767 F.3d 216 (3d Cir. 2014)........................................... 27

*Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85 (1977) ................................ 30

*Lopez v. Brewer*, 680 F.3d 1068 (9th Cir. 2012) ........................................................................ 9

*Los Angeles v. Preferred Commc'ns, Inc.*, 476 U.S. 488 (1986)................................................ 15

*Metro Lights, LLC v. City of Los Angeles*, 551 F.3d 898 (9th Cir. 2009)............................. 23, 28

*Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018).................... 13, 16, 27

*Nken v. Holder*, 556 U.S. 418 (2009) ....................................................................................... 10

*One World One Family Now v. City and Cty. of Honolulu*, 76 F.3d 1009 (9th Cir. 1996) ......... 22

*PGE v. Bureau of Labor & Indus.*, 317 Or. 606 (1993) ............................................................. 11

*Phillips v. Borough of Keyport*, 107 F.3d 164 (3d Cir. 1997) .................................................... 26

*Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014).................................................................. 15, 16

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376 (1973)............ 20

*Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367 (1969).................................................................. 15

*REX – Real Estate Exch., Inc. v. Brown*, No. 3:20-CV-02075-HZ, 2021 WL 5855660
   (D. Or. Dec. 9, 2021) ............................................................................................................ 13

*Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988) ........... 21

*Romero-Ochoa v. Holder*, 712 F.3d 1328 (9th Cir. 2013).......................................................... 16

*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47 (2006)................................. 14, 15

*Shelley v. Kraemer*, 334 U.S. 1 (1948) ....................................................................................... 4

*Short v. Brown*, 893 F.3d 671 (9th Cir. 2018) ........................................................................ 9, 34

*Singleton v. Wulff*, 428 U.S. 106 (1976) .................................................................................... 18

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ........................................................................ 14

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*State v. Gaines*, 346 Or. 160 (2009).............................................................................................. 11

*State v. Kragt*, 368 Or. 577 (2021)................................................................................................ 11

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519 (2015) ......... 25

*Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622 (1994)............................................................... 15

*U.S. Dep't of Labor v. Triplett*, 494 U.S. 715 (1990)..................................................................... 19

*United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629 (9th Cir. 2012) ............................ 25

*United States v. Edge Broad. Co.*, 509 U.S. 418 (1993)................................................................. 23

*United States v. Schales*, 546 F.3d 965 (9th Cir. 2008)................................................................. 12

*United States v. United Foods, Inc.*, 533 U.S. 405 (2011) ............................................................ 20

*Valle Del Sol Inc. v. Whiting*, 709 F.3d 808 (9th Cir. 2013)......................................................... 28

*Viceroy Gold Corp. v. Aubry*, 75 F.3d 482 (9th Cir. 1996) .................................................... 17, 18

*Video Gaming Techs., Inc. v. Bureau of Gambling Control*, 356 F. App'x 89 (9th Cir. 2009) .............................................................................................................................................. 34

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982)................. 18

*Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980) ................................ 18

*Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988)...................................................... 18

*Virginia v. Hicks*, 539 U.S. 113 (2003).......................................................................................... 12

*W. States Paving Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983 (9th Cir. 2005) ................ 23

*Watson v. Maryland*, 218 U.S. 173 (1910) .................................................................................... 13

*White v. City of Sparks*, 500 F.3d 953 (9th Cir. 2007)................................................................... 22

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ................................................................. 9, 10

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985)............................................................................................................................................. 28

**Oregon Statutes**

House Bill 2550  (Or. Laws 2021, ch. 359)............................................................................. *passim*

ORS 659A.421 ............................................................................................................................ 5, 7

ORS 696.020 ................................................................................................................................. 13

ORS 696.301 ................................................................................................................................. 13

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

ORS 696.805 ............................................................................................................ 7, 14

**Federal Statutes**

42 U.S.C. § 3604 ........................................................................................................... 5

42 U.S.C. §§ 3601–19 ................................................................................................... 7

**Rules and Regulations**

OAR 839-005-0003 ....................................................................................................... 5

OAR 863-015-0125 ..................................................................................................... 13

OAR 863-015-0155 ..................................................................................................... 14

OAR 863-015-0175 ..................................................................................................... 14

**Constitutional Provisions**

Or. Const. Art. I § 34 (1857)......................................................................................... 3

**Other Authorities**

Steve Strode, *FAQs Regarding HB 2550* (Dec. 2021)........................................... 10, 30

Measure History, HB 2550, 2021 Regular Session ....................................................... 9

Video Recording, House Committee on Housing, HB 2550, Feb 4, 2021 .................. 8, 11, 24, 26

Video Recording, House Committee on Housing, HB 2550, May 4, 2021............................. 8, 12

Video Recording, House Floor, HB 2550, Apr. 15, 2021 ................................................. 8, 11, 24

Video Recording, Senate Committee on Housing, HB 2550, May 25, 2021 ............................. 33

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## I.    INTRODUCTION

State and federal laws prohibit discrimination in home sales because of race, color, national origin, religion, sex, sexual orientation, gender identity, familial status, marital status, and disability ("protected characteristics").  Despite these longstanding prohibitions, housing discrimination and residential segregation persist, and the rate of homeownership of non-Hispanic white Oregonians is more than 20 percent higher than African American, American Indian, Hispanic, and Pacific Islander Oregonians.

To decrease the influence of prospective homebuyers' protected characteristics on sellers' decisions, the legislature enacted House Bill 2550 (2021) (HB 2550), which directs a seller's agent to "reject any communication other than customary documents in a real estate transaction, including photographs, provided by a buyer."  The law stops real estate agents' facilitation of the practice of sending buyer "love letters": personalized letters submitted by a prospective buyer to a seller to persuade the seller to accept the buyer's offer.  Love letters typically seek to emphasize perceived commonalities between buyer and seller and almost always reveal protected characteristics of the buyer.  The National Association of Realtors has recognized that love letters pose a risk of facilitating unlawful housing discrimination, either knowingly or due to the seller's unconscious bias, and has recommended that agents not accept or deliver love letters. However, before HB 2550 was enacted, Oregon law generally required sellers' agents to forward communications intended for their clients, including love letters.  Buyers' agents also felt compelled to encourage their clients to write love letters to compete with other prospective buyers who were doing so.  The Oregon Realtors support HB 2550 to resolve this tension and to discourage unlawful discrimination.

The law is well targeted to the State's interest in preventing housing discrimination.  The law targets only the agent's professional role as a conduit for communications, and imposes only an incidental burden, if any, on the agent's speech.  The law does not prohibit a buyer from sending a letter directly to a seller.  Rather, it seeks to stop real estate agents from encouraging

Page 1 -   DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
BM2

love letters.  This restriction on commercial speech is well-targeted to advance the government's substantial interest in preventing discrimination.  Total Real Estate Group, LLC ("TREG")'s First Amendment challenge to the law is therefore unlikely to succeed on the merits.

Nor has TREG shown that allowing the law to go into effect will result in irreparable injury to TREG or its clients.  The only practicing broker who submitted a declaration in support of the motion already stopped submitting love letters before the law went into effect with no harm to her business.  The balance of equities disfavors a preliminary injunction which would delay the State's efforts to protect against discrimination in the residential housing market.

The motion for a preliminary injunction should be denied.

## II.    BACKGROUND

### A.    Race Discrimination in Housing in Oregon

Oregon suffers from a centuries-long history of severe, widespread public and private race discrimination in the sale of residential real estate.  The Legislative Assembly has acknowledged and studied the legacy of this discrimination and its persistence.[1]  Ending private discrimination and remediating the effects of past discrimination is the express purpose of HB 2550.[2]  That history is briefly summarized here and described in more detail in the Report on Addressing Barriers to Home Ownership for People of Color in Oregon by the Legislative Assembly's Joint Task Force Addressing Racial Disparities in Home Ownership[3] and the expert report of Professor Lisa Bates of Portland State University.[4]

---

[1]  Jones Decl., Ex. 1 (Legislative Assembly's Joint Task Force Addressing Racial Disparities in Home Ownership, Report on Addressing Barriers to Home Ownership for People of Color in Oregon (Dec. 31, 2019) (Joint Task Force Report) at 50–54) (summarizing 19th and 20th Century of history of race discrimination in housing in Oregon).

[2] HB 2550 § 1 (amending ORS 696.805(7)) ("In order to help a seller avoid selecting a buyer based on the buyer's race, color, religion, sex, sexual orientation, national origin, marital status or familial status as prohibited by the Fair Housing Act ….").

[3] Jones Decl., Ex. 1 (Joint Task Force Report).

[4] Bates Decl., Ex. 1.

Page 2 -   DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
BM2

1.    **In Oregon's early history, the State excluded non-white citizens and violated their property rights.**

When Oregon was still a territory, free African Americans were prohibited from settling in Oregon, a rule incorporated in the Oregon Constitution.[5]  The original Oregon Constitution also provided that African Americans could not "hold any real estate," and African Americans and other minorities were excluded from homestead programs open to white settlers.[6]  The 1860 census reported only 128 of Oregon's 52,465 residents were African Americans (0.24%).[7]

2.    **State policies and organized efforts of the real estate industry encouraged race discrimination and residential segregation in Oregon well into the 20th Century.**

In 1937, the Federal Home Loan Corporation created "redlined" maps designating neighborhoods with racial minority households as higher risk, which were then used by appraisers, mortgage lenders, and loan insurers to make lending decisions.[8]  This disinvestment "reinforced the belief that minority-race residents depressed property values…."[9]  Racial covenants that a home could only be sold to white buyers were commonplace in many Portland

---

[5] Bates Decl., Ex. 1 at 3; Jones Decl., Ex. 1 (Joint Task Force Report) at 50.  The original Oregon Constitution provided:

> No free Negro, or Mulatto, not residing in this state at the time of the adoption of this constitution, shall come, reside, or be within this state, or hold any real estate, or make any contracts, or maintain any suit therein; an[d] the Legislative Assembly shall provide by penal laws, for the removal, by public officers, of all such Negroes, and Mulattos, and for their effectual exclusion from the state, and for the punishment of persons who shall bring them into the state, or employ, or harbor them.

Article I, § 34 (adopted by popular vote pursuant to Art. XVIII § 4), available at https://sos.oregon.gov/archives/exhibits/constitution/Documents/transcribed-1857-oregon-constitution.pdf.

[6] *Id.*; Bates Decl., Ex. 1 at 3; Jones Decl., Ex. 1 (Joint Task Force Report) at 51.

[7] Bates Decl., Ex. 1 at 3.

[8] Bates Decl., Ex. 1, at 5.

[9] Bates Decl., Ex. 1 at 6.

Page 3 -   DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
BM2

neighborhoods in the first half of the 20th century[10] until the Supreme Court held they were unenforceable in 1948.[11]   At least as late as 1945, realtors in Portland were prohibited by their association's code of ethics from selling homes in predominantly white neighborhoods to African American households.[12]   As a consequence of these policies, most African Americans and Japanese Americans lived in the Albina district of North Portland, and many other neighborhoods remained overwhelmingly white.[13]

### 3. The effects of past discrimination, reinforced by ongoing private discrimination, persist in housing disparaties and residential segregation.

"After many decades of exclusion and barriers to accessing housing and mortgages, there continue to be considerable racial gaps in homeownership in Oregon."[14]   As the Legislative Assembly's Joint Task Force found, stark disparities in home ownership rates persist in Oregon:

**Oregon Homeownership Rates 2013–2017**[15]

| Community | Rate |
|---|---|
| American Indian / Alaskan Native | 44.8% |
| Asian | 59.4% |
| Black or African American | 32.2% |
| Hispanic or Latino | 40.8% |
| Native Hawaiian or Another Pacific Islander | 33.4% |
| Other Races | 40.6% |
| Two or More Races | 46.4% |
| White, Not Hispanic or Latino | 65.1% |
| **Overall Rate** | **61.1%** |

---

[10] Bates Decl., Ex. 1 at 6; Jones Decl., Ex. 1 (Joint Task Force Report) at 51.

[11] *Shelley v. Kraemer*, 334 U.S. 1 (1948).

[12] Bates Decl., Ex. 1 at 7.

[13] Bates Decl., Ex. 1 at 7.

[14] Bates Decl., Ex. 1 at 8.

[15] Jones Decl., Ex. 1 at 6 (Joint Task Force Report) (Table 2) (citing U.S. Census American Community Survey data); *see also* Bates Decl., Ex. 1 at 9 (providing a similar dataset statewide and by metropolitan area).

Page 4 -   DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
BM2

Residential segregation persists in many cities and neighborhoods throughout the state as well.[16]

**B.    "Love Letters" and Residential Real Estate Sales**

In residential real estate transactions, personalized letters submitted by a buyer to a seller to persuade the seller to accept the buyer's offer are known as "love letters."[17]  Love letters communicate personal information about buyers to encourage the sellers to select their offer for reasons other than its financial terms.[18]  Many love letters include photographs, or even videos, of the buyers.[19]

Love letters almost always reveal information about the buyer's personal characteristics, which include protected characteristics such as the buyer's race, color, sexual orientation, marital status, or familial status (i.e., whether the buyer has children).[20]  Of the letters that TREG has produced in this litigation, 93% revealed information about at least one protected characteristic.[21]  The median number of protected characteristics revealed in a letter was five.[22]

Love letters are often designed to highlight perceived commonalities between buyer and seller, including protected characteristics.[23]  For example, letters often highlight a buyer's children (familial status).[24]  Love letters sometimes even include letters written by buyers'

---

[16] Bates Decl., Ex. 1 at 10.

[17] Bonner Decl. ¶¶ 2–3; Mullane Decl. ¶¶ 3–4; Rogers Decl. ¶ 7.

[18] Rogers Decl. ¶ 7.

[19] Bonner Decl. ¶ 2; Mullane Decl. ¶ 3; Steil Decl., Ex. 1 (Steil Report) at 4, 14 (Table 2).

[20] *See* 42 U.S.C. § 3604 (race, color, religion, sex, familial status, national origin, and disability); ORS 659A.421(2) (federal protected classes, plus sexual orientation, marital status, and source of income); OAR 839-005-0003 (defining "[s]exual orientation" as including "gender identity").

[21] Steil Decl., Ex. 1 at 12, 14 (Table 2).

[22] Steil Decl., Ex. 1 at 12.

[23] Mullane Decl. ¶ 4.

[24] Mullane Decl. ¶ 4; Bonner Decl. ¶ 3.

Page 5 -   DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
BM2

children or pictures drawn by children.[25]  Of the letters written by TREG's clients produced in this case, 85% revealed whether the buyer had children.[26]

All three of the practicing real estate agents who submitted declarations agree love letters influence sellers' decisions.[27]  Chris Bonner, who has worked as a real estate agent in the Portland area since 1990, declared, "sellers cannot help but be influenced by the contents of a letter, including when the letter discloses information such as a buyer's familial status."[28]  An analysis released by a leading national real estate broker, Redfin, confirmed that conclusion, finding that personal letters increased the likelihood of having an offer accepted by 52%.[29]

Recognizing the power of love letters, buyers' agents sometimes help buyers draft letters to have maximum impact on a seller in a competitive home-buying situation.[30]  Websites advising agents on the use of love letters commonly suggest "getting personal" and "emphasizing commonalities."[31]  Even agents who recognize the problems posed by such a strategy sometimes encourage their clients to write love letters in order to maximize the chances of an offer being accepted.[32]

The National Association of Realtors ("NAR") recognizes that love letters can pose fair housing risks because they often reveal protected characteristics, "which could then be used, knowingly or through unconscious bias, as an unlawful basis for a seller's decision to accept or

---

[25] Mullane Decl. ¶ 3.

[26] Steil Decl., Ex. 1 at 13, 14 (Table 2).

[27] Bonner Decl. ¶¶ 2–4; Mullane Decl. ¶¶ 3–6; Smith Decl. ¶¶ 2–3, 5.

[28] Bonner Decl. ¶ 4.

[29] Bates Decl., Ex. 1 at 15 (citing Rachel Musiker, *Which Bidding War Strategies Are Most Effective?*, Redfin (Jan. 18, 2018), https://www.redfin.com/news/which-bidding-war-strategies-are-most-effective/, which analyzed 14,000 offers written by Redfin agents in 2016 and 2017).

[30] Mullane Decl. ¶ 6.

[31] Bates Decl. Ex. 1 at 15.

[32] Mullane Decl. ¶ 6.

Page 6 -   DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
BM2

reject an offer."[33]  For that reason, NAR has recommended that real estate agents not deliver, accept, read, or help clients draft love letters.[34]

Before House Bill 2550 was enacted, the use of love letters was prevalent in the Oregon real estate industry, particularly when multiple prospective buyers competed for a property.[35] When a seller's agent received a letter from a buyer directed to the seller, the agent was required to forward it to the seller under ORS 696.805(2)(b), which requires a seller's agent to "present all written offers, written notices and other written communications to and from the parties in a timely manner," and ORS 696.805(2)(c), which requires a seller's agent to disclose material facts known by the agent and not apparent or readily ascertainable to a party to the transaction.[36]  At the same time, real estate licensees are subject to discipline by the Oregon Real Estate Agency and liable for civil penalties and damages for violating ORS 659A.421(2), which makes it unlawful for a real estate licensee to make any distinction between purchasers based on a protected characteristic, to circulate any communication that makes such a distinction, or to assist their client in doing so.[37]  The federal Fair Housing Act (42 U.S.C. §§ 3601–19) and the Realtor Code of Ethics and Standards of Practice impose similar prohibitions.[38]  Jeremy Rogers, Director of Legal Affairs for Oregon Realtors, declared that love letters create a clash between those statutory and ethical obligations, which "can only be resolved by a clear directive from the legislature, which HB 2550 (ORS 696.805(7)) provides."[39]

---

[33] Jones Decl., Ex. 5 at 1 (National Ass'n of Realtors, "Love Letters or Liability Letters?" (Oct. 23, 2020)).

[34] *Id*. at 2.

[35] Bonner Decl. ¶ 2; Mullane Decl. ¶ 3.

[36] Rogers Decl. ¶¶ 3–4, 6  & Ex. 1 (NAR Code of Ethics); Ambrose Decl. ¶ 8; Jones Decl., Ex. 3 at 39:9–40:4 (Ambrose Depo. Tr.).

[37] Rogers Decl. ¶ 5 (citing ORS 659A.421(2)).

[38] Rogers Decl. ¶ 5 (citing 42 U.S.C. §§ 3601–19) & Ex. 1.

[39] Rogers Decl. ¶ 6.

Page 7 -   DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
BM2

## C.   House Bill 2550

Representative Mark Meek, a licensed real estate agent in Oregon for over 25 years, introduced HB 2550 to combat "systemic issues of bias in real estate transactions."[40] Representative Meek testified that through his work as the co-chair of the Legislative Assembly's Task Force on Addressing Racial Disparities in Home Ownership, he concluded that the practice of using "love letters" could perpetuate "implicit biases that we're not even aware of."[41]  The Task Force had found wide racial disparities in home ownership in Oregon: the rate of homeownership among white families was more than 20% higher than for Black families and Latino families.[42]  His legislation was designed to discourage the use of love letters because their prevalence "perpetuates systemic issues of bias in real estate transactions and creates fair housing risks for real estate professionals."[43]  He explained that love letters "too often result in sellers making decisions based on their perception of who will fit in better in their neighborhood, furthering unfair housing practices and neighborhood racial segregation."[44]  The House unanimously approved the bill, which directed a seller's agent to "redact or withhold" communications provided by a buyer "as necessary to help the seller avoid selecting a buyer based on the buyer's race, color, religion, sex, sexual orientation, national origin, marital status, familial status or source of income."  HB 2550 (introduced).

In the Senate, members of the Committee on Housing expressed concerns that the law would place sellers' agents in a precarious position of determining which information to redact,[45]

---

[40] Video Recording, House Committee on Housing, HB 2550, Feb 4, 2021, at 3:02–3:15 (statement of Rep. Meek); *id.* at 6:05–6:15.

[41] *Id*. at 5:14–5:39.

[42] *Id.* at 8:44–9:50.

[43] Video Recording, House Floor, HB 2550, Apr. 15, 2021, at 8:24:29–8:24:44 (statement of Rep. Meek).

[44] *Id.* at 8:24:45–8:24:59.

[45] Video Recording, House Committee on Housing, HB 2550, May 4, 2021, at 28:19–30:18 (comments of Sen Linthicum); *id.* at 34:52–36:01 (comments of Sen Golden).

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

and the bill was amended to direct sellers' agents to reject all communications from buyers other than customary documents.[46]  The Senate passed the bill 18–11, the House concurred 58–1, and the Governor signed HB 2550 into law on June 23, 2021.[47]  The statute is effective January 1, 2022.  Or Laws 2021, ch 359, § 1.

## D.    This Litigation

Plaintiff filed this lawsuit (ECF 1) and moved for a preliminary injunction (ECF 3) on November 19, 2021.  The parties conducted limited discovery on an expedited basis, including depositions of TREG's declarants and TREG's production of "love letters" it sent and received.[48]  On December 2, TREG moved for expedited consideration of its motion for a preliminary injunction (ECF 20), which the Court denied (ECF 27).  The Court later granted the parties' joint motion setting a briefing schedule that concludes with TREG filing its reply on January 20, 2022 (ECF 29).

## III.    LEGAL STANDARDS

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (emphasis in original).  To obtain a preliminary injunction, plaintiffs must establish that "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest."  *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (citing *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)).  When the government is a party, courts consider the last two factors together, because the equities for the

---

[46] HB 2550 (2021), -A3 amendment (May 25, 2021).

[47] Measure History, HB 2550, 2021 Regular Session, https://olis.oregonlegislature.gov/liz/2021R1/Measures/Overview/HB2550.

[48] Joint Motion for Extension of Time (ECF 28) at 2.

Page 9 -   DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
BM2

State consist of the public interest in a case such as this. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). A plaintiff must establish each of the elements. *Winter*, 555 U.S. at 20–21.

The court may also balance the first and third factors to find that "serious questions going to the merits" combined with a balance of hardships that tips *sharply* towards the plaintiff can satisfy those two factors together, so long as the plaintiff also shows that there is a likelihood of irreparable injury. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Because the third and fourth factors are considered together, the *Alliance* balancing test requires TREG to show that its complaint raises serious First Amendment questions and also that the balance of equities tips sharply in its favor—that is, its own irreparable injury in complying with the law while this case is decided greatly exceeds the public interest served by the law.

## IV.    STATUTORY INTERPRETATION

As enacted, the statute provides:

> In order to help a seller avoid selecting a buyer based on the buyer's race, color, religion, sex, sexual orientation, national origin, marital status or familial status as prohibited by the Fair Housing Act (42 U.S.C. 3601 et seq.), a seller's agent shall reject any communication other than customary documents in a real estate transaction, including photographs, provided by a buyer.

ORS 696.805(7) (as amended by HB 2550, effective Jan. 1, 2022).

The Oregon Real Estate Commissioner enforces the legal duties of real estate brokers, including ORS 696.805(7). The Commissioner interprets the statute to permit the transmission of customary documents such as sales agreements, counter offer(s), addenda, disclosure forms, reports, and cover letters written by agents.[49] Buyers' "love letters" to sellers are not customary documents and must be rejected by the seller's agent rather than transmitted to the seller. The law does not regulate sellers, prospective buyers, or prospective buyers' agents at all.[50]

---

[49] Steve Strode, Real Estate Commissioner, *FAQs Regarding HB 2550 (The "Love Letter" Law)* (Dec. 2021), https://www.oregon.gov/rea/newsroom/Pages/2021_OREN-J/FAQs-Regarding-HB-2550-The-Love-Letter-Law.aspx.

[50] *Id.*

Page 10 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
BM2

The agency's interpretation of the statute is correct.  Under Oregon law, "question[s] of statutory interpretation [are] resolve[d] by considering the text, context, and any helpful legislative history."  *State v. Kragt*, 368 Or. 577, 586 (2021) (citing *State v. Gaines*, 346 Or. 160, 171-72, (2009)).  "When the legislature's intent is not clear from the text, context, and legislative history, [the court] may resort to maxims of statutory construction to resolve the uncertainty."  *Id.* at 594 (citing *PGE v. Bureau of Labor & Indus.*, 317 Or. 606, 612 (1993)).

The statute's text, context, and legislative history each show that the statute requires the seller's agent to reject a potential buyer's love letter but does not require a seller's agent to reject a cover letter from the potential buyer's agent.  First, a cover letter is a customary document, while a love letter is not.  Offers are typically conveyed with a cover note from the buyer's agent, which often includes a substantive explanation of the transaction, including the reasons the buyer is seeking the property.[51]  By contrast, love letters are less common,[52] and are generally only used in hot real estate markets when multiple competitive offers are expected.[53]  Second, a love letter is "provided by a buyer" whereas a cover letter is typically provided by a buyer's agent.

Any ambiguity in these terms is resolved by the legislative history.  The bill's sponsor repeatedly made clear that the aim of the bill was to end the practice of real estate agents transmitting buyers' "love letters" to sellers.[54]  By contrast, the legislative history contains no

---

[51] Jones Decl., Ex. 3 at 29:11–18 (Ambrose Depo. Tr.) ("typically"); Jones Decl., Ex. 5 at 81:18–20 (Smith Depo. Tr.) (estimating 75 percent).

[52] Jones Decl., Ex. 3 at 29:18–19 (Ambrose Depo. Tr.) ("periodically"); Jones Decl., Ex. 5 at 27:11–18 (Smith Depo. Tr.) (estimating 25 percent); Bates Decl., Ex. 1 at 15 (citing study finding Redfin agents used buyer-written love letters in 40 percent of offers).

[53] Jones Decl., Ex. 3 at 106:8–107:5 (Ambrose Depo. Tr.); Jones Decl., Ex. 5 at 28:7–16 (Smith Depo. Tr.); Bonner Decl. ¶ 2; Mullane Decl. ¶ 3.

[54] Video Recording, House Committee on Housing, HB 2550, Feb. 4, 2021, at 3:02–3:15 (statement of Rep. Meek) ("The practice of prospective buyers writing what we call love letters to the sellers in my opinion perpetuates . . . systemic issues of bias in real estate transactions."); Video Recording, House Floor, HB 2550, Apr. 15, 2021, at 8:23:48–8:23:56 (statement of Rep. Meek) ("In real estate transactions, prospective buyers will often submit what we like to call a

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

discussion at all of cover letters or other communications between agents.  In any event, given

the Commissioner's interpretation, TREG has no reason to fear an enforcement action based on a

cover letter or other transactional document.

## V.    ARGUMENT

**A.    TREG is Unlikely to Succeed on the Merits of its First Amendment Claim.**

TREG articulates two distinct First Amendment theories: (1) that HB 2550 "directly

burdens and chills the First Amendment rights of TREG and its brokers," and (2) "the law

burdens the First Amendment rights of TREG's clients," that is, sellers and potential buyers of

residential real estate.[55]  With respect to real estate brokers, HB 2550 regulates only the conduct

of sellers' agents, not their speech: the law prohibits agents from forwarding their clients' letters,

which they are otherwise required to do by statute.  As a law that regulates conduct, HB 2550 is

subject to rational basis review, which it easily survives.  *See* § IV.A.1, below.

With respect to buyers and sellers of residential real estate, HB 2550 regulates

commercial speech.  Thus, as TREG concedes, HB 2550 is subject to the intermediate scrutiny

test articulated by *Central Hudson*.  Because HB 2550 is well-targeted to advance the State's

interest in preventing and remedying discrimination, it survives intermediate scrutiny as well.

*See* § IV.A.2, below.

Both of these theories present facial challenges to the statute.  Even in the First

Amendment context, "[a] statute is not invalid simply because some impermissible applications

are conceivable."  *United States v. Schales*, 546 F.3d 965, 971 (9th Cir. 2008).  "Instead, the

'law's application to protected speech [must] be "substantial," not only in an absolute sense, but

also relative to the scope of the law's plainly legitimate applications.'"  *Id.* (quoting *Virginia v.*

*Hicks*, 539 U.S. 113, 119–20 (2003)).

---

love letter to try to stand out to a seller…."); Video Recording, Senate Committee on Housing,
HB 2550, May 4, 2021, at 17:25–2015 (statement of Rep. Meek).

[55] Pl.'s Mem. at 11–12.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

1.    **HB 2550 does not violate the First Amendment rights of real estate brokers.**

a.    **HB 2550 restricts real estate brokers' conduct, not their speech.**

"The Supreme Court has long recognized that states have broad authority to regulate the practice and licensing of certain professions." *Jarlstrom v. Aldridge*, 366 F. Supp. 3d 1205, 1214 (D. Or. 2018) (citing *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 625 (1995); *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975); *Watson v. Maryland*, 218 U.S. 173, 176 (1910); *Dent v. West Virginia*, 129 U.S. 114, 122 (1889)).  "States have a compelling interest in the practice of professions within their boundaries, and … as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions." *Fla. Bar*, 515 U.S. at 625 (quoting *Goldfarb*, 421 U.S. at 792).

One of those professions is that of a real estate agent.  *See REX – Real Estate Exch., Inc. v. Brown*, No. 3:20-CV-02075-HZ, 2021 WL 5855660, at *7–8 (D. Or. Dec. 9, 2021) ("*REX*"); *see, e.g.*, ORS 696.020(2) (imposing a license requirement for "professional real estate activity"); ORS 696.301(15) (authorizing the Real Estate Commissioner to revoke the license of a licensee who has "[e]ngaged in any conduct that is below the standard of care for the practice of professional real estate activity in Oregon as established by the community of individuals engaged in the practice of professional real estate activity in Oregon").  This Court recently rejected due process and equal protection challenges to a statute that prohibits sharing real estate commissions with any person who does not have a real estate license.  *REX*, 2021 WL 5855660, at *1, 8.  The Court explained that "regulating the interaction between sales professionals and consumers falls squarely within the governing power of the State and provides a rational basis" for the State's enforcement of the statute.  *Id.* at *8.

The Supreme Court "has upheld regulations of professional conduct that incidentally burden speech." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2373 (2018) ("*NIFLA*").  Some of Oregon's various regulations of professional real estate activity have the effect of either restricting or mandating speech of one form or another.  *See* OAR 863-015-0125

Page 13 - DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
BM2

(imposing requirements and restrictions on advertising by real estate licensees); OAR 863-015-0155 (prohibiting a real estate licensee from "discourag[ing] any party to a real estate transaction from seeking the advice of an attorney concerning any matter involving real estate activity in which such licensee is involved"); OAR 863-015-0175 (requiring a real estate licensee to notify the Real Estate Commissioner of any criminal conviction and certain other adverse decisions or judgments against the licensee).

House Bill 2550 requires a seller's agent to "reject any communication other than customary documents in a real estate transaction, including photographs, provided by a buyer." The law regulates an agent's conduct as a mere conduit for a communication from a buyer to a seller. A seller's agent is neither the source nor the intended recipient of a love letter. The seller's agent plays no role in selecting or editing the letter—the agent is required simply "[t]o present all written offers, written notices and other written communications to and from the parties in a timely manner." *See* ORS 696.805(2)(b); *see also* Jones Decl., Ex. 3 at 39:9–40:4 (Ambrose Depo. Tr.); Rogers Decl. ¶¶ 2, 4. There is therefore no expressive component to the agent's required act of transmission. *See Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 66 (2006) ("*FAIR II*") ("[W]e have extended First Amendment protection only to conduct that is inherently expressive."). House Bill 2550 is therefore a permissible regulation of professional conduct that does not burden the agent's speech. As a result, it is only subject to rational basis review.

Although a seller's agent is neither the author nor the audience of a love letter, TREG argues that agents are entitled to First Amendment protection as "intermediaries who transmit rather than produce speech." Pl.'s Mem. at 12–13. TREG cites a case that considered a restriction on pharmacies' and health insurers' sale of prescriber-identifying information and the disclosure or use of that information for marketing purposes (*Sorrell v. IMS Health Inc.*, 564 U.S. 552, 558–59 (2011)), as well as cases that considered the F.C.C.'s power to restrict or mandate the broadcasting of certain content (*F.C.C. v. Pacifica Found.*, 438 U.S. 726 (1978) and

Page 14 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
BM2

*Red Lion Broad. Co. v. F.C.C.*, 395 U.S. 367 (1969)).  However, although each of those cases involved a party's transmission of content that the party itself did not create, each case also involved a burden on a party's *choice* to convey or not convey a particular message or information.  As the Supreme Court explained in another broadcasting case, cable television programmers and operators engage in speech, because "[t]hrough 'original programming or by *exercising editorial discretion* over which stations or programs to include in its repertoire,' cable programmers and operators 'see[k] to communicate messages on a wide variety of topics and in a wide variety of formats.'"  *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 636 (1994) (quoting *Los Angeles v. Preferred Commc'ns, Inc.*, 476 U.S. 488, 494 (1986)) (emphasis added).

In contrast, a seller's agent who transmits a love letter neither conveys an original message nor exercises editorial discretion over which messages to transmit.  In fulfilling the statutory duty to transmit communications to the seller, the agent functions more like a common carrier, such as a telephone company, than a broadcaster.  *See F.C.C. v. League of Women Voters of Cal.*, 468 U.S. 364, 378 (1984) ("Unlike common carriers, broadcasters are entitled under the First Amendment to exercise the widest journalistic freedom consistent with their public duties.") (internal quotations and alteration omitted).  House Bill 2550 is thus a regulation of the agent's conduct, not the agent's speech.

Moreover, the conduct that is regulated is merely the agent's professional real estate activity.  "[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."  *FAIR II*, 547 U.S. at 62 (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)).  Applying this principle, the Ninth Circuit has held that a ban on providing sexual orientation change therapy to minors regulates conduct, not expressive speech, even when the therapy is administered through speech alone.  *Pickup v. Brown*, 740 F.3d 1208, 1229–31 (9th Cir. 2014), *abrogated on other grounds*

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

*by NIFLA*, 138 S. Ct. at 2374–75.[56]  The court emphasized that "the fact that speech may be used to carry out [mental health] therapies does not turn the regulation of conduct into a regulation of speech." *Id.* at 1229.  Because the statute regulated only the professional service itself, the court found that "any effect it may have on free speech interests is merely incidental," and held that it was subject to only rational basis review.  *Id.* at 1231.  Similarly, HB 2550 regulates only the agent's transmission of love letters.  Sellers' agents' obligatory transmission of love letters is not speech.  Rather, the agents are merely performing their professional duties, which are subject to regulation under the State's police power.

### b.    HB 2550 survives rational basis review.

As a result, with regard to a seller's agent's interests, HB 2550 is subject to only rational basis review.  *See Pickup*, 740 F.3d at 1231.  Under rational basis review, a law must be upheld if it bears a rational relationship to a legitimate state interest.  *Id.*  A court asks "only whether there are plausible reasons for [the legislature's] action, and if there are, [the court's] inquiry is at an end."  *Id.* at 1232 (quoting *Romero-Ochoa v. Holder*, 712 F.3d 1328, 1331 (9th Cir. 2013)).

Plaintiff concedes that preventing housing discrimination is an important interest.[57]  The law is rationally related to that interest.  Ninety-three percent of the love letters that plaintiff has produced in this litigation reveal information about one or more of a prospective buyer's protected characteristics under federal or Oregon fair housing laws.[58]  Testimony from experienced real estate agents confirms that sellers are often influenced by information about

---

[56] The Supreme Court in *NIFLA* appears to have abrogated *Pickup* to the extent that *Pickup* recognized a separate category of speech for "professional speech"—speech "within the confines of [the] professional relationship" between a professional and a client—but the Court did not "foreclose the possibility" that it might recognize such a category in the future.  *See NIFLA*, 138 S.Ct. at 2371–72, 2375.  In any event, *NIFLA* did not disturb *Pickup*'s holding that California's restriction on sexual orientation change therapy regulated conduct, not expressive speech, and the Supreme Court reaffirmed that "States may regulate professional conduct, even though that conduct incidentally involves speech."  *Id.* at 2372.

[57] Pl.'s Mem. at 19.

[58] Steil Decl., Ex. 1 at 12, 14 (Table 2).

Page 16 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
BM2

protected characteristics—including, in particular, familial status—and that buyers often highlight their familial status to influence the seller's decision.[59]  It is not only plausible but highly likely that requiring a seller's agent to reject love letters will reduce the likelihood that a seller's decision will be influenced by a buyer's protected characteristic.  HB 2550 is rationally related to the legitimate government interest of preventing housing discrimination.

### 2.    TREG is unlikely to succeed on its clients' First Amendment claims.

#### a.    TREG lacks standing to assert the rights of its clients.

TREG also claims "the law burdens the First Amendment rights of TREG's clients…."[60] TREG cannot prevail on this claim, because prudential standing requirements preclude TREG from asserting those third parties' rights in the first place.

In general, "[p]rudential limitations on standing 'require that parties assert their own rights rather than rely on the rights or interests of third parties.'"  *Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 488 (9th Cir. 1996) (quoting *Hong Kong Supermarket v. Kizer*, 830 F.2d 1078, 1081 (9th Cir. 1987)).  Whether an exception to this rule allows a party to assert the rights of another turns on: "(1) the relationship of the litigant to the person whose right he seeks to assert; and (2) the ability of the third part[ies] to assert [their] own right[s]."  *Id.*

The first factor depends on whether TREG and its clients share a "congruence[] of interests…."  *See Hong Kong Supermarket*, 830 F.2d at 1082 (holding no third-party standing because the plaintiff retailer's legal arguments were not well aligned with the consumers' interests).  TREG's commercial interest in delivering its clients' letters is not congruent with its clients' free speech interests.  TREG argues the law is underinclusive because it does not prohibit prospective buyers from sending letters directly to sellers.[61]  In other words, TREG suggests a constitutional rule that would require the State to curtail the options of the prospective buyers

---

[59] Bonner Decl. ¶ 4; Mullane Decl. ¶ 4.

[60] *See also* Pl.'s Mem. at 13–15 (arguing TREG has third-party standing).

[61] Pl.'s Mem. at 23–24.

Page 17 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
BM2

whose rights it purports to assert.  TREG also implausibly contends that buyers and sellers
cannot communicate independently,[62] even though such letters are almost always sent by email.[63]
These positions suggest that TREG's commercial motivation to remain at the center of the real
estate transaction is not well aligned with the constitutional interests of its clients.

As to the second factor, there is no genuine barrier to individuals who wish to send or
receive love letters through a seller's agent from suing state officials to assert their own rights.  A
case might outlast a given real estate purchase, but an individual often buys and sells more than
one home in a lifetime.  Such a litigant could assert the "capable of repetition but evading
review" exception to mootness.  TREG argues their future clients "have little incentive" to
litigate,[64] but "[a] simple lack of motivation does not constitute a 'genuine obstacle' to asserting
an interest." *Viceroy Gold Corp.*, 75 F.3d at 489 (quoting *Singleton v. Wulff*, 428 U.S. 106, 116
(1976)) (holding employer could not assert rights of its employees).

The authorities Plaintiff cites are unpersuasive.  First, *American Booksellers
Association*[65] and *Village of Schaumburg*[66] held that the overbreadth doctrine, which allows a
plaintiff to assert anyone's free speech rights in some cases, overcame the normal constraints on
third-party standing.  But the overbreadth doctrine does not apply to commercial speech.  *See
Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 496–97 (1982).

---

[62] Pl.'s Mem. at 14 n.9, 25 (citing Smith Decl. ¶ 13).

[63] Jones Decl., Ex. 5 at 30:5–31:6 (Smith Depo. Tr.).

[64] Pl.'s Mem. at 15.

[65] *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988).

[66] *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980).

BM2

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Second, *Triplett*[67] and *Caplin & Drysdale, Chartered*[68] each allowed third-party standing because the challenged laws were alleged to interfere with obtaining counsel, which itself would impair the absent third parties ability to vindicate their rights.  Finally, the Ninth Circuit's decision in *Hong Kong Supermarket* distinguishes *Craig v. Boren*[69] and the reproductive rights cases,[70] reasoning that those cases relied on a unique "congruence of interests" between the third-party plaintiff and the rights-holder that are not present here.  830 F.2d at 1082.

Thus, TREG cannot assert the rights of its clients.  This is particularly true at the outset of the case, when prudence counsels against allowing a party to assert another's rights before the parties have expended resources on a case that is ultimately nonjusticiable.  *See id.*.

### b.  Even if TREG may assert its clients' First Amendment rights, HB 2550 satisfies intermediate scrutiny.

Even if prospective buyers and sellers of real estate had asserted their own First Amendment claim, their claim would also be unlikely to succeed.  For buyers and sellers of real estate—the authors and intended recipients of love letters—HB 2550 is subject to intermediate scrutiny, because while love letters are speech, they are commercial speech, which enjoys "a lesser protection" under the First Amendment than "other constitutionally guaranteed expression."  *Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980).

---

[67] *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 720 (1990) ("When, however, enforcement of a restriction against the litigant prevents a third party from entering into a relationship with the litigant (typically a contractual relationship), to which relationship the third party has a legal entitlement (typically a constitutional entitlement), third-party standing has been held to exist.").

[68] *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989) ("[I]t is credibly alleged that the statute at issue here may 'materially impair the ability of' third persons in [the client's] position to exercise their constitutional rights.").

[69] 429 U.S. 190 (1976).

[70] No opinion in *June Medical* garnered a majority of the Court and Justice Breyer's discussion of third-party standing is *dicta* regardless because he found that the state forfeited the prudential standing argument.  *June Med. Servs. L. L. C. v. Russo*, 140 S. Ct. 2103, 2120 (2020) (Breyer, J.) ("[T]he State's strategic waiver *and* a long line of well-established precedents foreclose its belated challenge to the plaintiffs' standing." (emphasis added)).

Page 19 - DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
BM2

Under *Central Hudson*, a State may (i) restrict commercial speech that is neither misleading nor related to unlawful activity if (ii) the State asserts a substantial interest, (iii) the restriction directly advances the government interest involved, and (iv) the restriction is not more extensive than necessary to serve that interest. *Id.* at 563–66. As explained below, love letters are commercial speech because their primary purpose—indeed, their entire reason for existence—is to persuade a seller to accept an offer. *See United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2011) (explaining that "commercial speech" is "usually defined as speech that does no more than propose a commercial transaction"). Even if love letters are unrelated to unlawful activity,[71] HB 2550 satisfies intermediate scrutiny because it advances the government's substantial interest in remediating past public and private discrimination and eliminating private discrimination in residential real estate transactions, and it is well-targeted to that interest.

### i.    Letters in support of real estate buyers' offers are commercial speech.

"Commercial speech is 'usually defined as speech that does no more than propose a commercial transaction.'" *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021) (quoting *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001)). "Courts view 'this definition [as] just a starting point,' however, and instead try to give effect to 'a "common-sense distinction" between commercial speech and other varieties of speech.'" *Id.* (quoting *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 516 (7th Cir. 2014)). For example, the Ninth Circuit has held that parties were engaged in commercial speech when the parties "clearly propose[d] a commercial transaction" and "the core of [their] speech [was] directed to their products and why a consumer should buy them." *Hunt v. City of Los Angeles*, 638 F.3d 703, 716 (9th Cir. 2011).

---

[71] *But see Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 389 (1973) (upholding prohibition on sexist help-wanted ads) ("Any First Amendment interest ... is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity.").

Page 20 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
BM2

Real estate love letters are commercial speech because they are directed to persuading sellers to accept the author's offer.  Plaintiff's own arguments show that the perceived value of a love letter lies in its effect on the seller's decision.[72]  Therefore, House Bill 2550 is a regulation of commercial speech and is subject to intermediate scrutiny under *Central Hudson*.

TREG agrees that "[f]or the purpose of this motion for preliminary injunction Plaintiff will assume that love letters are commercial speech and that *Central Hudson* applies," but "Plaintiff intends to preserve the argument that love letters are not commercial speech."[73] Plaintiff argues that the commercial aspects of love letters are inextricably intertwined with noncommercial speech, because "their contents go far beyond a request for a sale and touch on highly personal details such as a prospective buyer's hobbies, interests, employment, and social relations."[74]

But TREG's argument misapplies the "inextricably intertwined" standard formulated in *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 796 (1988).  In *Riley*, the Supreme Court held that commercial speech does not retain its commercial character when it is "inextricably intertwined with otherwise fully protected speech."  *Id.*  Specifically, the Court held that charitable solicitations must be treated as fully protected expression because "solicitation is *characteristically* intertwined with informative and perhaps persuasive speech," and "without solicitation the flow of such information and advocacy would likely cease."  *Id.* (citation omitted; emphasis added).  Similarly, the Ninth Circuit held that when nonprofit corporations sold T-shirts imprinted with various "philosophical and inspirational messages" as a way to spread those messages, the commercial aspects of the sale were inextricably intertwined with fully protected speech.  *One World One Family Now v. City and Cty. of Honolulu*, 76 F.3d

---

[72] *See* Pl.'s Mem. at 6–8 (arguing that love letters help buyers "gain a competitive edge" and help inform sellers' choices).

[73] Pl.'s Mem. at 18 n.12.

[74] Pl.'s Mem. at 18 n.12.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

1009, 1011–12 (9th Cir. 1996).[75]  In contrast, an offer to buy a home is not characteristically intertwined with information about "hobbies, interests, employment, and social relations,"[76] and a restriction on love letters would do nothing to stop the flow of such information.

Plaintiff's argument that the inclusion of "personal details" in a love letter transforms the letter into noncommercial speech parallels arguments that have been rejected by the Supreme Court and the Ninth Circuit.  The Supreme Court rejected an argument that commercial speech and noncommercial speech were "inextricably intertwined" when a houseware sales presentation included lessons on home economics and financial responsibility.  *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 474 (1989).  The Court reasoned that "[n]o law of man or nature makes it impossible to sell housewares without teaching home economics, or to teach home economics without selling housewares."  *Id.*  Similarly, the Ninth Circuit rejected the notion that street vendors' "incorporation of spiritual elements into their sales pitch and products transform[ed] their proposal of a commercial transaction into fully protected speech," when "[n]othing in the nature of [the] products require[d] their sales to be combined with a noncommercial message."  *Hunt v. City of Los Angeles*, 638 F.3d 703, 708, 716–17 (9th Cir. 2011).

Likewise, nothing makes it impossible for a buyer to make an offer on a home without referring to "hobbies, interests, employment, and social relations," or to communicate about those subjects outside of a real estate context.  That personal information is therefore not inextricably intertwined with the commercial aspect of a love letter, and the inclusion of that information does not alter the letter's overriding commercial purpose.  The purpose of a love letter is to persuade a seller to accept an offer, not to inform the seller of the buyer's hobbies and

---

[75] For similar reasons, a painting is not commercial speech simply because it is sold commercially.  *See White v. City of Sparks*, 500 F.3d 953, 956 (9th Cir. 2007).

[76] Pl.'s Mem. at 18 n.12.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

interests.  Thus, if House Bill 2550 burdens speech at all, it affects only commercial speech, and it is subject to the intermediate scrutiny set out in *Central Hudson*.

ii.     **The State has a compelling interest in preventing housing discrimination.**

Under *Central Hudson*, "[t]he State must assert a substantial interest to be achieved by restrictions on commercial speech." 447 U.S. at 564.  Here, the State is advancing its "compelling interest in" addressing "the effects of either public or private discrimination…." *W. States Paving Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 991 (9th Cir. 2005). Plaintiff agrees that "there is no doubt that preventing discrimination is an important interest."[77]

"Both statistical and anecdotal evidence of discrimination are relevant in identifying the existence of discrimination." *W. States Paving Co.*, 407 F.3d at 991.  As described above and in the declarations Defendants submit today, the existence of such discrimination in Oregon, and the effects of past discrimination, are well documented.[78]

iii.    **HB 2550 advances the State's interest in preventing discrimination.**

A law that restricts commercial speech must directly advance the State's interest.  *See Cent. Hudson*, 447 U.S. at 564.  HB 2550 advances the State's interest in stopping discrimination in residential housing by discouraging personalized communications that almost all convey information about protected characteristics.

The question of whether a law directly advances the state interest "cannot be answered by limiting the inquiry to whether the government interest is directly advanced as applied to a single person or entity."  *United States v. Edge Broad. Co.*, 509 U.S. 418, 427 (1993).  A court must consider whether the law "advances [the] interest in its general application, not specifically with respect to" plaintiff.  *Metro Lights, LLC v. City of Los Angeles*, 551 F.3d 898, 904 (9th Cir. 2009).

---

[77] Pl.'s Mem. at 19.

[78] *See* Section II.A, above.

BM2

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Love letters typically contain information that expressly or impliedly conveys protected characteristics. That is reflected by the experience of HB 2550's sponsor in his 25 years as real estate agent[79] as well as that of other real estate agents.[80] Ninety-three percent of the letters sent or received by TREG brokers revealed at least one protected characteristic, and the median number of protected characteristics revealed in a letter was five.[81]

Conveying that information facilitates discrimination by allowing sellers to use protected characteristics in their decision-making process, consciously or unconsciously.[82] Other unlawful discrimination, such as against childless buyers, is not even widely recognized by sellers as unethical, let alone unlawful.[83] Even sellers who do not intend to make their decisions based on racial or other protected characteristics may act on those preferences automatically and unconsciously.[84] Love letters also encourage discrimination by "priming" buyers to focus their attention and decision-making on the commonalities between themselves and prospective buyers rather than financial components of the transaction.[85] Real estate agents who use love letters do so primarily to emphasize those personal commonalities.[86]

Love letters also convey personal information that is not itself a characteristic protected by antidiscrimination laws but strongly correlates to race or other protected characteristics.[87] For

---

[79] Video Recording, House Committee on Housing, HB 2550, Feb. 4, 2021, at 6:05–6:15 (statement of Rep. Meek); Video Recording, House Floor, HB 2550, Apr. 15, 2021, at 8:23:27–8:23:45 (statement of Rep. Meek).

[80] Mullane Decl. ¶¶ 4–5; Bonner Decl. ¶ 3.

[81] Steil Decl., Ex. 1 at 12–13.

[82] Bates Decl., Ex. 1 at 12–15, 17–18; Steil Decl., Ex. 1 at 7–8; Mullane Decl. ¶¶ 7, 9.

[83] Mullane Decl. ¶ 7; *see also* Steil Decl., Ex. 1 at 9 ("knowledge of fair housing laws is not widespread"); Ambrose Decl. ¶ 7 ("brokers are much more familiar with the obligations of the Fair Housing Act than their clients").

[84] Steil Decl., Ex. 1 at 7–8; Mullane Decl. ¶ 7.

[85] Steil Decl., Ex. 1 at 8; Bates Decl., Ex. 1 at 17.

[86] Bates Decl., Ex. 1 at 15, 17.

[87] Steil Decl., Ex. 1 at 12.

Page 24 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
BM2

example, love letters sometimes include information about where a prospective buyer was born

or raised, which itself may strongly suggest a buyer's race.[88]  The Fair Housing Act itself

"encompasses disparate-impact claims" and the Supreme Court has blessed efforts "to foster

diversity and combat racial isolation with race-neutral tools."  *Tex. Dep't of Hous. & Cmty. Affs.*

*v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 534, 545 (2015).  Prohibiting real estate agents

from transmitting love letters is one such tool.

The Court should not credit Plaintiff's declarations claiming love letters do not facilitate

discrimination.  Ms. Smith's declaration that "love letters do not ordinarily touch upon protected

class status"[89] is not borne out by the evidence, as her deposition testimony demonstrated.[90]

Prof. Steil's letter-by-letter analysis,[91] which the Court itself could review using the underlying

documents,[92] also shows that the letters Ms. Smith encounters as a TREG agent ordinarily *do*

touch upon protected characteristics.  TREG's other declarant has never acted as a real estate

agent in a single transaction and his testimony should not be credited.[93]

---

[88] Steil Decl., Ex. 1 at 12 (noting that Grant County's population was 99 percent white non-Hispanic in 1970 and 95 percent white non-Hispanic in 2000).

[89] Smith Decl. ¶ 10.

[90] Jones Decl., Ex. 6 at 70:25–71:17, 72:24–73:3, 73:14–22 (Smith Depo. Tr.).

[91] Steil Decl., Ex. 1 at 10–13, 14 (Table 2).

[92] Steil Decl., Ex. 2 (providing the love letters Steil analyzed).

[93] Jones Decl., Ex. 3 at 10:12–14 (Ambrose Depo. Tr.).  The Court should disregard in full Mr. Ambrose's declaration because he refuses to disclose the only adequate basis for his opinions, communications from his clients in the course of representation.  Mr. Ambrose's conclusions about the Oregon real estate industry are based on his "experience as a broker and attorney…." Ambrose Decl. (ECF 5) ¶ 10; *see also id.* ¶ 7 ("[i]n my experience"); *id.* ¶ 11 ("my experience is").  More than ninety percent of Mr. Ambrose's professional time is spent on his law practice, which is separate from TREG.  *See* Jones Decl., Ex. 3 at 10:17-20 (Ambrose Depo. Tr.). Mr. Ambrose categorically refused to answer questions about the underlying facts of his legal representations as they relate to the conclusions in his declaration.  *See id.* at 43:16-18.  The Court should strike Mr. Ambrose's lay expert testimony for lack of foundation given that he has shielded the bases of those opinions from adversarial testing.  *Cf. United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 640–41 (9th Cir. 2012) (so holding when a witness asserts the Fifth Amendment privilege against self-incrimination).  Other than his law practice, the other bases of

Page 25 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
BM2

The evidence that love letters almost always reveal protected characteristics and that such information influences sellers' decisions demonstrates that HB 2550 advances the State's interest in stopping discrimination by discouraging the use of love letters.  That evidence includes the testimony presented to the legislature as well as declarations containing the experience of experienced real estate agents and the analysis and conclusions of experts on fair housing.[94]  The Ninth Circuit has held that when applying strict scrutiny, "the factual predicate for the program should be evaluated based upon all evidence presented to the district court, whether such evidence was adduced before or after enactment of the [program]."  *Coral Constr. Co. v. King County*, 941 F.2d 910, 919–22 (9th Cir. 1991), *overruled on other grounds by Bd. of Trs. of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195 (9th Cir. 2019).

It follows that in a commercial speech case, applying only intermediate scrutiny, a court should consider both pre- and post-enactment evidence showing that a law directly advances the government's interest and that the law is not more extensive than necessary.  *See Phillips v. Borough of Keyport*, 107 F.3d 164, 178 (3d Cir. 1997) ("If a legislative body can produce in court whatever justification is required of it under the applicable constitutional doctrine, we perceive little to be gained by incurring the expense, effort, and delay involved in requiring it to reenact the legislative measure after parading its evidence through its legislative chamber.").

That Oregon is the first state to enact a law like HB 2550 necessarily limits the evidence available to the legislature and to this Court.  As a plurality of the Supreme Court has recognized, where a legislature presents an "innovative solution," it "may not have data that

---

his opinions are unreliable, inadmissible hearsay.  *See* Jones Decl., Ex. 3 at 50:3-8 (Ambrose Depo. Tr.) ("My experience that I'm referencing in Section 7 of my declaration is referring to general discussions at Total meetings, general discussions among Total brokers, general discussions over the years at education seminars, general experience day to day ranging from cocktail parties to more in-depth conversations at meetings.").

[94] *See, e.g.*, Bonner Decl. ¶¶ 3–4; Mullane Decl ¶¶ 4–5; Rogers Decl. ¶ 6; Steil Decl., Ex. 1 at 10–13, 14 (Table 2); Bates Decl., Ex. 1 at 17–18; Video Recording, House Committee on Housing, HB 2550, Feb. 4, 2021, at 5:14–5:39 (statement of Rep. Meek); *id.* at 8:44–9:50.

Page 26 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
BM2

could demonstrate the efficacy of its proposal because the solution would, by definition, not have been implemented previously." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 439–40 (2002) (plurality opinion). Considering a First Amendment challenge to a city's ban on operating more than one adult entertainment business in the same building, the plurality rejected the notion that the city was required "to demonstrate, not merely by appeal to common sense, but also with empirical data, that its ordinance will successfully lower crime." *Id.* at 439. The plurality explained that "[o]ur cases have never required that municipalities make such a showing, certainly not without actual and convincing evidence from plaintiffs to the contrary." *Id.* "Such a requirement would go too far in undermining our settled position that municipalities must be given a '"reasonable opportunity to experiment with solutions"' to address the secondary effects of protected speech," and would leave the city "with no means to address the secondary effects with which it is concerned." *Id.* at 439–40 (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986)). Here, requiring the State to prove with certainty that HB 2550 will reduce housing discrimination would leave the State with no means to address the risk of discrimination that love letters pose.

Similarly, the Third Circuit has held that "a state legislature is not constitutionally required to wait for conclusive scientific evidence before acting to protect its citizens from serious threats of harm." *King v. Governor of the State of N.J.*, 767 F.3d 216, 239 (3d Cir. 2014), *abrogated on other grounds by NIFLA*, 138 S. Ct. 2361 (2018). Applying that principle, the court held that a ban on employers asking prospective employees about their wage history directly advanced a city's interest in mitigating a racial and gender-based pay gap, despite the lack of conclusive evidence that discrimination was the sole cause of the wage gap. *Greater Phila. Chamber of Commerce v. City of Philadelphia*, 949 F.3d 116, 143, 153 (3d Cir. 2020). The court held that "[t]he City made a well-reasoned judgment based on the testimony presented to it and the unrefuted existence of the wage gap that banning wage history inquiries would prevent further perpetuation of gender and race discrimination in this context." *Id.* at 153. Here,

Page 27 - DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
BM2

likewise, the Legislature made a well-reasoned judgment based on the testimony presented to it.

That judgment is also supported by the further evidence presented here of the prevalence of

housing discrimination, that love letters almost always reveal protected characteristics, and that

the personal information in love letters—including protected characteristics—influences sellers'

decisions. *See id.* at 128–131, 143 (accepting post-enactment evidence presented in the litigation

and stating that that evidence "would, by itself, satisfy the [direct advancement] inquiry" under

*Central Hudson*).

Another aspect of the "direct advancement" inquiry is whether the law is underinclusive:

that is, whether there is a logical connection between the interest the law advances and the

exceptions the law makes to its own application. *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808,

824 (9th Cir. 2013). That is because underinclusivity "may diminish the credibility of the

government's rationale for restricting speech in the first place." *Id.* (quoting *Metro Lights*, 551

F.3d at 904–05). TREG argues HB 2550 is underinclusive because it does not prohibit all

methods of sellers learning of prospective buyers' protected characteristics, such as direct buyer

to seller communications. Pl.'s Mem. (ECF 4) at 22–24. In general, "governments are entitled

to attack problems piecemeal, save where their policies implicate rights so fundamental that strict

scrutiny must be applied." *Zauderer v. Office of Disciplinary Counsel of Supreme Court of

Ohio*, 471 U.S. 626, 651 n.14 (1985). For example, a state can prohibit the types of

communications that most "acute[ly]" present the problem that the state seeks to solve. *Valle

Del Sol Inc.*, 709 F.3d at 824. In addition, a state "may consider the benefits of different types of

… communications when determining which communications to restrict…." *Id.* at 824. The law

is aimed at real estate agents' encouragement and facilitation of love letters, which the law

directly targets. Real estate agents are key influencers in the transaction process and often work

to *encourage* the use of love letters.[95] Plaintiff's own witness testified she thinks potential

---

[95] *See* Mullane Decl ¶ 6; Bates Decl., Ex. 1, at 15.

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

buyers will not typically send letters to sellers directly,[96] and her recent experience after she stopped sending love letters herself has validated that prediction.[97]

TREG presents no evidence to support its claim that sellers will seek out protected information about prospective buyers. In any case, such efforts may be illegal in themselves and certainly would be strong evidence of discriminatory intent. *See Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1164 (9th Cir. 2008) (citing *Jancik v. HUD*, 44 F.3d 553, 557 (7th Cir. 1995)) ("[A] real estate broker may not inquire as to the race of a prospective buyer."). HB 2550's prohibition on sellers' agents transmitting love letters advances the State's interest in ending discrimination in residential real estate transactions.

### iv.    HB 2550 is well-targeted to preventing discrimination.

A restriction on commercial speech must not be "more extensive than is necessary" to serve the governmental interest that supports it. *Cent. Hudson*, 447 U.S. at 566. In other words, there must be a "reasonable fit" between the government's interest and the means chosen to advance that interest. *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1178 (9th Cir. 2018) (citing *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999)). "A regulation need not be absolutely the least severe that will achieve the desired end, but if there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993) (internal quotation marks and citation omitted). "On the whole, then, the challenged regulation should indicate that its proponent carefully calculated the costs and benefits associated with the burden on speech imposed by its prohibition." *Greater New Orleans Broad.*, 527 U.S. at 188 (internal quotation marks omitted).

---

[96] Smith Decl. ¶ 13.

[97] *See* Jones Decl., Ex. 5 at 63:15–64:25 (Smith Depo. Tr.) (describing clients being "fairly accepting" of the law and stating that Ms. Smith was not "get[ting] too much pushback" for discontinuing use of love letters before the law went into effect).

Page 29 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
BM2

TREG argues that HB 2550 is "far more extensive than necessary" because it "broadly prohibits all love letters, not just those that implicate protected class status."[98]  But HB 2550 does not prohibit love letters; it only restricts a seller's agent's role in facilitating those letters. Further, love letters almost always implicate protected class status.  As noted above, more than ninety percent of the letters written by TREG clients revealed at least one protected characteristic, and the median number of characteristics revealed was five.[99]

TREG, though, argues that HB 2550 is overinclusive, comparing it to the outright ban on real estate "For Sale" signs that the Supreme Court held unconstitutional in *Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85 (1977).[100]  But in *Linmark*, the Court's concern was that the ban on "For Sale" signs would leave sellers with few realistic and effective means of communicating even the basic fact that a house is for sale.  *See id.* at 93 (considering the alternative means of "communicating the message that is conveyed by a 'For Sale' sign in front of the house to be sold").  In contrast, HB 2550 imposes no such burden on the ability of buyers and sellers to find one another.  And the *lawful* information that TREG argues sellers will find useful can still be communicated, either in a letter sent directly from a buyer to a seller or in a cover letter written by the buyer's agent.[101]  Indeed, many of the cover letters written or received by TREG brokers convey information about "why the buyer likes the property, whether this purchase is the buyer's first, and whether the buyer intends to occupy the home,"  Pl.'s Mem. at 6–7.  *See* Jones Decl., Ex. 9 (cover letters produced by TREG) at 1 (stating that the buyers, a photographer and a painter, "were instantly drawn to the natural light and wall space to hang

---

[98] Pl.'s Mem. at 25.

[99] Steil Decl., Ex. 1 at 12.

[100] Pl.'s Mem. at 25.

[101] *See* Steve Strode, Real Estate Commissioner, *FAQs Regarding HB 2550 (The "Love Letter" Law)* (Dec. 2021), https://www.oregon.gov/rea/newsroom/Pages/2021_OREN-J/FAQs-Regarding-HB-2550-The-Love-Letter-Law.aspx (explaining that "a cover letter written by a buyer's agent explaining the prospective buyer's interest in the property" may be accepted by a seller's agent).

Page 30 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
BM2

their art"); *id.* at 2 (stating that the buyer "is a first time buyer that plans to move into the home"); *id.* at 3 (highlighting the buyer's appreciation for the "mid-century modern" architectural style of the house); *id.* at 4 (stating that the buyer's "sister lives around the corner and they have a great kinship that will be further enhanced if they get to live so close to each other"). In addition, TREG's broker declarant acknowledged that the non-discriminatory information that a buyer might include in a love letter to strengthen an offer is the same information that she sometimes includes in cover letters.[102] HB 2550 does not stop her from doing so.

TREG argues the legislature should "simply have required seller's agents to redact any letters they might receive to remove any references to a protected class."[103] Relying on brokers' individual judgments of what information must be redacted would not achieve the State's objective of limiting the risk of discrimination. Brokers are ill-equipped to make such determinations.[104]

The testimony of TREG's principal witness, TREG real estate broker Cheri Smith, illustrates the shortcomings of that approach. Ms. Smith declared that "[i]f I ever saw a letter that included information about protected characteristics such as race or sexual orientation I would warn the buyer not to send such a letter and if it was sent I would warn the seller that it is illegal under Oregon and federal law to act on such information."[105] But she also testified that she has never provided such a warning.[106] Indeed, no one at TREG has withheld delivering a

---

[102] Jones Decl., Ex. 6 at 56:13–57:6 (Smith Depo. Tr.).

[103] Pl.'s Mem. at 26.

[104] Rogers Decl. ¶ 10; *see also* Bates Decl., Ex. 1 at 15–16 (citing academic literature concluding that overreliance on brokers exacerbates race discrimination).

[105] Smith Decl. ¶ 12; *see also* Jones Decl., Ex. 5 at 69:20–23 (Smith Depo. Tr.) (re-adopting paragraph 12); *id.* at 43:1–4 ("[T]here are protected classes: Race, gender, familial status, sexual orientation, among others. So any information like that in a letter would be a red flag to me.").

[106] Jones Decl., Ex. 5 at 69:24–70:11 (Smith Depo. Tr.).

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

love letter for any reason since at least January 1, 2019.[107]  But almost every love letter TREG produced included information about protected characteristics,[108] and still all of those letters were sent.[109]

In one instance, Ms. Smith suggested to her clients to delete a paragraph in their future love letters that suggested their offer was weak, and her clients did so.[110]  But Ms. Smith did not suggest her clients omit a photograph that showed their race or delete language in the letter suggesting the couple was childless.  At deposition, Ms. Smith agreed that the letter her clients sent suggested their sex, sexual orientation, race, color, and family status.[111]

Plaintiff's proposal would also give real estate brokers an unenviable responsibility to "draw[] the line between communications and facts that they are required to transmit to their client under ORS 696.805(2) and those that they must redact or withhold under the introduced version of HB 2550."[112]  While it might be obvious some language reveals protected characteristics, other language would present tougher questions, such as whether referring to a playground near the home implies that the prospective buyers have children.  "These are the types of distinctions that litigators are trained to argue over but that real estate licensees should not be expected to make, on the spot, regarding communications coming from prospective

---

[107] *See* Jones Decl., Ex. 2 (Pl.'s Resp. to Defs.' First Set Requests for the Production of Documents) Nos. 2, 4 (responding that TREG possessed no love letters that were received from a buyer or a buyer's agent and not transmitted to the seller or seller's agent); *contra* Complaint ¶ 44 (ECF 1 at 13); Pl.'s Mem. at 23–24.

[108] Steil Decl., Ex. 1 at 12, 14 (Table 2).

[109] Jones Decl., Ex. 5 at 34:14–23 (Smith Depo. Tr.); Jones Decl., Ex. 2 (Pl.'s Resp. to Defs.' First Set Requests for the Production of Documents) Nos. 2, 4.

[110] Jones Decl., Ex. 6 at 38:20–39:11, 70:21–24  (Smith Depo. Tr.); Jones. Decl., Exs. 7–8 (Smith Depo. Exs. 2–3).

[111] Jones Decl., Ex. 6 at 70:25–71:17, 72:24–73:3, 73:14–22 (Smith Depo. Tr.).

[112] Rogers Decl. ¶ 10; *see also* Mullane Decl. ¶ 8 ("Real estate agents—who usually are not lawyers and who often do not understand the role that implicit bias plays in real estate transactions—are not well-equipped to determine whether a letter poses a risk of triggering discrimination.").

Page 32 -  DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
BM2

buyers."[113]  Ms. Smith herself could not name every protected class under federal and Oregon

law (omitting, among others, marital status and disability),[114] despite having attended a class

focused on fair housing issues earlier that year.[115]  Such an omission is understandable: she, like

most brokers, is not a lawyer, and she cannot be reasonably expected to act as one.[116]  This was

the precise concern that led the Oregon Senate to amend the bill to avoid requiring brokers to

individually assess each word of a love letter.[117]

      There is a reasonable fit between HB 2550 and the government's interests.  HB 2550 thus

meets each part of the *Central Hudson* test.

**B.     The Balance of Equities Favors the State.**

     **1.     TREG has not suffered an injury.**

      TREG's principal irreparable injury argument is that it will be harmed by its loss of its

First Amendment rights.[118]  But an injury based on a plaintiff's loss of constitutional rights

requires the plaintiff to establish it is likely to succeed on its constitutional claim.  *See Associated*

*Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991).

Thus, the harm to the plaintiff's constitutional rights turns on the Court's determination of its

likelihood of success on the merits: if the State is correct that the statute complies with the First

Amendment, then TREG's constitutional rights have not been infringed at all.  As shown above,

TREG cannot establish any such harm.

---

[113] Rogers Decl. ¶ 10.

[114] Jones Decl., Ex. 5 at 43:1–43:11 (Smith Depo. Tr.).

[115] *Id.* at 43:25–44:15.

[116] Rogers Decl. ¶ 10.

[117] Video Recording, Senate Committee on Housing, HB 2550, May 25, 2021, at 47:12–48:10 (Sen. Golden explaining that he supports the amendment to avoid "put[ting] it on the shoulders of a seller's agent to find the exact line of what is permitted and not permitted content").

[118] *See* Pl.'s Mem. at 29 .

Page 33 - DEFENDANTS' RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION
    BM2

TREG's other claims of irreparable injury—that they would lose business and be hit with frivolous regulatory complaints from their clients—do not withstand scrutiny. *See* Pl.'s Mem. at 30. TREG's broker declarant, Ms. Smith, already "generally" stopped "including letters from buyers" with her offers even now, before the law has taken effect.[119] None of the tangible harms that Plaintiff fears would occur have unfolded. *Compare* Smith Decl. ¶ 9 (suggesting clients would accuse her of misconduct or refuse to pay her) *with* Jones Decl., Ex. 5 at 63:19–65:2 (Smith Depo. Tr.) (testifying no client has done so since she stopped sending love letters).

> ## 2.    The public interest disfavors an injunction.

To prevail on a preliminary injunction, a plaintiff must also show "the balance of equities tips in [its] favor; and … an injunction is in the public interest." *Short*, 893 F.3d at 675. The equities disfavor an injunction.

"[A] state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined." *Video Gaming Techs., Inc. v. Bureau of Gambling Control*, 356 F. App'x 89, 92 (9th Cir. 2009). Enjoining HB 2550 would delay the State's efforts to remediate and prevent discrimination in the residential housing market by leaving the practice of love letters unabated. It would also undermine the residential real estate industry's efforts to curb the practice. And it would confuse real estate brokers' efforts to comply with their professional responsibilities by changing their legal obligations just months after the new law went into effect.

---

[119] Jones Decl., Ex. 5 at 63:15–18 (Smith Depo. Tr.); *see also id.* at 61:13–17 (showing Ms. Smith understands the legislation is effective January 1).

BM2

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## VI.    CONCLUSION

The motion for a preliminary injunction (ECF 3) should be denied.


DATED December __23__, 2021.

Respectfully submitted,

ELLEN F. ROSENBLUM
Attorney General


_s/ Brian Simmonds Marshall_
BRIAN SIMMONDS MARSHALL #196129
Senior Assistant Attorney General
ALEX JONES #213898
Assistant Attorney General
Trial Attorneys
Tel (971) 673-1880
Fax (971) 673-5000
Brian.S.Marshall@doj.state.or.us
Alex.Jones@doj.state.or.us
Of Attorneys for Defendants

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000