Christina M. Martin, OSB #084117
CMartin@pacificlegal.org
Lead Counsel
Pacific Legal Foundation
4440 PGA Blvd. #307
Palm Beach Gardens, Florida 33410-6541
(509) 480-9709

Daniel M. Ortner, Cal. SB #329866*
DOrtner@pacificlegal.org
Ethan W. Blevins, Wash. SB #48219*
EBlevins@pacificlegal.org
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814-4605
(916) 419-7111
*Attorneys for Plaintiff*
* Pro Hac Vice

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| TOTAL REAL ESTATE GROUP, LLC, an Oregon limited liability company, | Case No.: 3:21-cv-1677 |
| Plaintiff, | |
| v. | **REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| STEVE STRODE, in his official capacity as the Oregon Real Estate Commissioner; ELLEN ROSENBLUM, in her official capacity as Attorney General for the State of Oregon's Department of Justice, | |
| Defendants. | |

Reply ISO MPI

# TABLE OF CONTENTS

Page(s)

I.   Total Real Estate Has Standing ........................................................... 1

   a    The Love Letter Ban Directly Burdens Protected Speech ...................................... 2

   b.   The Law Regulates Broker Speech ........................................................ 4

   c.   Brokers' Rights as Speech Intermediaries Are Protected by the First Amendment ............................................................................. 7

   d.   Total Real Estate Has Standing to Assert the Rights of Its Clients ..................... 10

II.  Total Real Estate Is Likely to Succeed on the Merits of Its First Amendment Claim ...... 13

   a.   The Love Letter Ban Fails to Directly Advance the Government's Interest ........ 14

      1.   Barring access to information that could be used for unlawful ends does not directly advance the government's intererets ...................................... 14

      2.   The love letter bar relies on speculation and conjecture .......................... 16

      3.   The love letter bar is fatally underinclusive ............................................... 19

      4.   The love letter bar does not further an interest in resolving conflicting duties ............................................................................... 23

   b.   The Love Letter Ban Is More Extensive than Necessary ................................... 24

      1.   The love letter ban is overinclusive ......................................................... 24

      2.   The State has failed to rebut obvious less-restrictive alternatives ........... 26

         i.    Strengthen Enforcement of Existing Anti-Discrimination Laws .. 27

         ii.   Require the Redaction of Love Letters and Accompanying Photographs .................................................................................. 28

         iii.  Require Fair Housing Disclosures in Real Estate Transactions .... 29

         vi.   Require More or Better Training in Fair Housing Law ............... 30

         v.    Implement Affordable Housing Initiatives ................................... 30

         vi.   Require More or Better Training in Fair Housing Law ............... 31

         vii.  Allow Brokers and Organizations Worried about Discrimination to Advise Their Clients Not to Write Love Letters ........................... 31

III. Irreparable Harm Is Established Per Se in First Amendment Cases ................................ 32

IV.  The Balance of Equities Favors an Injunction ................................................. 32

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Ballen v. City of Redmond*, 466 F.3d 736 (9th Cir. 2006) ............................................................22

*Bartnicki v. Vopper*, 532 U.S. 514 (2001) ...................................................................14

*Boyer v. Salomon Smith Barney*, 344 Or. 583 (2008)....................................................12

*Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011)...........................................8

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980)..........11, 25

*City of Cincinnati v. Discovery Network*, 507 U.S. 410 (1993)................................................ 26-27

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994) ...................................................................19

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002)...............................................19

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
657 F.3d 936 (9th Cir. 2011) .......................................................................24, 26

*Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002) .................................................. *passim*

*Craig v. Boren*, 429 U.S. 190 (1976)..............................................................12

*Free Speech Coalition v. Ashcroft*, 535 U.S. 234 (2002) ........................................ 14-16

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) ........................................................32

*Hong Kong Supermarket v. Kizer*, 830 F.2d 1078 (9th Cir. 1987)................................................12

*IMDB.com Inc. v. Becerra*, 962 F.3d 1111 (9th Cir. 2020)......................................................14, 27

*Interstate Cir., Inc. v. City of Dallas*, 390 U.S. 676 (1968)..........................................................8

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)..........................................................................5

*Klein v. City of San Clemente*, 584 F.3d 1196 (9th Cir. 2009) ......................................................32

*Linmark Assocs., Inc. v. Willingboro Twp.*, 431 U.S. 85 (1977) ...............................................11, 26

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001)...........................................................16, 18

*Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921 (2019)..............................................8

*McCullen v. Coakley*, 573 U.S. 464 (2014) ...........................................................26, 32

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012)........................................................32

*Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415 (1963)........................7

*National Association for the Advancement of Psychoanalysis v. California Board of Psychology*, 228 F.3d 1043 (9th Cir. 2000)........................3

*National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018)................... 2-3

*Or. Occupational Safety & Health Div. v. CBI Servs., Inc.*, 356 Or. 577 (2014)........................5

*Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014)........................................................ 2-3, 8

*Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827 (9th Cir. 2014)........................13

*Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002)..............................................26

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994)...............................................16

*Valle Del Sol Inc. v. Whiting*, 709 F.3d 808 (9th Cir. 2013).......................................26

*Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620 (1980)..................10

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976)..............................................................................16

*Virginia v. American Booksellers Association, Inc.*, 484 U.S. 383 (1988)..........................11

*Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015) ...............................................20

## Statutes

42 U.S.C. § 3604........................................................................................28

Or. Rev. Stat. § 659A.421.............................................................................28

Or. Rev. Stat. § 696.174 (2021).....................................................................30

Or. Rev. Stat. § 696.805(2)(b) ......................................................................23

## Miscellaneous

Been, et al., Vicki, *Supply Skepticism: Housing Supply and Affordability*, N.Y.U Furman Center  (2018)...................................................................................31

*New York State Housing and Anti-Discrimination Disclosure Form*, N.Y. Dep't of State, Div. of Licensing Servs. and N.Y. Div. of Consumer Rights (May 2020)...................29

HB 2550, 81st Leg. Ass., Reg. Sess. (Or. 2021)....................................................28

Hearing on HB 2550 Before the S. Comm. on Hous. and Dev., 81st Leg. Ass.,
    2021 Reg. Sess. (Or. 2021),
    https://olis.oregonlegislature.gov/liz/mediaplayer?clientID=4879615486&eve
    ntide =2021051093&startStreamAt=976............................................................................5, 11

Nat'l Ass'n of Realtors, *2021 Code of Ethics & Standards of Practice* (2022)..............................7

Or. Real Estate Agency, *Law and Rule Required Course 2022-2023*, Or. Real
    Estate Agency (Aug. 4, 2021)...............................................................................30

Or. Real Estate News-Journal (Sept. 2021) ....................................................................4

Strode, Steve, *New Legislation Related to Your License*, Or. Real Estate News-
    Journal (Sept. 2021) ..........................................................................................4

Strode, Steve, *FAQs Regarding HB 2550 (The "Love Letter" Law)*, Or. Real
    Estate News-Journal (Dec. 2021),
    https://www.oregon.gov/rea/newsroom/Pages/2021_OREN-J/FAQs-
    Regarding-HB-2550-The-Love-Letter-Law.aspx ..................................................5

Volokh, Eugene, *Crime-Facilitating Speech*, 57 Stan. L. Rev. 1095 (2005) ..............................15

Oregon's love letter ban is a heavy-handed solution in search of a problem. The State of Oregon enacted a speech ban without evidence that the restricted speech results in discrimination. None of the Defendants' declarants had ever analyzed a love letter before this lawsuit, and there is no indication that anyone in the Oregon legislature had either. Instead, the State relies on highly generalized and stale evidence of race discrimination in the Oregon housing market (none of which addresses love letters), and a superficial analysis of a meager total of 27 love letters that Total Real Estate produced in discovery. But the letters that Total Real Estate produced only highlight that love letters contain a wide variety of useful, truthful, and accurate information. And in its rush to ban letters, constitutionally protected pure speech, the State also ignored a wide variety of alternatives that would eliminate discrimination without suppressing speech. The love letter ban is therefore unconstitutional.

To avoid confronting this truth, Defendants attempt to belatedly narrow the scope of the love letter ban to exclude cover letters so that they can argue that Total Real Estate lacks standing. But this litigation ploy would create an exception that would swallow the law and undermine any of its purported benefits. It only further illustrates why Oregon's poorly tailored and ill-conceived love letter ban violates the First Amendment.

## I.      Total Real Estate Has Standing

Total Real Estate and its brokers frequently use love letters and buyer's agent cover letters in their practice. Since 2018, Total Real Estate brokers have sent or received at least 72 love letters and cover letters on behalf of their clients, containing the speech of both Total Real Estate clients and Total Real Estate brokers. Total Real Estate alleges, and Defendants do not dispute, that the love letter ban will cause it harm because these letters help Total Real Estate compete. Hence, Total Real Estate is directly injured by the love letter ban, and its injury would be redressed by an

injunction. Defendants nevertheless claim that Total Real Estate lacks standing because the First Amendment rights of Total Real Estate and its brokers are not implicated. They are wrong. And in any event Total Real Estate can raise the First Amendment rights of its clients.

      a.        **The Love Letter Ban Directly Burdens Protected Speech**

Defendants rely on a slew of outdated cases to argue that "states have broad authority to regulate the practice and licensing of certain professions" and that therefore professional regulations that "have the effect of restricting or mandating speech of one form or another" are subject to more lax constitutional standards. Defs.' Resp. to Mot. Prelim. Inj. at 13–14. But in *National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2373 (2018) [*NIFLA*], the Supreme Court rejected this notion. It held that "[s]peech is not unprotected merely because it is uttered by 'professionals'" and that the Constitution forbids content-based restrictions on professional speech just as it does any other category of speech. *Id.* at 2371–72. Hence, the State errs in its reliance on cases such as *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014), which embrace the discredited notion that "the First Amendment tolerates a substantial amount of speech regulation within the professional-client relationship that it would not tolerate outside of it." *Id.* at 1228. Those cases were expressly abrogated by *NIFLA*.[1]

The Supreme Court in *NIFLA* continued to recognize a narrow exception for regulations of conduct that incidentally burden speech such as the requirement that a doctor provide a client with non-controversial information about a medical proceeding and seek informed consent. *NIFLA*, 138 S. Ct. at 2373. But that exception does not apply to love letters and broker cover letters

---

[1] Defendants argue that *NIFLA* did not disturb *Pickup*'s holding regarding therapy restrictions. That is technically true. But in reaching that conclusion the Court in *Pickup* relied extensively on the discredited notion that the Constitution offers diminished protection for professional speech. And since Oregon's restriction is not analogous to the restriction in *Pickup*, this Court should avoid relying on *Pickup* and its flawed reasoning.

because Oregon's law "regulates speech as speech." *Id.* Unlike the informed consent requirement mentioned in NIFLA or the licensing and training requirement for psychologists upheld in *National Association for the Advancement of Psychoanalysis v. California Board of Psychology*, 228 F.3d 1043 (9th Cir. 2000), the love letter ban targets love letters precisely because of their communicative or expressive content. Indeed, love letters are "inherently expressive." The only "conduct" that is being targeted by the love letter ban is the transmission and communication of information—in other words, speech.

This distinction also sets the love letter ban apart from the ban on sexual orientation change efforts in *Pickup*. In that case, the Ninth Circuit expressly noted that the law did not prevent mental health providers from expressing their views to patients, recommending sexual change efforts, or even making referrals to unlicensed counselors. *Pickup*, 740 F.3d at 1223 (9th Cir. 2014), *abrogated by NIFLA*, 138 S. Ct. 2361. The law therefore targeted contested therapeutic practices, not speech. By contrast, the love letter ban's whole purpose is to prevent the communication of information about "protected characteristics." Defs.' Resp. to Mot. Prelim. Inj. at 1.

The Ninth Circuit's decision in *Conant v. Walters*, 309 F.3d 629, 635 (9th Cir. 2002) is also instructive. In *Conant*, the Court affirmed the invalidation of a law which barred a doctor from recommending that a patient could benefit from medical marijuana. *Id.* at 639. The Court contrasted the act of prescribing a controlled substance with the act of recommending marijuana use. *Id.* at 636. The Court explained that "[b]ecause a doctor's recommendation does not itself constitute illegal conduct" and the prohibition "strike[s] at core First Amendment interests" it could not be upheld. *Id.* Likewise here, Oregon's law bans the transmission of information and in doing so "strike[s] at a core First Amendment interest[]" that "does not itself constitute illegal

conduct." *Id.* Love letters accordingly do not fall into the exception for conduct that incidentally involves speech, and the love letter ban is subject to First Amendment scrutiny.

     **b.**     **The Law Regulates Broker Speech**

Defendants argue that Total Real Estate does not suffer a First Amendment injury because the law only prohibits it from transmitting the speech of others and not from engaging in its own speech. But on its face HB 2550 encompasses more than the transmission of letters. The law broadly bars the transmission of all "communications" from the buyer that are not "customary." This logically includes broker cover letters which include the same kind of information from and about the buyer that would be found in a love letter, especially if the buyer expresses a desire to communicate that information to the seller.

In September 2021 Commissioner Strode wrote that the only acceptable "customary" documents included "disclosure forms, sales agreements, counter offer(s), addenda, and reports."[2] This list conspicuously excluded cover letters.[3] Commissioner Strode felt that the intent of the law was sufficiently "clear" and that no additional regulation or commentary was necessary.[4] But it appears that Commissioner Strode had a change of heart after this lawsuit was filed.. In a December FAQ, Commissioner Strode restated the same list of documents that he considered "customary" back in September (which does not include cover letters), but then also confusingly and without explanation stated that a seller's agent may accept "a cover letter written by a buyer's agent

---

[2] Steve Strode, *New Legislation Related to Your License*, Or. Real Estate News-Journal (Sept. 2021), https://www.oregon.gov/rea/newsroom/Pages/2021_OREN-J/New-Legislation-Related-to-Your-License.aspx. (Reply Exhibit 10)
[3] *Id.*
[4] *Id.*

explaining the prospective buyer's interest in the property."[5] Defendants' interpretation is at best a "convenient litigating position" and a "*post hoc* rationalizatio[n] advanced to defend past agency action against attack" and it is accordingly entitled to no deference. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2417 (2019) (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (internal quotation marks omitted)). *See also Or. Occupational Safety & Health Div. v. CBI Servs., Inc.*, 356 Or. 577, 585 (2014) (explaining that an agency's statutory interpretation is not entitled to deference unless the agency is formally interpreting delegative terms).

Commissioner Strode's interpretation should be rejected because it is illogical, self-defeating, and contrary to the text of the statute. There is no reason to think that broker cover letters are any more or less likely to contain information about a buyer's protected class status. In fact, these letters may be more likely to reveal gender since a buyer's agent is likely to refer to a prospective buyer in the third person ("she") rather than first person ("I").[6] Allowing buyers' agents to include whatever personal information the buyer wanted in a cover letter would be an exception so large that it would swallow the rule, especially as buyers' agents would feel ethically obligated to include this personal information if asked to by the buyer.

Defendants' interpretation is also inconsistent with the legislative history. Representative Meek, the bill's chief sponsor, was clear that the purpose of this law was to require a seller's agent to "withhold any *information* not customary in a real estate transaction."[7] Meek also emphasized

---

[5] Steve Strode, *FAQs Regarding HB 2550 (The "Love Letter" Law)*, Or. Real Estate News-Journal (Dec. 2021), https://www.oregon.gov/rea/newsroom/Pages/2021_OREN-J/FAQs-Regarding-HB-2550-The-Love-Letter-Law.aspx. (Reply Exhibit 16)

[6] *See* Steil Dep. at 57:20–58:3 (agreeing that a cover letter would be more likely to use sex specific pronouns than a love letter) (Reply Exhibit 1).

[7] Hearing on HB 2550 Before the S. Comm. on Hous. and Dev., 81st Leg. Ass., 2021 Reg. Sess. (Or. 2021), https://olis.oregonlegislature.gov/liz/mediaplayer?clientID=4879615486&eventide =2021051093&startStreamAt=976 (20:00) (emphasis added) (Reply Exhibit 19).

that the purpose of the law was to ensure that "sellers should be making decisions solely based on buyers' qualifications and the merits of the offer."[8] Meek pointed to the example of a buyer communicating what kind of crops he planned to grow on a property and said "[w]ho cares what kind of corn or beans they are going to plant? The seller should be making a decision based on the merits of that buyer."[9] Similarly, Senator Jama emphasized that he believed that "the merit of the contract that you submit to the seller should only be related to the financial aspects of it" and not any other personal details.[10] And while an earlier version of the law would have allowed redactions and therefore allowed relevant personal information to be communicated, the law was amended precisely to ban the transmission of any personal information outside of the four corners of a real estate transaction offer. Accordingly, it doesn't matter whether this "information" comes in the form of a buyer-written cover letter or in a cover letter written by a buyer's agent. Oregon's law prohibits both.[11]

This interpretive debate only further illustrates that HB 2550 has already had a chilling effect in light of its deeply flawed and unclear language. Mr. Ambrose, an attorney and principal broker with decades of industry experience, found the terms of the law sufficiently overbroad, vague, and uncertain that he felt obligated to prohibit the transmission of any buyer's agent cover letters to ensure compliance with the law.[12] And in light of the law's chilling effect, it is

---

[8] *Id.* at 20:30.

[9] *Id.* at 38:00.

[10] *Id.* at 43:30.

[11] Even if the Court accepts the Commissioner's interpretation, the law will still prohibit transmission of any other communications from a buyer's agent that were not deemed "customary" which might include a phone call or other oral exchange where the buyer's agent is asked to reveal information about the buyer.

[12] Ambrose Decl. ¶¶ 13–17. Defendants attempt to discredit Mr. Ambrose because his primary occupation is the practice of law. But Mr. Ambrose is one of the three principal brokers of Total Real Estate and has worked with Total Real Estate's brokers for decades listening to their concerns

unacceptable that HB 2550's terms are so unclear that real estate professionals must rely on an informal FAQ that was not issued until after a First Amendment lawsuit was filed rather than on the terms of the law to know what exactly is or is not covered. *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 438 (1963) ("Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.").

The broad and expansive nature of the law is significant because broker cover letters are frequently used by brokers to express *their own* views, such as describing the broker's relationship with the buyer. For instance, in one of Total Real Estate's letters, a broker expresses his wish that a deal will go through because he is close friends with the prospective buyer and would love the buyer to live close by.[13] There would be no way for a buyer's agent to share this information other than through the use of a cover letter since buyer's agents are not allowed to communicate directly with a represented seller.[14] HB 2550 therefore excludes any speech from a buyer's agent that is not deemed "customary," which directly limits the speech of Total Real Estate and its agents.

    c.    **Brokers' Rights as Speech Intermediaries Are Protected by the First Amendment**

The Supreme Court has long recognized that intermediaries who transmit the speech of others are entitled to First Amendment protection. Defendants wrongly assert that "[t]he seller's agent plays no role in selecting or editing the letter" and that agents "neither convey[] an original

---

and advising them on a variety of legal compliance issues. Mr. Ambrose's legal work is also highly relevant. In contrast, one of the State's experts, Mr. Rogers, had never completed a real estate deal and had reviewed almost no love letters or cover letters and yet offered his speculative opinion about the impact of the love letter ban. Rogers Dep. at 15:20–25, 36:3–5, 29:17–30:3 (Reply Exhibit 4).

[13] TREG Prod. 000068 (Reply Exhibit 6).

[14] Article 16 of the National Association of REALTORS® code of ethics prohibits direct communications between a buyer's agent and a seller represented by another agent. *See* Nat'l Ass'n of Realtors, *2021 Code of Ethics & Standards of Practice,* art. 16 (2022) (Reply Exhibit 12); *See also* Rogers Dep. at 18:17–20:3 (Reply Exhibit 4).

message nor exercise[] editorial discretion over which messages to transmit." Defs.' Resp. to Mot. Prelim. Inj. at 14–15. Defendants therefore argue that Total Real Estate and its agents are like common carriers without any First Amendment rights.

This argument is both legally irrelevant and factually untrue. As a legal matter, the Supreme Court has not required intermediaries to convey an original message or exercise editorial discretion to qualify for First Amendment protections. For instance, in *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011), merchants who sold or rented console videogames were able to successfully strike down on First Amendment grounds a law which barred them from selling violent video games to minors. There was no question that these merchants could bring a First Amendment claim even though they merely sold or rented prepackaged games and did not exercise editorial discretion over game content. *See also Interstate Cir., Inc. v. City of Dallas*, 390 U.S. 676, 685 (1968) (exhibitors of a film successfully challenged a law which barred them from allowing anyone under the age of 16 to attend). And unlike the love letter ban in this case, the law in *Brown* did not bar video game store clerks from recommending or speaking about video games, merely the sale or rental of a completed product.

Furthermore, cable companies are frequently subject to extensive must-carry regulations that the Supreme Court recently noted "restrict [their] editorial discretion and in effect require [them] to operate almost like a common carrier." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1932 (2019). Nevertheless, they have been allowed to bring First Amendment claims. To hold otherwise would create a perverse incentive whereby governments could strip away First Amendment freedoms by subjecting an industry to extensive regulation.

In any event, as a factual matter, real estate agents are far more personally involved in the transmission of love letters and the consummation of a real estate transaction than a common

carrier is with the transmission of cargo or phone calls. Unlike common carriers, real estate brokers are fiduciaries that use their skills and relationships to diligently advance their client's interests. For instance, during her deposition Ms. Smith discussed at length an instance where, as a buyer's agent, she advised a client on how to edit a love letter in order to make it more presentable and persuasive for a seller.[15] Similarly, Ms. Smith noted that as a seller's agent she frequently reaches out to buyer's agents to seek additional information that she believes the seller will likely want.[16] Ms. Smith works to get to know her clients well enough "to know what information they're going to want" and to provide a personalized experience and help her client find the best offer.[17] Ms. Smith also noted that, as a seller's agent, if she felt that "something in the letter … was possibly going to hurt the client's chances of getting their offer accepted or if it was just inappropriate information that a seller could potentially use to discriminate" she might reach out and ask the buyer's agent to revise a letter.[18] Professor Lisa K. Bates, the State's expert, also noted that when she bought her home her real estate broker provided her with a template that the broker created and recommendations on what to include in her love letter, not something that FedEx or another common carrier does.[19] Total Real Estate's First Amendment rights are therefore implicated.

The State's own witness, Mr. Rogers, further undermines the notion that real estate agents are merely common carriers. Mr. Rogers testified that before the love letter ban, he advised brokers

---

[15] Smith Dep. at 35:9–36:9 (Reply Exhibit 7); *Id.* at 38:10–39:20 (Reply Exhibit 8).
[16] *Id.* at 30:7–15 ("When I receive an offer package, first I review·everything that was included. I go through the purchase and sale agreement. I might make notes about the earnest money, the down payment, the close date. Sometimes I'll have questions or feel like I need more information or that my client is going to want more information. So I might follow up with the buyer's agent and get answers to those questions before I present the offer to the seller.") (Reply Exhibit 7)
[17] *Id.* at 82:24–83:5 (Reply Exhibit 7).
[18] *Id.* at 35:1–7 (Reply Exhibit 7)
[19] Bates Dep. at 26:5–12 (Reply Exhibit 5).

that not only were they entitled to reject any love letters if they felt they touched on protected class status, but that his position was that they were affirmatively required to do so.[20]

Finally, the State advances the puzzling argument that because Ms. Smith and other brokers at Total Real Estate began adopting new policies in advance of the January 1, 2022, implementation of the love letter ban, that their First Amendment rights are not harmed. But Mr. Ambrose and Ms. Smith were unequivocal that any changes in practice came as a result of the love letter ban, that they believe that love letters are beneficial to Total Real Estate and its clients, and that they would continue using them if the law is enjoined.[21]

### d.    Total Real Estate Has Standing to Assert the Rights of Its Clients

Even if Total Real Estate is not entitled to raise its own First Amendment rights, it is entitled to raise First Amendment claims on behalf of its clients. Defendants' efforts to distinguish the voluminous cases that Plaintiff cites on this point are unpersuasive.

Most significantly, Defendants fail to meaningfully distinguish cases like *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 634 (1980) which establishes that "the courts are inclined to disregard the normal rule against permitting one whose conduct may validly be prohibited to challenge the proscription as it applies to others because of the possibility that protected speech or associative activities may be inhibited by the overly broad reach of the statute." Defendants argue that this rule only applies to cases where the overbreadth doctrine applies and categorically declare that overbreadth can never apply to cases involving commercial speech. But this expanded standing doctrine may not apply "*in certain* commercial speech cases," *Vill. of Schaumburg*, 444 U.S. at 634 (emphasis added), where speech is less susceptible to being

---

[20] Rogers Dep. at 26:2–27:7 (Reply Exhibit 4).
[21] Ambrose Decl.  ¶ 10, 12, 15–17; Smith Decl. ¶¶ 6–9.

chilled by "overbroad regulation." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980). But that is manifestly not the case here. The love letter ban will chill a wide variety of client expression because it blocks the main avenue through which such communications are made and the alternatives are far "less effective" and "less likely to reach" their intended audience.[22] *Linmark Assocs., Inc. v. Willingboro Twp.*, 431 U.S. 85, 93 (1977). Total Real Estate is like the bookstore in *Virginia v. American Booksellers Association, Inc.*, 484 U.S. 383, 398 (1988), which was presumptively allowed to challenge a ban on the commercial display of sexually explicit books to minors "not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."

In any event, even if this First Amendment presumption does not apply to the love letter ban, Plaintiffs are still entitled to raise the First Amendment rights of their clients. The State argues that Total Real Estate lacks a "congruence of interests" because the current love letter ban is underinclusive. But that is not an incongruity of interest. Total Real Estate does not advocate for a law that prohibits buyers from sending letters directly to sellers. Such a law would be even more blatantly unconstitutional, as the law's sponsors recognized.[23] Plaintiff and its clients would both benefit from the exact same legal remedy, an invalidation of the love letter ban and protection of free speech. Plaintiff also does not argue, contrary to Defendants' assertion, that buyers and sellers cannot communicate directly, merely that that they have a First Amendment right to select their

---

[22] Mr. Rogers of Oregon REALTORS® recognized that requiring a buyer to reach out to a seller imposes a serious burden and makes it far less likely that such communications will be timely and effective. Rogers Dep. at 58:22–59:21 (Reply Exhibit 4).

[23] *See e.g.* S. Hearing on HB 2550 (Reply Exhibit 19) at 31:00 (Rep. Meek discussing how communications between a buyer and a seller are protected by the First Amendment); *id.* at 36:00 (Sen. Golden acknowledging the same).

means of communication and that direct buyer-to-seller communication is far "less effective" and "less likely to reach" the intended audience in light of the time-sensitive nature of real estate transactions and that therefore the love letter ban significantly impinges on First Amendment freedoms. Any incongruence of interest is therefore totally illusory.

Defendants rely on the case of *Hong Kong Supermarket v. Kizer*, 830 F.2d 1078 (9th Cir. 1987) where the Ninth Circuit found that a supermarket that wanted to enjoin a government program had an interest that diverged from its customers, who merely wanted to end the discriminatory implementation of the program. But that case is not analogous because Total Real Estate seeks the relief that would most benefit its clients, total invalidation of the love letter ban. Furthermore, unlike the supermarket in *Hong Kong Supermarket*, 830 F.2d at 1082, Total Real Estate and its agents are fiduciaries and so they are by law required to advance their client's interest rather than their own.[24]

Defendants also argue that Total Real Estate's interests are different because "its commercial motivation to remain at the center of the real estate transaction is not well aligned with the constitutional interests of its clients." Defs.' Resp. to Mot. Prelim. Inj. at 13–14. But Plaintiff's commercial motivation aligns perfectly with the constitutional (and commercial) interests of its clients to be able to buy and sell their home in light of all the pertinent information. And commercial interests have never barred a party that is directly regulated by a law from raising constitutional claims on behalf of its clients. *See Craig v. Boren*, 429 U.S. 190, 194 (1976) (liquor store had standing to raise equal protection claims on behalf of its customers).

---

[24] Under Oregon law the relationship between a broker and a client is considered to be a sufficiently "special relationship" that an aggrieved client could bring tort claims for breach of duty and not just breach of contract claims. *Boyer v. Salomon Smith Barney*, 344 Or. 583, 591 (2008).

Defendants also argue that there are no barriers to individuals suing to assert their own rights. But Defendants concede that real estate transactions are short-lived and that therefore mootness will frequently be a barrier. They nevertheless claim that because individuals may buy and sell more than one home in their lifetimes, they can therefore assert the "capable of repetition but evading review exception" to mootness. But this mootness exception applies only in "exceptional circumstances," *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 836 (9th Cir. 2014), and an individual home buyer or seller is unlikely to be able to prevail under this exception for two reasons. First, the sale of a home is not "of inherently limited duration," *id.*, as some homes remain on the market for years and some buyers are unable to find a home for an extended period of time. Second, the individual small-home buyers who most rely on love letters are not engaged in frequent home purchases or sales like institutional investors, so it is unlikely that there will be a "reasonable expectation that [they] will be subjected to the same action again." *Id.* Furthermore, it is difficult for any given buyer to know whether he will want to send a love letter in advance since the decision depends on specific needs and market factors. Third-party standing exists for precisely this type of case, where individual plaintiffs will struggle to overcome jurisprudential barriers and where there is a strong congruence of interests.

## II.    Total Real Estate Is Likely to Succeed on the Merits of Its First Amendment Claim

In no other context do courts countenance banning the conveying of truthful and accurate information just because that information *might* be used in a discriminatory fashion. And yet here the State of Oregon has banned a whole category of speech merely because some of that information might somehow be used to discriminate. That blunderbuss approach cannot survive constitutional scrutiny.

a.    **The Love Letter Ban Fails to Directly Advance the Government's Interest**

1.    *Barring access to information that could be used to for unlawful ends does not directly advance the government's interests*

The Supreme Court has rejected the notion that government may pursue its interests indirectly by barring disclosure of information that might be used unlawfully. Hence, while the government has a legitimate interest in preventing housing discrimination, restricting the flow of truthful information that might be used by others to engage in unlawful discrimination is too indirect a means of pursuing that interest to satisfy the tailoring component of intermediate scrutiny. The Court should reject the State's defense of the love letter ban on the grounds that information in some letters "facilitates discrimination by allowing sellers to use protected characteristics in their decision-making process." Defs.' Resp. to Mot. Prelim. Inj. at 24.

Speech can often convey information that others may use for unlawful ends. "But it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party." *Bartnicki v. Vopper*, 532 U.S. 514 (2001). For instance, in *IMDB.com Inc. v. Becerra*, 962 F.3d 1111, 1123 (9th Cir. 2020)—a case that the State does not even attempt to distinguish—the Ninth Circuit held that California could not bar online publication of actors' ages just because employers might use that information to discriminate based on age. And in *Conant*, 309 F.3d 629, the Ninth Circuit struck down a law that penalized physicians for recommending the use of medical marijuana to patients at a time when prescriptions or use of medical marijuana was widely unlawful. The Ninth Circuit rejected the government's rationale that it could restrict such recommendations simply because they might encourage patients to violate the law. *Id.* at 638. Likewise, in *Free Speech Coalition v. Ashcroft*, 535 U.S. 234, 253–254 (2002), the Supreme Court struck down a ban on virtual child pornography, rejecting the argument that pedophiles might use such images to lure children into

participating in illicit sexual activity. The Court concluded: "Without a significantly stronger, more direct connection, the Government may not prohibit speech on the ground that it may encourage ... illegal conduct." *Id.*

An alternative rule allowing censorship on the sole basis that such information could potentially be used by others for pernicious purposes would indeed have "remarkable" implications. Crime novels, for instance, can give aspiring criminals useful ideas about how to pull off their next heist. A newspaper's mention of an eyewitness's name might facilitate criminals in intimidating or even harming that witness. Unless speech rises to the level of intentional aiding and abetting of unlawful behavior, courts must be cautious to allow speech censorship simply because third parties might use the information unlawfully. *See Conant*, 309 F.3d at 635–36 (distinguishing between recommending use of medical marijuana and aiding and abetting a patient in unlawful use).[25]

That principle applies here. While love letters could contain information that others could use for unlawful ends, prohibiting them under such a rationale is not an appropriately tailored means of addressing the government's interests. Indeed, love letters are even more attenuated from unlawful conduct than in *Conant v. Walters*, where a doctor's direct encouragement that a patient unlawfully use a controlled substance was still protected. Here, love letters do not affirmatively encourage discrimination, and they contain many more innocuous details than the speech in

---

[25] *See also* Eugene Volokh, *Crime-Facilitating Speech*, 57 Stan. L. Rev. 1095, 1106 (2005) (suggesting that speech facilitating unlawful conduct should be constitutionally protected unless "(1) it's said to a person or a small group of people when the speaker knows these few listeners are likely to use the information for criminal purposes, (2) it's within one of the few classes of speech that has almost no noncriminal value, or (3) it can cause extraordinarily serious harm (on the order of a nuclear attack or a plague) even when it's also valuable for lawful purposes").

*Conant* and *Free Speech Coalition*, such as a buyer's description of why they love a home's landscaping or the scenic view from the second story.

Indeed, speech that could facilitate discrimination is commonplace in society, and much of that speech has value. For instance, employment discrimination is a serious concern, and yet no state bans in-person job interviews, even though those interviews almost certainly reveal the applicant's race, color, and sex, and may also reveal other characteristics such as disability status, marital status, and sexual orientation. The State's expert, Professor Steil, sat on several search committees that conducted in-person interviews revealing this information.[26] And yet he stated that discrimination did not play a role in those hiring decisions.[27] The State of Oregon cannot ban a whole category of speech merely because some of that information might somehow be used to discriminate. The fact that this risk exists does not justify speech suppression. As the Supreme Court said in another commercial speech case: "It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 770 (1976).

### 2.    *The love letter ban relies on speculation and conjecture*

A law does not directly advance an important government interest if the government has done nothing "more than simply 'posit the existence of the disease to be cured.'" *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994). The State must do more than dabble in "*mere speculation and conjecture*." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001). Hence, even if a government could ever directly advance its interests by barring truthful speech that might

---

[26] Steil Dep. at 136:12–140:2 (Reply Exhibit 1).
[27] *Id.* at 140:3–24.

incidentally facilitate unlawful behavior, the State must show that the love letter ban is more than a solution in search of a problem; it has failed to do so.

HB 2550 floats on a cloud of speculation. Despite multiple declarations and expert reports, the State has not once pointed to a single instance of a seller unlawfully discriminating against a buyer based on the content of a love letter. The State has not even attempted to show that love letters result in a disparate impact.

Instead, the State goes to great lengths to read between the lines of the love letters submitted in discovery by Total Real Estate to show that they reveal protected class. But even if a discerning seller can decode such details from the love letters submitted in discovery, that fact does not cure the fundamental flaw in the State's defense: it has failed to show that sellers have ever once unlawfully discriminated against a buyer because of something a buyer said in a letter.

Even if the State can get past this basic stumbling block, the letters that the State has submitted to support the law provide only paltry evidence in support of a total ban on the transmission of love letters. For one, the State has examined only 27 letters, all submitted by Total Real Estate during discovery. And Total Real Estate's declarants had similarly not reviewed any love letters other than these 27 letters.[28] This indicates that the State did not have a single love letter on hand as evidence to support the legislation prior to its passage, underscoring the conjectural nature of the whole enterprise. Now, the State's attorneys are scrambling to do the hard work of marshalling evidence in support of the legislation, which should have been done by the legislature itself.

Even assuming, counterfactually, that Total Real Estate's love letters were before the legislature, they provide inadequate support for the love letter ban. For one, a sample of 27 letters

---

[28] Steil Dep. at 160:1–11 (Reply Exhibit 1).

is hardly sufficient to conduct meaningful research into love letters' likely impact on housing discrimination. The state's expert who analyzed the letters admitted that he would be cautious about generalizing from these 27 letters to draw conclusions about love letters across the entire state of Oregon.[29] Worse, this tiny sample came from one small real estate firm operating primarily in one region of the state—hardly a representative sample.

Even if the Court overlooks the State's failure to show any evidence that love letters contribute to housing discrimination and the problems with the dearth of evidence regarding love letter content, the love letters submitted in discovery do not in fact show that love letters frequently reveal the protected class about which the State is most concerned: race.

The State's opposition and all the declarations accompanying it, including Professor Bates's expert report and the research relied on in that report, focus on the state's interest in preventing racial discrimination as the basic rationale of the love letter ban.[30] The state's overriding concern appears to be addressing the ownership gap between whites and other racial minorities. The State has never claimed that housing discrimination is prevalent with regard to any other protected classes, or that a worrisome ownership gap exists regarding these classes. And Professor Steil conceded that evidence regarding race discrimination cannot be generalized to assume discrimination on the basis of unrelated characteristics such as sex or religion.[31]

---

[29] Steil Dep. at 44:22–45:25 (Reply Exhibit 1).

[30] *See, e.g.*, Defs.' Resp. to Mot. Prelim. Inj. at 1 ("[T]he rate of homeownership of non-Hispanic white Oregonians is more than 20 percent higher than African American, American Indian, and Pacific Islander Oregonians."), 2–3 (describing racial discrimination in housing); Steil Dep. at 29:14–32:3 (acknowledging that only a single study that he cited dealt with sex, family status, sexual orientation, or marital status, that none dealt with religion, and that this one study was not focused on Oregon and involved the rental market); Bates Decl., Ex. 1 at 3–18 (entirely devoted to housing discrimination based on race).

[31] Steil Dep. at 31:3–23 (Reply Exhibit 1).

Yet race, the State's primary concern, is one protected class that is revealed infrequently by love letters. In fact, the state's expert found *zero* letters where the *written* content of the letter expressly revealed race, indicating that barring the written content of a love letter does nothing to satisfy the State's overriding interest in preventing racial discrimination. Only photographs of buyers revealed raced, which accompanied less than half of the letters.[32] In short, because the State has failed to show that love letters contribute to discrimination, particularly racial discrimination, the love letter ban does not directly advance the government's interest.

The State also insists that it need not "prove with certainty that HB 2550 will reduce housing discrimination." Defs.' Resp. to Mot. Prelim. Inj. at 27. This statement misses the point, which is that the State not only has failed to present any evidence that HB 2550 will reduce housing discrimination, but it has also failed to present concrete evidence that buyer love letters contribute to or increase the incidence of housing discrimination in Oregon. This distinguishes *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002), relied upon by the State, where there was in fact substantial evidence that concentrations of adult businesses were strongly correlated with increased crime. While the Supreme Court did not require Los Angeles to show that their approach of limiting the locations of such businesses would reduce such crime, the city had at least made an initial showing that their presence contributed to the problem. Here, the State has failed to show that love letters contribute to or increase the prevalence of housing discrimination.

### 3. The love letter ban is fatally underinclusive

The State has adopted a law that does not extend equally to all the activity contributing to the alleged harm, thus "diminishing the credibility of the government's rationale for restricting speech in the first place." *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994). The love letter ban does

---

[32] Steil Dep. at 54:4–16 (Reply Exhibit 1).

not prohibit buyers from simply sending letters directly to sellers or prevent sellers from doing independent research to learn about buyers. And if Defendant Strode's recent statements are credited, the law does not even prevent a buyer's agent from including all the personal information that the State disapproves of in a cover letter accompanying an offer package or the seller's agent from passing that information along to the seller. This underinclusive scope renders the ban unconstitutional.

The love letter ban is underinclusive because it fails to restrict buyers from simply sending love letters directly to the seller themselves. The State seeks to excuse this as a "piecemeal" approach. But such a patchwork approach is constitutionally improper where the unregulated speech "affects [the State's] stated interest in a comparable way." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 451 (2015).

Not only do buyer love letters sent directly to sellers affect the State's interests "in a comparable way," but they are also more likely to reveal protected class status than if the real estate agent was more directly involved as an intermediary. As the State's declarants admitted, real estate agents are more knowledgeable about fair housing laws than their clients.[33] And Ms. Smith testified that she would exert her influence to ask buyers to amend letters that raised serious fair housing concerns.[34]

The State seeks to patch this gaping hole by arguing that real estate agents are "key influencers" in real estate transactions who encourage the use of buyer love letters. But HB 2550 does nothing to prevent real estate agents from encouraging their buyers to just mail or email love letters directly to the sellers. Indeed, this point also addresses the State's contention that buyer-to-

---

[33] Rogers Dep. at 57:22–25 (Reply Exhibit 4) ; Steil Dep. at 32:22–33:5 (Reply Exhibit 1).
[34] Smith Dep. at 35:1–12 (Reply Exhibit 7).

seller communications are rare—they will certainly become more common as real estate brokers strategically respond to the law by telling their buyers to just send letters directly to sellers. The law does not account for this obvious workaround, which is precisely why the law fails to directly advance the government's interests in preventing discrimination.

If this Court accepts Defendant Strode's sudden statement that the law does not apply to cover letters, then the under-inclusiveness problem only expands. Cover letters can and often do reveal personal details about buyers, very much akin to the details revealed in buyer love letters, and their use in this fashion will increase if Oregon's law remains in effect.[35] In fact, cover letters may be more likely to reveal some protected classes than love letters, since cover letters will refer to a buyer in third-person gendered terms such as "he" or "she", rather than the first person "I."[36]

Nor does the love letter ban prevent a seller from finding much of this taboo information for themselves. A seller can open a laptop and glean plenty of information about buyers that touch on protected classes with a few keystrokes. Using information available on "customary" real estate documents such as the applicant's name, a seller with basic internet access and skill can learn more information related to protected classes than was provided in the love letters submitted by Total Real Estate. During his deposition, Professor Steil was presented with two such examples. In one instance a news article that was the first result on a Google search revealed all the information that could be inferred from the love letter and accompanying picture as well as the buyers' religious affiliation, which was not contained in the love letter.[37] In another instance a love letter contained no protected class information and yet a seller would have been able to discern the buyer's race,

---

[35] *See, e.g.*, TREG Prod. 000052, 000066, 000122 (Reply Exhibit 6).
[36] *See* Steil Dep. at 57:20–58:3 (Reply Exhibit 1).
[37] *Id.* at 95:17–103:10.

sex, sexual orientation, marital status, familial status, and disability status just by looking at the Instagram page of one of the prospective buyers.[38]

Sellers can also simply view security footage when buyers come to visit a home, watch from a nearby location as the buyers visit the home, or ask next-door neighbors. These methods are far more likely to reveal a buyer's race than love letters, the written content of which rarely, if ever, reveals a person's race.

The government responds that Total Real Estate has not presented evidence to support the claim that sellers might seek out buyer information, but the State carries the burden of proof under intermediate scrutiny to demonstrate proper tailoring, not the Plaintiff. *See Ballen v. City of Redmond*, 466 F.3d 736, 742 (9th Cir. 2006) (government has burden of satisfying the narrow tailoring requirement of the commercial speech test). Plus, sellers frequently want to know details about buyers,[39] and are therefore likely to seek out other means of obtaining that information if they cannot obtain it from a buyer love letter. The government also claims that internet surfing to find out about someone who's made an offer might already be illegal anyway. But discriminating against a protected class based on love letter content is already illegal, too, which is one of the many reasons the State's love letter ban is excessive. Moreover, Total Real Estate is not arguing that sellers will necessarily engage in internet searches to specifically seek out protected class status, but rather that such status will be incidentally revealed by what they find in their efforts to learn about a buyer.

---

[38] *Id.* at 104:11–115:19.
[39] Smith Decl. ¶ 7; Smith Dep. at 30:7–15 (Reply Exhibit 7)

4.      *The love letter ban does not further an interest in resolving*
        *conflicting duties*

The State argues that the love letter ban also resolves a conflict in the legal and ethical duties of real estate brokers. This is not true. According to the declaration of Jeremy Rogers, who works for Oregon REALTORS®, brokers have a conflicting legal duty to disclose written communications from buyers to their seller clients, on the one hand, *see* ORS 696.805(2)(b), and a duty not to assist in discrimination by their clients, on the other.[40] This is simply a legal conclusion that Mr. Rogers is not uniquely qualified to make, but it is also an incorrect legal conclusion. Disclosing information that a seller *might* use to discriminate does not "assist" in discrimination as prohibited by Oregon statute. A similar distinction arose in *Conant*, 309 F.3d at 635, where the Ninth Circuit held that a doctor's mere anticipation that their recommendation to use medical marijuana would facilitate a patient's illegal conduct did not qualify as aiding and abetting such conduct. Here, the connection between a love letter's content and unlawful discrimination is even more tenuous, since much love letter content is innocuous. Sellers may rely on the information in such letters for perfectly lawful reasons, such as making an offer because the buyer is a first-time home buyer or plans to occupy the home. Indeed, while Mr. Rogers' beliefs about the law are not relevant, Mr. Rogers himself conceded that simply disclosing a letter that contains information that could hint at protected class status does not in fact violate anti-discrimination laws.[41] This supposed conflict is also undermined by the fact that Oregon REALTORS®, prior to the love letter ban, recommended that sellers' agents inform buyer agents that the seller would not be accepting love letters.[42]

---

[40] *See* Rogers Dep. at 21:16–22:12 (Reply Exhibit 4).
[41] Rogers Dep. at 32:1–19, 38:8–39:6 (Reply Exhibit 4).
[42] Rogers Dep. at 26:18–24 (Reply Exhibit 4).

b.     **The Love Letter Ban Is More Extensive than Necessary**

1.     *The love letter ban is overinclusive*

The love letter ban restricts a wide array of speech that does not even present information

that sellers could use to discriminate. It is therefore overinclusive, barring speech that presents no

threat to the State's interests. *See Comite de Jornaleros de Redondo Beach v. City of Redondo*

*Beach*, 657 F.3d 936, 948 (9th Cir. 2011) (A law is not narrowly tailored where a plaintiff identifies

examples of "prohibited speech that do not cause the types of problems that motivated the [law].").

Here is a non-exhaustive list of the information in the love and cover letters disclosed in

discovery that offer truthful information that does not touch on protected class:

- To explain that the location of the home is conveniently located next to a local hospital that the prospective buyer uses;[43]
- To explain buyer qualifications in greater detail than is expressed in the application;[44]
- To express a desire to live permanently in the area;[45]
- To describe features that a buyer likes about the home;[46]
- To explain how certain rooms or spaces in the house are particularly well suited for what they will be used for such as an ideal space for hanging artwork;[47]
- To describe how the house provides good storage for buyer's possessions;[48]
- To explain that the home will be a good fit for household pets;[49]
- To explain the small size of the down payment;[50]
- To explain the relatively small amount of an offer;[51]
- To promise to care for the home;[52]
- To express flexibility about the request that certain fixtures remain in the property;[53]
- To explain unusual provisions of the offer such as a contingency or agreement to occupy;[54]

---

[43] TREG Prod. 000042 (Reply Exhibit 6).
[44] TREG Prod. 000044 (Reply Exhibit 6).
[45] *See, e.g.*, TREG Prod. 000129 (Reply Exhibit 6).
[46] *See, e.g.*, TREG Prod. 000047 (Reply Exhibit 6).
[47] TREG Prod. 000126 (Reply Exhibit 6).
[48] TREG Prod. 000064–65 (Reply Exhibit 6).
[49] *See, e.g.,* TREG Prod. 000077, 000108–111 (Reply Exhibit 6).
[50] TREG Prod. 000046, 000050, 000127 (Reply Exhibit 6).
[51] TREG Prod. 000130, 000140 (Reply Exhibit 6).
[52] TREG Prod. 000046 (Reply Exhibit 6).
[53] TREG Prod. 000052 (Reply Exhibit 6).
[54] TREG Prod. 000053 (Reply Exhibit 6).

- To explain how a cash buyer has enough funds;[55]
- To express an eagerness to close quickly;[56]
- To mention that the buyers are first time home buyers;[57]
- To explain why the location of the house is perfect for commuting;[58]
- To tell the seller about their own home and how well it is maintained;[59]
- To discuss a love of gardening and how the home is well suited for growing plants;[60]
- To admire the architectural style of a home and its resemblance to a previous family home;[61] and
- To explain why a certain repair is important for the prospective buyer.[62]

As this list illustrates, the amount and type of pertinent information that a buyer may wish to convey that does not threaten the State's interests in any way is endless.

The State responds by pointing out that love letters can still be sent directly by buyers to sellers. This defense only shows how underinclusive the law is. It also ignores the buyer's First Amendment interest in deciding how to communicate to the seller and the agent's interest in serving as a speech intermediary.

Unlike content-neutral speech restrictions, the availability of another channel through which to communicate a message is not relevant to the commercial speech test. *See Central Hudson*, 447 U.S. at 564. Here, a buyer has a First Amendment right to choose to send the letter through an authorized agent as part of an offer package rather than directly via email or mail. There are valid reasons why a buyer may prefer this option—communicating through an agent may increase the likelihood that the communication will be seen by the seller and considered

---

[55] TREG Prod. 000075 (Reply Exhibit 6).
[56] TREG Prod. 000084, 000088 (Reply Exhibit 6).
[57] TREG Prod. 000089–91 (Reply Exhibit 6).
[58] *Id.*
[59] TREG Prod. 000100–103 (Reply Exhibit 6).
[60] TREG Prod. 000103, 000136 (Reply Exhibit 6).
[61] TREG Prod. 000128 (Reply Exhibit 6).
[62] TREG Prod. 000119 (Reply Exhibit 6).

trustworthy. In any event, the alternatives are far "less effective" and "less likely to reach" their intended audience. *Linmark*, 431 U.S. at 93.

2.    *The State has failed to rebut obvious less-restrictive alternatives*

A speech restriction is more extensive than necessary to meet the government's stated interest if there are "numerous and obvious less-burdensome alternatives to the restriction on commercial speech." *City of Cincinnati v. Discovery Network*, 507 U.S. 410, 417 n.13 (1993). "[T]he availability of obvious less-restrictive alternatives renders a speech restriction overinclusive." *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 826 (9th Cir. 2013). This is because "restricting speech should be the government's tool of last resort," even in commercial speech cases. *Id.*; *see also Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002) ("If the First Amendment means anything, it means that regulating speech must be a last—not first—resort. Yet here it seems to have been the first strategy the Government thought to try."). To meet this burden the State "must show that it 'seriously undertook to address the problem with less intrusive tools readily available to it'" and that "imposing lesser burdens . . . 'would fail to achieve the government's interests, not simply that the chosen route was easier.'" *McCullen v. Coakley*, 573 U.S. 464, 494–95 (2014).

Here, the State could pursue other methods "that would allow it to achieve its stated interests while burdening little or no speech." *Comite de Jornaleros de Redondo Beach*, 657 F.3d at 949. Plaintiff listed several such alternatives in their opening brief and the state's own experts acknowledged the existence of others: The State could require that the letters be redacted to eliminate references to protected classes; it could enforce current anti-discrimination law; and it could implement other reforms such as disclosures, trainings, and housing policy reforms. The State has only addressed redaction as an alternative to the love letter ban, without addressing other

alternatives such as enforcing existing anti-discrimination law or implementing other reforms. Defs.' Resp. to Mot. Prelim. Inj. at 31–33. Because the State has failed to address the "numerous and obvious less-burdensome alternatives to the restriction on commercial speech," it has failed its burden under intermediate scrutiny. *Discovery Network*, 507 U.S. at 417 n.13.

i.    Strengthen Enforcement of Existing Anti-Discrimination Laws

Most glaringly, the State has not addressed efforts it could make to more effectively enforce existing fair housing law which the Supreme Court has repeatedly emphasized is a less restrictive alternative to imposing new speech restrictions. As the State's expert, Professor Bates, noted in her report, the Statewide Fair Housing Action Plan found a lack of enforcement in fair housing violations because buyers are often unaware of fair housing laws or that they are being discriminated against.[63] The Plan recommended increasing outreach, education, and clarity about the homebuying process and better educating real estate professionals about their responsibilities to facilitate stronger fair housing enforcement.[64] The State could also improve enforcement of its fair housing laws by auditing real estate transactions to discover when a party in a real estate transaction expresses personal affinity or animus for certain groups, an alternative mentioned by Professor Bates in her report.[65] But the state has taken none of these steps. Instead of making the outreach and education efforts recommended by the Plan, it merely wrings its hands and claims that discrimination is hard to detect and prevent. Simply giving up without trying to implement more robust enforcement measures does not satisfy the Government's obligation to seriously consider and adopt less-restrictive alternatives. *See IMDB.com*, 962 F.3d at 1123 ("Rather than restrict truthful speech, the typical 'method of deterring unlawful conduct is to impose an

---

[63] Bates Decl., Ex. 1 at 10 (Reply Exhibit 5).
[64] *Id.* at 11.
[65] *Id.* at 12.

appropriate punishment on the person who engages in it.") (quoting *Bartnicki*, 532 U.S. at 529). Accordingly, it cannot resort to restricting speech.

                ii.        Require the Redaction of Love Letters and Accompanying Photographs

One obvious alternative to HB 2550's prohibition on brokers transmitting all "non-customary communications" from the buyer to the seller would have been to require brokers to redact content implicating protected class status.[66] In fact, this alternative was originally proposed by the State in the bill as it was originally introduced, before the State adopted its current, more extensive approach. HB 2550, 81st Leg. Ass., Reg. Sess. (Or. 2021). Defendants argue that "[r]elying on brokers' individual judgments of what information must be redacted would not achieve the State's objective" and that "[b]rokers are ill-equipped to make such determinations." Defs.' Resp. to Mot. Prelim. Inj. at 31. However, brokers work in a highly regulated field, are trained in state and federal fair housing law, must comply with regular continuing education requirements, and are capable of identifying which classes are protected and which are not, as they are enshrined in those laws. 42 U.S.C. § 3604; Or. Rev. Stat. § 659A.421. They should, therefore, be capable of redacting letters that implicate protected class status if Oregon law requires them to do so.

Banning photographs that reveal protected class status would be another far less burdensome alternative.[67] This method would be especially effective for addressing any concerns

---

[66] Although Plaintiff does not necessarily endorse the constitutionality of this approach either, it would at least burden less speech than the current ban, which bans the transmission of all noncustomary communications.

[67] Photographs may still contain useful information. For instance, in one letter the prospective buyers included photographs of their current home to show the condition of the home and that they had taken good care of the home. TREG Prod. 000100 (Reply Exhibit 6) And the State's expert

of discrimination on the basis of race and color, which is the overwhelming focus of the legislation and the State's defense of it. The only letters that the State's expert Professor Steil identified as revealing race and color were those that contained personal photographs.[68] Photographs were also the most likely means by which sex might be revealed in a love letter. Mandating the redaction of love letters and photographs that reveal protected class status would therefore advance the State's interest in preventing housing discrimination while being less burdensome than completely banning the transmission of all "non-customary communications" by brokers.

          iii.      Require Fair Housing Disclosures in Real Estate Transactions

Another obvious less restrictive alternative that has been left unaddressed by the State would have been to require the parties involved in a transaction and their brokers to sign a disclosure form stating that they recognize that they cannot discriminate on the basis of protected class status and are aware of buyers' rights under fair housing law. This method is already utilized in New York State.[69] A disclosure form would enable the State to ensure that all parties involved in a transaction are aware of their rights and obligations under fair housing law. It would help make buyers aware of their rights and emphasize to sellers and brokers that they may not unlawfully discriminate while reminding them of the requirements of fair housing law. Professor Steil himself recognized that a disclosure form would increase awareness and likely reduce discrimination in housing transactions.[70]

---

conceded that this information might be valuable for a seller to know when deciding whether to sell a house. Steil Dep. at 81:11–84:8 (Reply Exhibit 1).

[68] Steil Dep. at 54:4–16 .

[69] *New York State Housing and Anti-Discrimination Disclosure Form*, N.Y. Dep't of State, Div. of Licensing Servs. and N.Y. Div. of Consumer Rights (May 2020), https://dos.ny.gov/system/files/documents/2021/03/2156.pdf (Reply Exhibit 17).

[70] Steil Dep. at 135:22–136:5 (Reply Exhibit 1).

iv.    Require More or Better Training in Fair Housing Law

The State has also failed to address the option of requiring that brokers receive more training in fair housing law, to ensure that they are aware of their legal responsibilities, do not engage in illegal discrimination, and are equipped to prevent illegal discrimination that they may encounter. Anti-discrimination and anti-bias training would be a far less burdensome method for combatting discrimination in Oregon's housing market than banning the transmission of noncustomary communications. In fact, Oregon is already requiring real estate brokers renewing their license *this year* to take a course discussing the requirements of federal and state fair housing law and how to recognize implicit bias and prohibited transactions in their practices.[71] If the State is unsatisfied with its current training procedures, then increasing or improving this type of fair housing training represents a less burdensome method for addressing discrimination and disparities in housing than the love letter ban.

v.    Implement Affordable Housing Initiatives

Additionally, the State has not addressed a variety of measures that it could have taken to ensure that housing is more affordable for marginalized communities while avoiding a ban on protected speech. *See* Defs.' Resp. to Mot. Prelim. Inj. at 31. For example, it could have chosen to simplify housing permits to make it easier to build new homes, thus increasing the supply of housing and decreasing its cost. It could also have reduced barriers to urban growth, again increasing the supply of housing. Finally, the state could have employed measures to make it easier for first-time homebuyers to secure favorable terms in real estate transactions. Any one or all of

---

[71] Or. Rev. Stat. § 696.174 (2021); Or. Real Estate Agency, *Law and Rule Required Course 2022-2023*, Or. Real Estate Agency (Aug. 4, 2021) (Reply Exhibit 15).

these measures would help make housing more affordable and easier to obtain by marginalized communities without burdening speech.

vi.    Require More or Better Training in Fair Housing Law

Another measure the State has failed to discuss would be to reform zoning laws to enable the construction of more housing, again making it more affordable for marginalized communities, thus reducing the ownership gap and reducing residential segregation. The State could utilize upzoning measures, thus increasing development capacity, which would in turn increase the supply of housing and decrease its cost.[72] It could loosen zoning restrictions to allow for the building of single-family and multifamily homes across a wider area. By reforming zoning laws to facilitate the construction of new housing, the state could make housing more accessible and reduce disparities in the housing market without burdening protected speech.

vii.   Allow Brokers and Organizations Worried about Discrimination to Advise Their Clients Not to Write Love Letters

Another less restrictive measure would have been to allow brokers and organizations who are concerned about discrimination to advise their clients not to write love letters, or at least not to mention anything that could implicate protected class status in those letters. According to Mr. Rogers, Oregon REALTORS® began advising its licensees not to use love letters a few years ago.[73] Efforts by organizations such as Oregon REALTORS®, as well as by individual brokers, to police themselves and avoid potential discrimination in the use of love letters, provide a far less restrictive alternative to completely banning the transmission of love letters and other "non-customary" documents.

---

[72] Vicki Been et al., *Supply Skepticism: Housing Supply and Affordability*, N.Y.U Furman Center 10-12 (2018) (Reply Exhibit 14).
[73] Rogers Dep. at 26:2–27:7 (Reply Exhibit 4).

Oregon does not necessarily need to "enact all or any of the proposed measures discussed above." *McCullen v. Coakley*, 573 U.S. 464, 493 (2014). "The point is instead that the [State] has available to it a variety of approaches that appear capable of serving its interests" without restricting protected speech. *Id.* at 494–94. Because the State has failed to address why these approaches do not present viable alternatives, the love letter ban is more extensive than necessary and fails intermediate scrutiny.

## III.    Irreparable Harm Is Established Per Se in First Amendment Cases

Defendants claim that Plaintiff has failed to establish irreparable harm because Plaintiff cannot succeed on its constitutional claim. Defs.' Resp. to Mot. Prelim. Inj. at 33. For reasons discussed above, Plaintiff is likely to succeed on the merits of its First Amendment claim. Because Plaintiff is likely to succeed on its constitutional claim and the "loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury," Plaintiff has suffered an irreparable injury. *Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

## IV.    The Balance of Equities Favors an Injunction

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). The State claims a preliminary injunction lasting a matter of months would undermine the State's efforts to remediate discrimination, even though the State has seen fit to allow agents to transmit love letters for decades without apparent concern. The equities favor upholding the Constitution. *See Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[I]t may be assumed that the Constitution is the ultimate expression of the public interest.").

DATED: January 20, 2022.

Respectfully submitted,

s/Christina M. Martin

CHRISTINA M. MARTIN
Local Counsel, OSB #084117
Daniel M. Ortner, Cal. SB #329866*
Ethan W. Blevins, Wash. SB #48219*
*Attorneys for Plaintiff*
* Pro Hac Vice

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Oregon by using the CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted,

s/Christina M. Martin

CHRISTINA M. MARTIN
Local Counsel, OSB #084117
*Attorney for Plaintiff*