IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TOTAL REAL ESTATE GROUP, LLC, an
Oregon limited liability company,

                    Plaintiff,

     v.

STEVE STRODE, in his official capacity as
the Oregon Real Estate Commissioner; and
ELLEN ROSENBLUM, in her official
capacity as Attorney General for the State of
Oregon's Department of Justice,

               Defendants.

No. 3:21-cv-01677-HZ

OPINION & ORDER

Christina M. Martin
Pacific Legal Foundation
4440 PGA Blvd, Suite 307
Palm Beach Gardens, FL 33410

Daniel M. Ortner
Ethan Blevins
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814

     Attorneys for Plaintiff

1 – OPINION & ORDER

Brian Simmonds Marshall
Alexander Charles Jones
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201

       Attorneys for Defendants

HERNÁNDEZ, District Judge:

       Plaintiff Total Real Estate Group, LLC ("TREG"), a real estate firm, seeks a preliminary injunction enjoining Defendants Steve Strode, in his official capacity as Oregon Real Estate Commissioner, and Ellen Rosenblum, in her official capacity as Attorney General for the State of Oregon's Department of Justice, from enforcing Oregon House Bill 2550. The Court held oral argument on the Motion on February 9, 2022. For the reasons that follow, the Court grants the Motion for a Preliminary Injunction.

## BACKGROUND

       The State of Oregon seeks to achieve a laudable goal: to stop discrimination in home ownership based on protected class status including, race, color, religion, sex, sexual orientation, national origin, marital status, or familial status. In order to do so, it passed a law that unquestionably interferes with speech. The question before the Court is whether that law goes too far.

## I.    Factual Background

       This case concerns the regulation of "love letters" by the State of Oregon. The term "love letters" refers to "notes, letters, and pictures that buyers may submit along with their offers to purchase in order to create an emotional connection between sellers and buyers — especially when significant competition exists on a given property." Ortner Decl. Ex. 10 at 2, ECF 45-10; Compl. ¶ 17, ECF 1.

A.      **HB 2550**

In September 2021, Governor Kate Brown signed into law House Bill 2550 ("HB 2550").

Compl. ¶ 15. HB 2550 amends Section 696.805 of the Oregon Revised Statutes, which

enumerates the duties and obligations owed by a seller's agent in a real estate transaction. The

amendment states:

> In order to help a seller avoid selecting a buyer based on the buyer's race, color,
> religion, sex, sexual orientation, national origin, marital status or familial status as
> prohibited by the Fair Housing Act (42 U.S.C. 3601 et seq.), a seller's agent shall
> reject any communication other than customary documents in a real estate
> transaction, including photographs, provided by a buyer.

Or. Rev. Stat. ("ORS") § 696.805(7).

The statute does not define "customary documents." In an article in the Oregon Real

Estate News Journal, Steve Strode Oregon's Real Estate Commissioner offered the following

guidance: "the Agency interprets [customary documents] to mean disclosure forms, sales

agreements, counter offer(s), addenda, and reports. Love letters would not be considered

customary documents." Ortner Decl. Ex. 10 at 2. He stated further that "[t]he intent of the bill

was clear during the legislative process, and the Agency does not envision additional rulemaking

at this time." *Id.* The Oregon Real Estate Agency then issued "FAQs Regarding HB 2550 (The

"Love Letter" Law)" on its website. It states that "lender preapproval letters for financed

transactions" and "verification of funds for cash transactions" are considered "customary

documents" and that a seller's agent may accept a "a cover letter written by a buyer's agent

explaining the prospective buyer's interest in the property." Second Jones Decl. Ex. 1 at 1, ECF

47-1.

The parties agree that HB 2550 does not prohibit communications directly between a

buyer and a seller. Pl. Mem. at 23, ECF 4; Def. Resp. at 1, ECF 30.

B.    **Legislative History**

Representative Mark Meek, a practicing real estate agent, introduced HB 2550. Ortner Decl. Ex. 18 ("Def. Video 2") at 3:05, ECF 45. At the hearing on the bill, he stated that in his opinion the practice of providing love letters "perpetuates systemic issues of bias in real estate transactions." *Id.* at 3:05–3:16. He testified that through his work as the co-chair of the Legislative Assembly's Task Force on Addressing Racial Disparities in Home Ownership, he concluded that the practice of using "love letters" could perpetuate "implicit biases that we're not even aware of." *Id.* at 5:15–5:24. He also discussed and shared data on racial disparities in homeownership in Oregon. *Id.* at 9:07–9:51. The Oregon House of Representative unanimously approved the bill. Def. Resp. at 15.

The original house bill required the seller's agent to redact information provided by prospective buyers to help the seller avoid selection of a buyer based on a buyer's "race, color, religion, sex, sexual orientation, national origin, marital status, familial status, or source of income." Def. Video 2 at 2:04–25. In the Senate, members of the Committee on Housing questioned this approach and raised concerns about the role a seller's agent would have to play in redacting the letters. Ortner Decl. Ex. 19 ("Def. Video 1") at 28:19–30:18, 32:38–34:13, 35:00–36:01, ECF 45.

C.    **This Litigation**

Plaintiff TREG is a real estate firm with offices in Bend and Portland, Oregon. Compl. ¶ 12. TREG's principal broker supervises about twenty licensed real estate brokers (also called agents) throughout Oregon. *Id.* On November 19, 2021, Plaintiff filed this case and moved for a preliminary injunction. Compl., Mot. for Prelim. Inj., ECF 3. On December 2, 2021, Plaintiff moved for expedited review. Mot. to Expedite, ECF 20. On December 10, 2021, the case was

reassigned to Judge Hernandez from Magistrate Judge Acosta and the Court denied the Motion

to Expedite. ECF 26, 27. The Case was taken under advisement when Defendants filed their

reply brief on January 20, 2022. Def. Reply, ECF 44.

## II.    Evidence Relevant to the Motion

In response to the Motion, Defendants submitted three types of evidence supporting HB

2550's purpose of addressing discrimination in housing: (1) history and prevalence of housing

discrimination in Oregon; (2) prevalence of protected characteristics in love letters; and (3)

evidence that shows how personal information in love letters influences which offers sellers

select. Plaintiff offered evidence of HB 2550's potential effect on its business.

### A.    Evidence in Support of HB 2250's Stated Purpose

Oregon has a long and abhorrent history of racial discrimination in property ownership

and housing. For example, the 1857 Oregon Constitution prohibited Black Americans and

immigrants of Chinese descent from owning real property. First Jones Decl. Ex. 1 at 21, ECF 37-

1. During the same period, the Donation Land Claim Act and Homestead Act entitled white

settlers to property in Oregon Territory if they lived on it and cultivated it for four years. *Id.*

Later, the 1923 Alien Land Law banned Japanese nationals from owning or leasing land in

Oregon. *Id.*

While people of color were eventually permitted to own land in the State of Oregon, a

series of governmental policies, industry practices, and private arrangements enshrined housing

discrimination and racial segregation in Oregon's communities through the 1900s and present

day. *Id.* at 22; Bates Decl. Ex. 1 at 5–8, ECF 31-1. These included racially restrictive covenants,

redlining, racial steering, and urban renewal that displaced Black and Japanese-American

households in particular. *Id.*

Considerable racial disparities persist in homeownership. Over a 21-percentage point differential separates Black, Native Hawaiian, or Pacific Islander, and Hispanic households from White households in Oregon. *See* Bates Decl. Ex. 1 at 8–9 (Homeownership Rates by Ethnicity/Race (alone or in combination) statewide, Oregon, 2015-2019: American Indian or AK Native (59%), Asian (68%), Black (41%), Native HI or Pacific Islander (43%), White (68%), Hispanic (any race) (45%), Total Population (65%)).

Defendants' expert, Justin Steil, Ph.D., Associate Professor of Law and Urban Planning at the Massachusetts Institute of Technology, analyzed the love letters produced by Plaintiff in this case. Steil Decl. Ex. 1, ECF 32-1. He found that the vast majority of the letters produced (93%) disclosed the buyer's race, color, religion, sex, sexual orientation, national origin, marital status, familial status, or disability. *Id.* at 4. About half of the letters included photographs that revealed some information about race, color, and sex or gender, among other characteristics. *Id.* He gave the opinion that love letters enable intentional and unintentional discrimination in housing by "providing information about characteristics on which discrimination is prohibited by state and federal law." *Id.* at 4. He based this conclusion on quantitative data showing the existence of conscious explicit bias in housing transactions and the growing body of research showing how implicit biases predict discriminatory behavior. *Id.* at 5–8.

Defendants' expert, Lisa K. Bates, Ph.D., Associate Professor in the Toulan School of Urban Studies at Portland State University, submitted a report that details the history of racial discrimination and segregation in Oregon and the academic literature on the persistence of racial discrimination in homebuying. *See* Bates Decl. Ex. 1. Ms. Bates gave the opinion that though the practice of "buyer love letters" has not been studied in the academy, the practice is "likely to create a number of discriminatory outcomes." *Id.* at 17. She based this opinion on "the extensive

literature" that documents "how discrimination accumulates through multiple dimensions of the real estate transaction." *Id.* The second half of her report catalogs this body of research. Based on that research, she described part of the potential discriminatory problem with love letters as follows:

> Sellers may consciously or unconsciously prefer buyers who describe a profile that is most similar to their own in terms of demographics and family status. Those decisions reinforce existing gaps in homeownership (predominantly white) and existing neighborhood segregation as sellers are replaced with like buyers.

*Id.*

Evidence suggests love letters increase the likelihood an offer will be accepted by a buyer. A study conducted by the real estate company Redfin reviewed 14,000 transactions. Bates Decl. at 15 (citing Leigh Kamping-Carder, *The Strangely Effective (and easy) Way to Win a Bidding War*, The Wall Street Journal, Jan 18, 2018). It found that 40% of offers included love letters and that love letters increased the likelihood of having an offer accepted by 52%. *Id.* Practicing real estate agents agree that love letters influence sellers' decision making process. Bonner Decl. ¶ 4, ECF 63; Mullane Decl. ¶ 4, ECF 35; Smith Decl.¶¶ 2–3, 5, ECF 6.

### B.    Evidence of Plaintiff's Anticipated Harm

Plaintiff submitted the following evidence of potential harm from the enforcement of HB 2550. In her declaration, practicing real estate agent, Cheri Smith, stated that HB 2550 "will likely lead to many angry and dissatisfied clients." Smith Decl. ¶ 7 She also expressed concerns that HB 2550 might lead clients to "accuse" her of not fulfilling her ethical and fiduciary duty to "disclose material facts known by the seller's agent." *Id.* ¶ 9. Plaintiff's general counsel, who is also a broker, expressed this same concern. Ambrose Decl. ¶ 8, ECF 5. In Ms. Smith's experience, the practice of sending love letters has allowed herself and her clients to compete with higher offers, including those submitted by investors. Smith Decl. ¶¶ 2–3, 5.

## STANDARDS

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must show (1) that he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in his or her favor; and (4) an injunction is in the public interest. *Id.* at 20.

In the Ninth Circuit, courts may apply an alternative "serious questions" test, which allows for a preliminary injunction when a plaintiff shows that "serious questions going to the merits" were raised and the balance of hardships tips sharply in plaintiff's favor, assuming the other two elements of the Winter test are met. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011). This formulation applies a sliding scale approach where a stronger showing of one element may offset a weaker showing in another element. *Id.* at 1131. Nevertheless, the party requesting a preliminary injunction must carry its burden of persuasion by a "clear showing" of the four elements set forth above. *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).

## DISCUSSION

The Court begins by addressing the first *Winter* factor: whether Plaintiff can show it is likely to succeed on the merits of its First Amendment claim. Assuming HB 2550 regulates commercial speech, the Court holds Plaintiff is likely to succeed on the merits of its First Amendment claim because the statute is overinclusive and cannot survive intermediate scrutiny. The Court then turns to the remaining *Winter* factors and finds that they favor Plaintiff.

//

//

## I.      Likelihood of Success on the Merits

As a threshold matter, the Court considers Defendants' standing arguments then proceeds to the merits of the First Amendment commercial speech analysis.

### A.      Standing

Plaintiff raises two First Amendment theories in its motion for a preliminary injunction: (1) that HB 2550 burdens the First Amendment rights of Plaintiff and its agents and (2) that HB 2550 burdens the First Amendment rights of its clients.[1] On the first theory, Defendants contend that Plaintiff lacks direct standing to bring a First Amendment challenge because HB 2550 regulates sellers' agents' conduct, not speech. On the next theory, Defendants argue Plaintiff lacks standing to assert the First Amendment rights of its client.

Federal courts are courts of limited jurisdiction, and as a preliminary matter, a plaintiff must satisfy the "case or controversy" requirement of Article III of the U.S. Constitution to maintain a claim in this forum. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983); *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004). If the court does not have an actual case or controversy before it, it lacks authority to hear the matter in question. *Lyons*, 461 U.S. at 101. "Standing is a core component of the Article III case or controversy requirement." *Barnum*

---

[1] The Parties agree that Plaintiff mounts a facial challenge. "An ordinance may be facially unconstitutional in one of two ways: either it is unconstitutional in every conceivable application, or it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally overbroad." *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1271 (9th Cir. 2017) (citation and internal quotation marks omitted). Although generally disfavored, facial challenges are given greater leniency in the First Amendment context. "It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society." *Broadrick v. Oklahoma*, 413 U.S. 601, 612–13 (1973).

*Timber Co. v. EPA*, 633 F.3d 894, 897 (9th Cir. 2011) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Standing pertains to the federal courts' subject matter jurisdiction. *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010); *see also Cetacean Cmty.*, 386 F.3d at 1174 ("A suit brought by a plaintiff without Article III standing is not a 'case or controversy,' and an Article III federal court therefore lacks subject matter jurisdiction over the suit.").

The "irreducible constitutional minimum" of standing consists of three elements: the plaintiff must have (1) suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016); *Lujan*, 504 U.S. at 560. To establish an injury in fact, a plaintiff must show that "he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339 (internal quotation omitted). A plaintiff "must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000). At this stage in the proceedings, a plaintiff need only "show that the facts alleged, if proved, would confer standing." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1140 (9th Cir. 2003).

### i.    Direct Standing

The question before the Court is not whether Plaintiff has standing to challenge the law at all—it clearly regulates real estate agents—but whether Plaintiff has standing to challenge HB 2550 as an impermissible restriction on speech.

"[R]estrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct," and "the First Amendment does not prevent

restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). In the Ninth Circuit the "threshold question is whether conduct with a 'significant expressive element' drew the legal remedy or the ordinance has the inevitable effect of 'singling out those engaged in expressive activity.'" *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 408 (9th Cir. 2015) (quoting *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706–07 (1986)).

Defendants argue HB 2550 does not violate Plaintiff's First Amendment rights because it restricts agents' conduct, not speech. Plaintiff points to two ways HB 2550 directly burdens its agents' speech: (1) it argues love letters contain agents' speech because agents sometimes help draft love letters; and (2) HB 2550 prohibits agent cover letters, which are agent speech.

As an initial matter, the Court addresses whether HB 2550 prohibits a seller's agent from transmitting an agent authored cover letter. This issue is important because if HB 2550 bans agent cover letters, it clearly burdens agents' speech. Plaintiff argues HB 2550 prohibits cover letters. Defendants argue it does not.

Buyer's agents use cover letters when submitting an offer to convey information about their clients and the strength of the offer. Pl. Mem. at 18. Oregon's real estate commissioner issued informal guidance that HB 2550 does not prohibit the use of agent cover letters. At oral argument, however, the parties agreed that this informal guidance is not entitled to deference. *See Oregon Occupational Safety & Health Div. v. CBI Servs.*, Inc., 356 Or. 577, 585, 341 P.3d 701, 706 (2014). No other court has interpreted or applied HB 2550, so the Court cannot rely on precedent to answer whether it prevents the transmission of agent cover letters. Accordingly, the Court turns to the three-part statutory interpretation framework laid out by the Oregon Supreme

Court in *State v. Gaines* to determine the intent of the legislature in drafting HB 2550. 346 Or.

160, 165, 206 P.3d 1042, 1047 (2009)

First, the Court examines the text and the context of the statute. *Id.* at 171 (citing *PGE v.*

*Bureau of Labor and Indus.*, 317 Or. 606, 610–11 (1993)). In construing the text and context, the

Court neither "insert[s] what has been omitted" nor "omit[s] what has been inserted." ORS

174.010. Next, the parties are "free to proffer legislative history to the court, and the court will

consult it after examining the text and context, even if the court does not perceive an ambiguity

in the statute's text, where that legislative history appears useful to the court's analysis." *Id.* at

172. Finally, "[i]f the legislature's intent remains unclear after examining text, context, and

legislative history, the court may resort to general maxims of statutory construction to aid in

resolving the remaining uncertainty." *Id.*

As previously stated, HB 2550 provides:

> In order to help a seller avoid selecting a buyer based on the buyer's race, color,
> religion, sex, sexual orientation, national origin, marital status or familial status as
> prohibited by the Fair Housing Act (42 U.S.C. 3601 et seq.), a seller's agent shall
> reject any communication other than customary documents in a real estate
> transaction, including photographs, provided by a buyer.

ORS 696.805(7).

The plain text and context of the statute do not indicate whether HB 2550 prohibits cover

letters. HB 2550 does not define "customary documents in a real estate transaction" and the plain

meaning of "customary" does not necessarily include or exclude cover letters. *See Customary*,

Webster's Third New Int'l Dictionary 559 (1971) ("commonly practiced, used, or observed:

familiar through long use or acquaintance "). However, "when the legislature uses technical

terminology—so-called 'terms of art'—drawn from a specialized trade or field" the court may

"look to the meaning and usage of those terms in the discipline from which the legislature

borrowed them." *Comcast Corp. v. Dep't of Revenue*, 356 Or. 282, 296, 337 P.3d 768, 776 (2014). This is an exception to the ordinary meaning rule. *Id.*

Here, neither party offers an authoritative source for the definition of customary documents or explains whether this term has a specialized meaning in the real estate industry. *See, e.g., Mueller v. PSRB,* 325 Or. 332, 339, 937 P.2d 1028 (1997) (finding DSM-III the "definitive source" when interpreting the "term of art" "personality disorder"); *Dept. of Rev. v. Croslin,* 345 Or. 620, 628, 201 P.3d 900 (2009) (relying on Black's Law Dictionary for the definition of "damages"). While "customary documents" does not appear to be a term of art in the traditional sense, to have any meaning, it requires knowledge of common practice in the real estate industry. Thus, the Commissioner's informal interpretation may provide some relevant context. For example, in *State ex rel. Dep't of Transp. v. Stallcup*, the Oregon Supreme Court relied in part on a formal interpretation by the board that regulated appraisers to inform its interpretation of the term "appraisal" in a condemnation statute. 341 Or. 93, 102, 138 P.3d 9, 14 (2006). The Court follows this approach and finds Commissioner Strode's interpretation that HB 2550 does not prohibit the transmission of cover letters persuasive, but not dispositive.

The legislative history provided by the parties does not address the precise question before the Court either. Plaintiff points the Court to general statements by Representative Meek and Senator Jama concerning the purpose of the law. *See* Def. Video 2 at 19:59-20:15 (Representative Meek stated that the purpose of HB 2550 is to require a seller's agent to "withhold any information not customary in a real estate transaction." He went on to say, "[t]he goal of this bill is to ban love letters in a real estate transaction."); *id.* at 43:30-50 (Senator Jama stated he hoped the bill would ensure decisions were made based on the financial merits of the offer). It argues these statements show that if HB 2550 excludes cover letters it would not

achieve the legislators' stated purpose. But Plaintiff's argument extrapolates too far—these are general statements that if anything show that the legislature's focus was love letters. Plaintiff provides no evidence that the legislature contemplated documents beyond love letters or intentionally used broad language in an effort to prohibit more types of documents. *Cf. State v. Walker*, 356 Or. 4, 20–21, 333 P.3d 316, 326 (2014) (interpreting Oregon's Racketeering Influenced and Corrupt Organizations law and relying on legislative history that showed that legislators were aware that the statue's broad wording "did not preclude its use to reach 'low level' crimes or smaller-scale coordinated activities").

Defendants argue the legislature's exclusive focus on love letters shows that it intended to exclude cover letters from HB 2550's prohibition. This argument is only marginally persuasive. Silence on cover letters does not necessarily imply legislators intended to exclude them, it only shows that they were not expressly considered. *See Wyers v. Am. Med. Response Nw., Inc.*, 360 Or. 211, 227, 377 P.3d 570, 579 (2016) (noting that "drawing conclusions from silence in legislative history misapprehends the nature of legislative history itself, which often is designed not to explain to future courts the intended meaning of a statute, but rather to persuade legislative colleagues to vote in a particular way").

With little to no guidance from the text in context and legislative history, the Court "resort[s] to general maxims of statutory construction to aid in resolving the remaining uncertainty." *Gaines*, 346 Or. at 172. The maxim of statutory construction pertinent here is that "in the face of competing constructions of an enactment, [courts] generally are required to 'choose the interpretation which will avoid any serious constitutional difficulty.'" *State v. Lanig*, 154 Or. App. 665, 674, 963 P.2d 58, 63 (1998) (citations omitted). Plaintiff's interpretation sets HB 2550 "on a collision course" with the First Amendment because it sweeps in a second

significant category of speech. *Id.* Thus, for the purposes of the preliminary injunction only, the Court assumes HB 2550 does not prohibit the transmission of cover letters.[2]

But, even without prohibiting agent cover letters, the Court finds Plaintiff has direct standing to challenge HB 2550 under the First Amendment. Defendants argue Plaintiff's agents are merely conduits for communications from a buyer to a seller. The evidence presented so far shows otherwise.

Plaintiff provided evidence that real estate agents exercise some amount of editorial discretion in crafting client love letters. Plaintiff's witness, a practicing real estate agent, testified that on one occasion she directed a client to revise a love letter. Ortner Decl. Ex. 7 ("Smith Dep.") 35:9-36:9, ECF 45-2. Defendants' expert witness testified that when she went to purchase her own home, her agent provided a template love letter to use in her offer. Ortner Decl. Ex. 5 ("Bates Dep.") 26:5-12, ECF 46-4. On the limited record before the Court at this stage in the litigation, Plaintiff has shown that agents play more than a passive role in crafting letters, and that at least in some cases love letters contain agent speech. Accordingly, HB 2550 places more

---

[2] While not raised by Plaintiff in its Complaint or motion, the Court notes that the definitional problem with the terms "customary documents in a real estate transaction" suggests HB 2550 may be void for vagueness. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A statute may be void for vagueness when it either "(1) fails to give a 'person of ordinary intelligence a reasonable opportunity to know what is prohibited;' (2) 'impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application;' or (3) 'abut(s) upon sensitive areas of basic First Amendment freedoms, [ ] operat[ing] to inhibit the exercise of (those) freedoms.'" *Hunt v. City of Los Angeles*, 638 F.3d 703, 712 (9th Cir. 2011) (citation omitted). When the law "implicates First Amendment rights . . . a 'more demanding' standard of scrutiny applies." *Id.* (citations omitted). HB 2550 implicates First Amendment rights but fails to clearly define what speech is prohibited. This ambiguity has left experienced real estate agents guessing at what content may or may not be passed along to their clients and presents a potential vagueness problem.

than an incidental burden on their speech. Plaintiff may bring a First Amendment challenge to HB 2550.

### ii.    Third Party Standing

Plaintiff argues in the alternative that it has third party standing to assert a claim on behalf of its clients. Defendants argue Plaintiff cannot satisfy this exception to the ordinary standing rules. Plaintiff responds that the nature of its agents' relationships to their clients allows it to assert these claims.

"Ordinarily, a party must assert [their] own legal rights and cannot rest [their] claim to relief on the legal rights . . . of third parties.'" *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689 (2017) (citation and internal quotation marks omitted). There is an exception to this requirement when the parties have a "close relationship." *See Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (quoting *Powers v. Ohio*, 499 U.S. 400, 411(1991)).

Under this exception, a plaintiff may have third party standing if (1) "the party asserting the right has a close relationship with the person who possesses the right" and (2) "there is a hindrance to the possessor's ability to protect [their] own interests." *Kowalski*, 543 U.S. at 130, 125. As a predicate to these inquiries, the court "must identify the 'right' that the [plaintiff is] purportedly asserting on their clients' behalf." *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 764 (9th Cir. 2018) (citation omitted). Here, Plaintiff asserts the First Amendment rights of its clients to send and receive personalized information about the purchase of a home through a real estate agent.

The Supreme Court has allowed attorneys to invoke the rights of existing clients. *See Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989); *Department of Labor v. Triplett*, 494 U.S. 715 (1990). Though the Court has found the attorney-client relationship

insufficiently close when it involves the representation of a hypothetical client. *See Kowalski*, 543 U.S. at 131.

The real estate agent-client relationship and attorney-client relationship bear some significant similarities. Like attorneys, real estate agents are in fiduciary relationships with their clients and are "bound to protect [their] client's interests." *Starkweather v. Shaffer*, 262 Or. 198, 203, 497 P.2d 358, 360 (1972). They also speak and act on behalf of their clients. Finally, Plaintiff and its clients share a mutual financial interest in getting an offer accepted, and on the seller side, selecting the best offer.

The Supreme Court has also allowed "standing to litigate the rights of third parties when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights." *Kowalski*, 543 U.S. at 130, (quoting *Warth*, 422 U.S. at 510). For example, in *Craig v. Boren* the Court allowed a commercial business (a liquor store) to assert the rights of its clients. 429 U.S. 190, 195 (1976) ("[V]endors and those in like positions have been uniformly permitted to resist the efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function."). Enforcement of HB 2550 indirectly burdens the rights of real estate agents as third parties by restricting how they can advocate on behalf of their clients.

Defendants argue Plaintiff's interest in remaining at the center of the transaction cuts against a finding of a close relationship with its clients. All professionals have some self-interest in ensuring they maintain their business and clients. As fiduciaries, however, real estate agents are required by law to put their clients' interests before their own. This mandate is enough to assume Plaintiff would not act to the detriment of its clients in bringing this lawsuit. Taken together, the Court finds the similarities between real estate agents and attorneys, and the fact

that enforcement of HB 2550 impacts Plaintiff, support finding a "close relationship" for the purposes of third party standing.

On the second factor, Defendants argue Plaintiff has not shown that its clients have any impediment to bringing their own suit to challenge HB 2550. Plaintiff responds that the impediment faced by its clients is time. They argue that their clients face a mootness problem because any given real estate transaction would likely close before a hypothetical lawsuit ends. Defendants agree that the swiftness of residential real estate transactions presents a problem for clients seeking to vindicate their own rights. It argues instead that Plaintiff's clients can rely on the wrongs "capable of repetition, yet evading review" exception to mootness. *See Roe v. Wade*, 410 U.S. 113 (1973) (citations omitted). Whether this exception might apply to clients in a real estate transaction is a separate legal question not before the Court. The Court will not assume it applies for the purposes of this analysis. More importantly, courts relax the impediment requirement in the First Amendment context. *See Broadrick*, 413 U.S. at 612 ("Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."). There is no question that HB 2550 prevents Plaintiff's clients from speaking by prohibiting the conventional use of love letters in residential real estate offers.

HB 2550 affects the rights of Plaintiff's clients and Plaintiff has existing agent-client relationships that this law has impacted. *See* Smith Dep. 63:15-64:5. Plaintiff has shown that its clients will have some challenge protecting their own interests because of the quick nature of most residential real estate transactions. The Court finds Plaintiff has a sufficiently close relationship to warrant third party standing and may bring this claim on behalf of its clients.

### B.    Commercial Speech Analysis

The Court now turns to the merits of Plaintiff's First Amendment claim. On the first prong of the *Winters* analysis, the next threshold issue is whether HB 2550 regulates commercial speech. On its motion for a preliminary injunction, Plaintiff assumes HB 2550 regulates commercial speech but states that it "intends to preserve the argument that love letters are not commercial speech." Pl. Mem. at FN 12. In its Complaint, Plaintiff framed its claim as one based on commercial speech alone. *See* Compl. ¶ 46-57 ("First Amendment protections extend to speech connected to a commercial transaction."). Accordingly, for the purposes of this motion, the Court analyzes HB 2550 as though it regulates commercial speech.[3]

Assuming HB 2550 regulates commercial speech for the purpose of the preliminary injunction, the Court now considers whether it survives the intermediate scrutiny standard set forth in *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980). Intermediate scrutiny applies to restrictions on commercial speech. *CTIA - The Wireless Ass'n v. City of Berkeley, California*, 928 F.3d 832, 842 (9th Cir. 2019). The Ninth Circuit has repeatedly found that in commercial speech cases *Central Hudson's* four-factor test applies. *See Retail Digital Network, LLC v. Prieto*, 861 F.3d 839, 846 (9th Cir. 2017) ("*Sorrell* did not mark a fundamental departure from *Central Hudson*'s four-factor test, and *Central Hudson* continues to

---

[3] The Court defers to Plaintiff's framing of its case, though the Court questions whether HB 2550 regulates commercial speech. The Court notes that if HB 2550 does not regulate commercial speech, it is likely unconstitutional. At oral argument Defendants conceded that this is a content based regulation. As a result, it would be subject to strict scrutiny. Under the First Amendment, strict scrutiny requires the government to show that the regulation is "narrowly tailored to promote a compelling Government interest," and that there are no less restrictive alternatives that would further the government's interest. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000). As explained below, Plaintiff has identified several less restrictive alternatives.

apply."); *but see CTIA - The Wireless Ass'n*, 928 F.3d at 842 (distinguishing compelled

commercial speech).

> In *Central Hudson*, the Supreme Court announced a four-part test for assessing the constitutionality of a restriction on commercial speech: (1) if 'the communication is neither misleading nor related to unlawful activity,' then it merits First Amendment scrutiny as a threshold matter; in order for the restriction to withstand such scrutiny, (2) '[t]he State must assert a substantial interest to be achieved by restrictions on commercial speech;' (3) 'the restriction must directly advance the state interest involved;' and (4) it must not be 'more extensive than is necessary to serve that interest.'"

*Metro Lights, L.L.C. v. City of Los Angeles*, 551 F.3d 898, 903 (9th Cir. 2009) (*quoting Cent.*

*Hudson*, 447 U.S. at 564–66).

### i.    Related to a Misleading or Unlawful Activity

The parties do not dispute that the speech here merits First Amendment protection

because it is neither misleading nor related to an unlawful activity. The Court agrees. The speech

itself does not propose an illegal transaction. It does not, for example, countenance

discrimination. *Cf. Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376,

387–89 (1973) (finding that a regulation that prohibited the use of sex-designated columns in a

newspaper's help wanted section did not warrant First Amendment protection because it

proposed an illegal activity). And, although a seller may later use the information in a love letter

as a basis for discrimination, without more, the act of sharing one's personal characteristics in

not unlawful. *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 821 (9th Cir. 2013) ("*Central*

*Hudson's* legality requirement, [] has traditionally focused on the content of affected speech—

i.e., whether the speech proposes an illegal transaction—instead of whether the speech is

associated with unlawful activity.").

//

//

### ii.       Governmental Interest

The parties also agree that Defendants have asserted a substantial governmental interest. It is well-established that preventing discrimination is a substantial governmental interest. *See W. States Paving Co. v. Washington State Dep't of Transp.*, 407 F.3d 983, 991 (9th Cir. 2005) (recognizing preventing "the effects of either public or private discrimination" as a compelling government interest); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984) (finding that the government has a compelling interest "of the highest order" in "eliminating discrimination and assuring its citizens equal access to publicly available goods and services"). The closer call here is whether HB 2550 "directly advances" the government's interest and whether Defendants' regulation is "not more extensive than is necessary to serve that interest." *Central Hudson*, 447 U.S. at 566.

### iii.      Direct Advancement of Governmental Interest

*Central Hudson's* third prong asks whether the restriction on commercial speech directly advances the state's substantial interests. *Id.* at 564. One "consideration in the direct advancement inquiry is underinclusivity." *Valle Del Sol Inc.*, 709 F.3d at 824 (citation and internal quotation marks omitted). Plaintiff argues HB 2550 is underinclusive because it does not prevent buyers from sending love letters directly to sellers and may not prohibit agent cover letters, which often contain similar information.

Summarizing Supreme Court precedent, the Ninth Circuit has noted that "regulations are unconstitutionally underinclusive when they contain exceptions that bar one source of a given harm while specifically exempting another." *See Metro Lights, L.L.C.*, 551 F.3d at 906. There are two situations where this can occur are: (1) "if the exception 'ensures that the [regulation] will fail to achieve [its] end,'" and (2) where the "exceptions that make distinctions among different

kinds of speech" do not "relate to the interest the government seeks to advance." *Id.* (citations omitted). "[U]nderinclusivity is relevant to *Central Hudson's* direct advancement prong because it may diminish the credibility of the government's rationale for restricting speech in the first place." *Valle Del Sol Inc.*, 709 F.3d at 824 (internal quotations and citation omitted).

But regulations are "not automatically underinclusive simply because they are content-based and fail to regulate all forms of . . . communication." *Id.* A government may consider whether the targeted conduct presents a greater problem than the excepted conduct and the value it derives from each. *See id.* (noting that Arizona could determine which types of "roadside labor solicitations present more acute safety concerns" and "the benefits of different types of roadside communications when determining which communications to restrict").

The record supports that love letters transmitted with an offer through the seller's agent present a more acute problem than buyer to seller direct contact. Real estate agents play a critical role in residential real estate transactions and facilitate the use of love letters. Bates Decl. Ex. 1 at 15–16; Mullane Decl. ¶ 9; Smith Decl. ¶¶ 3–4. Plaintiff's witness, Ms. Smith stated in her declaration that "it is not generally feasible for buyers, especially those relocating to the area, to reach out directly to the seller" and under HB 2550 "there will be no way for a buyer to transmit crucial information to a seller in a timely and reliable fashion." Smith Decl. ¶ 13. Though HB 2550 does not prohibit all methods through which a love letter could be delivered, it prohibits the most conventional conduit for these communications. Thus, assuming HB 2550 has its intended effect, it targets the conduct that presents the most acute concerns.

According to the Court's preliminary analysis, HB 2550 also does not prohibit agent cover letters. At first blush, this presents a significant underinclusivity problem for the law. At oral argument, Defendants conceded that essentially all the same information often found in love

letters could be included in agent cover letters. Critically though, Defendants emphasized that other professional obligations prevent agents from including the types of information that could be easily used by a seller to unlawfully discriminate against a buyer. The Court assumes real estate agents are aware of and comply with their professional obligations. Thus, allowing agent cover letters does not make HB 2550 under inclusive.

Next, Plaintiff argues Defendants have not shown that HB 2550 advances the government's interest—i.e., Defendants do not have enough evidence to show HB 2550 will achieve its intended purpose. Defendants need not produce a peer-reviewed study to show that HB 2550 may reduce unlawful discrimination in housing. *See Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 195 (1997) (finding courts' "sole obligation is 'to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence'" (internal citation omitted)); *see also Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 966 (9th Cir. 2014) (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986) and noting that governments must be given "a reasonable opportunity to experiment with solutions to admittedly serious problems").

Defendants have shown that racial disparities in homeownership persist in Oregon. They have shown that most love letters contain protected characteristics, including a prospective buyer's race or color. They presented evidence that conscious and unconscious bias are ongoing problems in American society and effect decision-making processes. Two expert witnesses, who have studied urban planning and inequality for decades, concluded that love letters likely enable discrimination. Furthermore, both parties submitted evidence that sellers are influenced by love letters in determining which offer to select. Plaintiff did not introduce any evidence that rebuts, or even casts doubt, on these findings.

Plaintiff is correct that Defendants did not produce direct evidence linking the practice of sending love letters to discrimination, but significant circumstantial evidence supports Defendants' stated interest.[4] Accordingly, Oregon legislators drew a reasonable inference that prohibiting the transmission of love letters through seller's agents will reduce unlawful discrimination in homeownership.

### iv.    Narrowly Drawn to Achieve Governmental Interest

Although Defendants have shown HB 2550 advances the state's substantial interests, it cannot survive the last step of the *Central Hudson* test. "The last step of the *Central Hudson* analysis complements the third step, asking whether the speech restriction is not more extensive than necessary to serve the interests that support it." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001) (citation and internal quotation marks omitted). The Supreme Court has clarified that the fourth factor "does not require satisfaction of a 'least-restrictive-means standard,' but rather requires 'a fit between the legislature's ends and the means chosen to accomplish those ends, [ ] a fit that is not necessarily perfect, but reasonable[,] . . . a means narrowly tailored to achieve the desired objective.'" *Retail Digital Network, LLC*, 861 F.3d at 846 (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477, 480 (1989) (citations and internal quotation marks omitted)).

The Court finds that HB 2550 is not adequately tailored and thus violates the First Amendment. HB 2550 prohibits the transmission of all non-customary documents. This prohibition includes love letters and any other speech beyond disclosure forms, sales agreements,

---

[4] Plaintiff also argues that love letters "infrequently" specify a buyer's race. It suggests this is an issue because much of Defendants' evidence is based on the problem of racial discrimination in housing. Plaintiff ignores Defendants' expert analysis which showed that nearly half of the letters disclosed a prospective buyer's race or color through photographs. Steil Decl. Ex. 1 at 13–14.

counter offers, addenda, and reports. Even if HB 2550 targeted love letters alone, Plaintiff has shown that love letters contain significant amounts of speech beyond references to a buyer's personal characteristics. Plaintiff provided many examples of other innocuous information prospective buyers include in love letters. Some examples from the love letters in evidence are as follows: to express a desire to live permanently in the area, to explain unusual provisions of the offer, to discuss a love of gardening and how the home is well suited for growing plants, to admire the architectural style of the home, and to explain why a certain repair is important to the prospective buyer. Pl. Reply at 29–30. Defendants suggest that a buyer's agent can provide this same information in a cover letter. But permitting agent cover letters does not cure the problem. The 27 love letters in evidence show that love letters are highly personal and reflect the voice and character of their authors. This personal character would be lost in an agent authored cover letter.

Plaintiff also shows that there are a number of reasonable alternatives to HB 2550's broad sweep. To survive intermediate scrutiny the subject regulation need not be the last alternative or the least restrictive response, but it does need to be a "means narrowly tailored to achieve the desired objective." *See Fox*, 429 U.S. at 476–78. Here, the alternatives offered by Plaintiff show that Defendants could have addressed the problem of housing discrimination without infringing on protected speech to such a degree.

Plaintiff raises these alternatives: (1) greater enforcement of existing fair housing laws; (2) requirement that agents redact client love letters; (3) prohibition on the inclusion of photos; (4) fair housing disclosure requirement in real estate transactions; (4) increased fair housing training for real estate agents; (5) increase the stock of affordable housing; or (6) do nothing and

allow individual real estate agents to advise their clients to not send love letters. Pl. Reply at 27–32.

Of course, not all the alternatives proposed by Plaintiff are equal. The last two alternatives do not merit serious consideration. HB 2550 has not been linked to affordability, and "do nothing" is not a legitimate alternative when the evidence shows housing discrimination is an enduring societal problem. Greater enforcement is also not particularly persuasive. The record shows that discrimination in housing has persisted despite the passage of local, state, and federal prohibitions. As Defendants' experts explained, discrimination in private housing transactions is pernicious because it derives from multiple sources, including explicit and implicit biases. From this standpoint, greater enforcement is not an alternative—it is the status quo or the tool the government has already tried and has shown limited success.

The remaining suggested alternatives, however, show that Defendants could achieve their objective in a manner that places less of a burden on otherwise lawful speech. Requiring real estate agents to redact love letters is a more precise tool to address the government's interest. Defendants contend that the Oregon legislature considered and rejected that approach. They offer no evidence though that explains why the legislature changed course, and the Senate hearing testimony suggests legislators rejected this approach because they were concerned about censorship and liability for real estate agents. As Plaintiff points out, based on Defendants' expert report, prohibiting photographs would target the disclosure of race and color. And the other alternatives— more training and a fair housing disclosure— may decrease discrimination without placing any burden on speech.

Under the *Central Hudson* test, the government must show there is "a reasonable fit between the legislature's ends and the means chosen to accomplish those ends." *Am. Acad. of*

*Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1111 (9th Cir. 2004) (citation omitted). "The fit need not be perfect nor the single best to achieve those ends, but one whose scope is narrowly tailored to achieve the legislative objective." *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1111 (9th Cir. 2004) (citation omitted). As its means, the government chose an approach that has the effect of significantly limiting truthful, nonmisleading speech. In light of the reasonable less restrictive alternatives offered by Plaintiff, Defendants have not shown that HB 2550 is "narrowly tailored to achieve the legislative objective." *Id.* HB 2550 is thus overinclusive and restricts more speech than necessary to serve Defendants' interest of reducing discrimination in housing. Because HB 2550 is overinclusive, the Court finds that Plaintiff is likely to succeed on the merits of its First Amendment claim.

## II.    Irreparable Harm

Plaintiff must also "demonstrate that irreparable injury is likely in the absence of an injunction." *Winters*, 555 U.S. at 22. "Typically, monetary harm does not constitute irreparable harm." *Calif. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 851 (9th Cir. 2009), *vacated and remanded sub nom. Douglas v. Indep. Living Ctr. of S. Calif., Inc.*, 565 U.S. 606 (2012). The deprivation of a constitutional right, however, may constitute irreparable injury. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (affirming the district court's finding that, without an injunction, the plaintiffs faced irreparable harm where it was likely they would be unlawfully detained in violation of the Fourth Amendment). This is especially so in the First Amendment context. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Plaintiff will suffer irreparable harm without an injunction because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* HB 2550 went into effect on January 1, 2022, and there is evidence that Plaintiff's

agents have advised clients not to send love letters in anticipation of the law. Accordingly, Plaintiff (and their clients) will suffer irreparable harm without an injunction.

## III.    Balance of Equities

Plaintiff has the burden to show that the balance of equities tips in its favor. *Winter,* 555 U.S. at 20. Plaintiff has shown a significant First Amendment interest on behalf of itself and its clients. Defendants raise countervailing interests: a delay in remediating discrimination in housing and the likelihood of confusion within the real estate industry. While these are serious concerns, the balance of hardship favors Plaintiff given the strong protection typically afforded First Amendment rights. This is especially so where the subject regulation sweeps in significant amounts of speech and there are reasonable alternatives to this level of restriction.

## IV.    Public Interest

"The public interest inquiry primarily addresses impact on non-parties rather than parties." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (internal quotation marks omitted). The Ninth Circuit has found that "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres*, 695 F.3d at 1002 (internal citations and quotations omitted); *see also Cuviello v. City of Vallejo*, 944 F.3d 816, 834 (9th Cir. 2019) ("We have consistently recognized the significant public interest in upholding free speech principles." (internal quotations and brackets omitted)).

Continuing enforcement of HB 2550 likely violates the rights of Plaintiff and its clients, but also the rights of prospective buyers of residential real estate throughout Oregon. It is not in the public interest to enforce a law that is likely unconstitutional, even one aimed at the laudable goal of reducing unlawful discrimination in housing.

**CONCLUSION**

The Court GRANTS Plaintiff's Motion for a Preliminary Injunction [3]. Defendants are

preliminarily ENJOINED from enforcing ORS § 696.805(7). This Preliminary Injunction shall

remain in effect until the entry of a final judgment in this case.

IT IS SO ORDERED.


DATED: March 3, 2022 .


MARCO A. HERNÁNDEZ
United States District Judge